1  RYAN M. LAPINE, ESQ. (Cal. Bar No. 239316)
   *rlapine@rmslaw.com*
2  JOSHUA H. HERR, ESQ. (Cal. Bar No. 301775)
   *jherr@rmslaw.com*
3  ROSENFELD, MEYER & SUSMAN LLP
   232 North Canon Drive
4  Beverly Hills, California 90210-5302
   Telephone:  (310) 858-7700
5  Facsimile:  (310) 860-2430

6  Attorneys for Plaintiffs
   NANO FOUNDATION, LTD. and
7  COLIN LeMAHIEU

8             UNITED STATES DISTRICT COURT

9             CENTRAL DISTRICT OF CALIFORNIA

10

11 NANO FOUNDATION, LTD., a New     )  Case No.
   York non-profit corporation; and )
12 COLIN LeMAHIEU, an individual,    )  **COMPLAINT FOR:**
                                     )
13          Plaintiffs,              )  **(1)  DEFAMATION;**
                                     )
14      vs.                          )  **(2)  TRADE LIBEL;**
                                     )
15 DAVID C. SILVER, an individual.   )  **(3)  INTENTIONAL**
                                     )       **INTERFERENCE WITH**
16          Defendants.             )       **PROSPECTIVE ECONOMIC**
                                     )       **ADVANTAGE**
17 _____ )
                                     )  **DEMAND FOR JURY TRIAL**
18

19

20

21

22

23

24

25

26

27

28

1  Plaintiffs Nano Foundation, Ltd. and Colin LeMahieu complain and allege as
2  follows:

3  1.  This lawsuit results from statements Defendant David C. Silver made
4  during a panel speech at any industry convention, the Blockchain Law Summit, in
5  Los Angeles, California on May 24, 2018, statements now published for public
6  access on YouTube.

7  2.  Opening his remarks by raving that "there is a ton of fraud in the space
8  right now", Mr. Silver made inflammatory, false statements about Plaintiff Nano
9  Foundation, Ltd. ("Nano Foundation") and its chief executive officer, Plaintiff Colin
10  LeMahieu, to an audience of their industry peers.  Among those statements, Mr.
11  Silver falsely stated that Mr. LeMahieu committed crimes and he made a series of
12  false statements regarding Mr. LeMahieu's marital divorce.  Mr. Silver's false
13  statements have gravely damaged Nano Foundation and Mr. LeMahieu, have caused
14  Mr. LeMahieu shame and embarrassment, and have harmed Nano Foundation 's
15  reputation and Mr. LeMahieu's reputation within their industry and among their
16  peers.

17  **THE PARTIES**

18  3.  Nano Foundation is a non-profit corporation, organized under the laws
19  of and in good standing with the State of New York.  Its principal place of business
20  is located in Brooklyn, New York.  It is, thus, a citizen of New York.  Its subsidiary,
21  NanoLabs, Inc., a non-profit corporation organized under the laws of and in good
22  standing with the State of Delaware, has its principal place of business in Delaware.
23  It is, thus, a citizen of Delaware.

24  4.  Mr. LeMahieu is Nano Foundations' founder and chief executive.  He is
25  a permanent resident and citizen of Texas.

26  5.  Mr. LeMahieu is a private citizen and not in any way a public figure.

27  6.  Mr. Silver is an individual who, on information and belief, resides in or
28  around Broward County, Florida and is a citizen of Florida.

## JURISDICTION

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332.  The matter in controversy exceeds $75,000, exclusive of costs.  Nano Foundation is a resident of New York, its subsidiary is a resident of Delaware, Mr. LeMahieu is a resident of Texas, and Mr. Silver, on information and belief, is a resident of Florida.

8.      This Court has personal jurisdiction over Mr. Silver.  He travelled to this forum and made the defamatory statements at issue in this matter in Los Angeles, California.

## VENUE

9.      Venue in the United States District Court for the Central District of California is proper pursuant to 28 USC § 1391(b)(2).  The events giving rise to the claim – Mr. Silver's false and defamatory statements – took place in Los Angeles, California.

10.     This is the most convenient forum in which to adjudicate this matter.  The statements at issue were witnessed by a room full of people in Los Angeles, California.  While undoubtedly some of those witnesses may have travelled to attend this industry conference, on information and belief, the largest constellation of witnesses, including the event producers, reside in or near this district.

## BLOCKCHAIN, CYRPTOCURRENCY, NANO, AND THE BLOCKCHAIN LAW SUMMIT

### Cryptocurrency and Blockchain Fundamentals

11.     To quote the MIT Technology Review, a blockchain is a "mathematical structure for storing data in a way that is nearly impossible to fake."

12.     Cryptocurrency, meanwhile, is a medium of exchange, just as the United States Dollar or the Mexican Peso are mediums of exchange.  Only unlike traditional forms of currency, it is created and stored electronically in a blockchain.  It is a substitute for traditional cash devices.  When used with cryptocurrency, a

1  blockchain, to again quote the MIT Technology Review, "makes it virtually

2  impossible for someone to spend the same [cryptocurrency] twice, solving a

3  problem that had hindered previous attempts to create digital cash."  In layman's

4  terms, blockchains are the math that power cryptocurrency and allow it to exist.

5      13.    Though blockchains have many *potential* applications, such as allowing

6  for voting in elections via smartphones or computers, maintaining records of title for

7  land, and creating records of disease diagnosis to control epidemics, at present they

8  are most closely tied to and are used overwhelmingly in the cryptocurrency industry.

9

10  <u>The Blockchain Summit Gathered The Major Players in the Cryptocurrency Space</u>

11  <u>in Los Angeles</u>

12      14.    The Blockchain Law Summit 2018 (the "Blockchain Summit") took

13  place on May 24, 2018 in Los Angeles, California.  Its stated intent was "connecting

14  leading blockchain legal experts with the most promising blockchain startups and

15  investors."  Given that at present blockchains are overwhelmingly utilized in the

16  cryptocurrency industry, the Blockchain Summit gathered cryptocurrency startups,

17  investors, collectors, scholars, and journalists for a day of presentations and

18  networking.

19

20      <u>Cryptocurrency, ICOs, and How It Operates</u>

21      15.    Cryptocurrency differs from internet coin offerings, commonly known

22  by the acronym ICOs.

23      16.    An ICO is a token given out as security in exchange for capital.  It is

24  cash backed.  In industry parlance, an ICO is "not a real coin".

25      17.    ICO issuers profit if the market rate for their tokens exceed their initial

26  capital backing.

27      18.    Cryptocurrency, on the other hand, is released as computer code and

28  mined by users from an internet site or application, called a faucet, that distributes it.

LAW OFFICES
ROSENFELD,
MEYER &
SUSMAN LLP

519982.01                                           4                          COMPLAINT

19.    Cryptocurrency creators do not release their coins for profit, nor can they profit from releasing them into commerce.  They are not distributed in exchange for money.

20.    A particular cryptocurrency obtains value if and only if users view it as a reliable and trustworthy tool to facilitate electronic exchanges of goods and services.

21.    As demand for particular units of cryptocurrency increases, it gains value.  That value eventually fluctuates as a product of the particular level of demand verse the cryptocurrecy's finite supply in the market.  In this way, cryptocurrency, though not released for a profit and not cash backed, becomes an electronic commodity with a known value that can be and is used in place of cash.

22.    As a very basic economic principal, anything that positively or negatively impacts a particular cryptocurrency's reputation for trustworthiness or reliability affects its market value greatly by altering demand.

23.    Cryptocurrency is traded on exchanges.  An exchange is a business that allows customers to purchase and sell cryptocurrency for other assets, including conventional money.

24.    Certain business, like a hotel or a pizzeria or a video game store, for example, may accept a particular cryptocurrency instead of conventional money for the goods or services they offer.  Those types of transactions occur outside of exchanges and mimic cash transactions.

<u>Nano Foundation, Nano, and Colin LeMahieu</u>

25.    Mr. LeMahieu created a next-generation cryptocurrency called RaiBlocks.  It allows for nearly instantaneous transactions and carries with it no fees. It utilizes block-lattice technology to decentralize processing without sacrificing security.  (In layman's terms, at present, it is the Cadillac of cryptocurrency.)  On January 31, 2018, the periodical Medium declared that it "is objectively the best

1 pure cryptocurrency".  It wrote "[o]f the pure cryptocurrencies (coins like Bitcoin,

2 Bitcoin Cash and Litecoin that operate solely as currencies) it has no equal."

3      26.    Mr. LeMahieu did not profit from the creation of RaiBlocks.

4 RaiBlocks are cryptocurrency, not ICOs.  He did retain a small amount of RaiBlocks

5 on their creation, which he used to create a developer fund.  To the extent that

6 RaiBlocks gained value due to market demand, that fund was to be and is used to

7 service RaiBlocks, to keep them operational, and to improve their protocol.

8      27.    Those retained RaiBlocks are periodically transferred to NanoLabs,

9 Inc., a not for profit corporation.  They, by their very nature, do not generate profits.

10 NanoLabs, Inc. exists to service the cryptocurrency and to incubate further

11 development and innovation in the space.

12      28.    In January of 2018, the name RaiBlocks was changed to Nano.  Within

13 the blockchain and crytocurrency industries and communities, Nano is known to

14 refer to both the crytocurrency, itself, and to Nano Foundation and its subsidiary.

15 For purposes of simplicity, Nano is used in this complaint to refer to the

16 cryptocurrency currently known as Nano, formerly known as RaiBlocks.

17

18 <u>Nano is Traded on Cryptopia and Then on BitGrail Where a Hack Occurred</u>

19      29.    For a while, Nano was traded on an exchange based in New Zealand

20 called Cryptopia.   The periodical Medium describes Cryptopia as follows:

21 "Cryptopia is a decent, middle-of-the-road exchange that coins often build up steam

22 on before heading off to bigger and better exchanges."

23      30.    Though released as a cryptocurrency and not an ICO, due to its

24 reliability and characteristics, enough demand existed for Nano that consumers

25 exchanged it, with an assigned market-demand driven monetary value on Cryptopia.

26      31.    Cryptopia is in no way related to Nano.  It is an independent exchange.

27      32.    Certain individuals who came to possess Nano coins, unrelated to Nano

28 Foundation or Mr. LeMahieu, issued death threats to the Cryptopia management

1 | team when certain transactions were not processed due to being below the
2 | exchange's minimum deposit threshold.  (Individuals can own a fraction of a
3 | particular cryptocurrency coin, just like you can own a fraction of a United States
4 | dollar in the form of a nickel or a dime.  The Cryptopia exchange did not accept
5 | fractional transactions of less than 0.0005 Nanos.)

6 |      33.    In response to these death threats made by third-party owners of Nano
7 | coins, Cryptopia removed Nano from its exchange.

8 |      34.    In Italy, an individual named Francesco Firano opened a new
9 | cryptocurrency exchange called BitGrail.  Mr. Firano had and has no relationship to
10 | Nano Foundation or to Mr. LeMahieu.

11 |      35.    Mr. Firano vetted Nano, evidently agreed with the periodical Medium
12 | that Nano "is objectively the best pure cryptocurrency", and enabled it to be
13 | exchanged on BitGrail.

14 |      36.    A third-party hacker or group of hackers unrelated in any way to Nano
15 | Foundation, to Mr. LeMahieu, or to, on information and belief, Mr. Firano and
16 | BitGrail, hacked BitGrail and stole $150,000,000 in Nano coins.

17 |      37.    Unsure of how to handle this development, BitGrail and Mr. Firano
18 | were not initially transparent.  They froze user accounts and requested verifications
19 | for transactions, among other actions, before announcing the hack.

20 |      38.    Upon learning of the hack, Nano Foundation immediately reported it to
21 | the Federal Bureau of Investigation.  It and Mr. LeMahieu, though they had nothing
22 | to do with the hack, did not profit from it, and were not in any way the cause of it,
23 | have taken all steps within their power to assist law enforcement in attempting to
24 | remedy the hack.

25 |      39.    Nano is now traded and continues to be traded on dozens of exchanges.
26 | Additional new exchanges, included ones dedicated solely to Nano, have begun to
27 | appear given the coin's sterling reputation.

28 |

LAW OFFICES
ROSENFELD,
MEYER &
SUSMAN LLP

519982.01

7

COMPLAINT

## DEFENDANT DAVID C. SILVER MAKES A SERIES OF DAMAGING FALSE STATEMENTS ABOUT NANO FOUNDATION AND MR. LEMAHIEU IN A PANEL SPEECH AT THE BLOCKCHAIN SUMMIT TO THEIR INDUSTRY PEERS

40.     Defendant David C. Silver presented at the Blockchain Summit at 5:25 p.m.  He gave a twenty minute speech, followed by a five minute question and answer session.  He was the only presenter at the Blockchain Summit during this time.  His presentation was entitled "Cryptocurrency, Blockchain and US Litigation - Yesterday, Today and Tomorrow".

41.     In attendance for this presentation were Nano Foundation's and Mr. LeMahieu's industry peers, investors in cryptocurrency, and press who report on the industry.

### The Defamatory Statements at Issue

### DEFAMATORY STATEMENT #1

42.     During his presentation, Mr. Silver stated "Nano is not really a real coin, they claim to be a real coin but what they couldn't get, uh, any recognition in the United States Coinbase, Kraken, Poloniex, Bitfinex, Gemini, no one was willing to put them on their exchange.  Why?  Cause [sic] they were an alternative coin and they weren't really a real coin."

43.     Mr. Silver's statement was false.

44.     Nano is a pure cryptocurrency, not an ICO or some other form of alternative coin.  Several entities put Nano on their exchanges, including but not limited to Cryptopia, BitGrail, and KuCoin.  Other exchanges were created solely for the purpose of listing and trading Nano.  Binance, the largest cryptocurrency exchange, lists Nano.  The European company CoinGate integrated Nano into their online cryptocurrency payment system allowing Nano to be used to purchase goods on websites that use CoinGate as a payment provider.  WireX, a European cryptocurrency debit card issuer, accepts Nano to fund their debit cards.

LAW OFFICES
ROSENFELD,
MEYER &
SUSMAN LLP

519982.01

8

COMPLAINT

**DEFAMATORY STATEMENT #2**

45.     Mr. Silver then launched into a litany of further false statements, included among them the false statement that Plaintiffs committed a crime.  Mr. Silver said of the Plaintiffs: "They tell their customers 'if you really believe in Nano….. go to this small exchange in Italy that we don't know anybody and we have nothing to do but we completely vouch for him and he's running a legitimate exchange', we're gonna [sic] give him the Nano, he's gonna [sic] give us money every time he sells a Nano, he's gonna [sic] take half and we're gonna take half, we're gonna [sic] get rich and then one day there's gonna [sic] be an exit scam and then you're gonna [sic] be out $150 million."

46.     None of these statements were true.

47.     Neither Nano, nor any of its executives or team members ever stated to owners of Nano coins or to consumers or to anyone "if you really believe in Nano….. go to this small exchange in Italy that we don't know anybody and we have nothing to do but we completely vouch for him and he's running a legitimate exchange".  They never made these exact statements, nor did they ever make statements to this general effect.

48.     Neither Nano nor any of its executives received any money as a result of consumers trading Nano they owned on the BitGrail exchange or elsewhere.  Nano is a cryptocurrency, not an ICO.

49.     Further, neither Nano Foundation nor Mr. LeMahieu gave Mr. Firano or BitGrail any Nano coins.  Third-party owners of the coins traded them on this exchange.

50.     Neither Nano Foundation nor its executives "got rich" – or obtained any money at all – by virtue of private third-party consumers buying and selling their own Nano on BitGrail.

LAW OFFICES
ROSENFELD,
MEYER &
SUSMAN LLP

519982.01

9

COMPLAINT

51.   Nano did not participate in any criminal activity, much less an "exit scam" as Mr. Silver alleges.  As the audience at the Blockchain Summit would be well aware, in cryptocurrency development, an "exit scam" occurs when the owners of a purported cryptocurrency company intentionally create a coin using faulty technology.  They artificially cause a price increase by making false promises or representations.  They then sell all or substantially all of their holdings for top dollar.  They then leave the cryptocurrency unsupported and disappear when it fails due to inadequate technology.  None of that occurred with Nano Foundation and its developers.  The development fund contains over 50% of its initial amount and continues to fund development operations.  The remaining funds have been used to pay employees for service and development of the cryptocurrency.  The Nano is not defective.  Its founders and developers have not left the market or otherwise disappeared from contact.  Instead, the development team has doubled in size in the past year.

52.   Mr. Silver's statements to a convention full of their industry peers and colleagues that the Nano Foundation and its developers profited from or were capitalized by the third-party hack of BitGrail, that they engaged in a criminal "exit scam", and that they caused that hack by engaging in a criminal "exit scam", were all false, were highly inflammatory, and have greatly damaged their reputations, have caused Mr. LeMahieu emotional distress, and have caused Mr. LeMahieu considerable shame.

### DEFAMATORY STATEMENT #3

53.   Mr. Silver went on to say "When [the Nano developers] were asked to fix the problem and fork it [sic], their response was 'it's against our ethos.' … I don't care where [sic] your ethos is, you live in the United states of America, there are laws here, those laws will be followed.  We are now in Federal Court.  When they tell the judge 'well, we don't wanna [sic] give back the money' a Federal Court

1 | judge is gonna say 'well if you wanna [sic] stay here and you don't wanna [sic] go to
2 | jail, you're gonna [sic] give back the money'."

3 |     54.    Mr. Silver's statements were not truthful.

4 |     55.    The Nano developers and executives, Mr. LeMahieu among them,
5 | never stated or implied that it was against their ethos to address and/or fix to the
6 | extent they can the third-party BitGrail hack.  Instead, when they learned of it, they
7 | immediately reported it to the Federal Bureau of Investigation.  They have assisted
8 | law enforcement in its efforts to investigate this third-party criminal act.

9 |     56.    The Nano developers and executives, Mr. LeMahieu among them,
10 | cannot and did not say "we do not wanna [sic] give the money back" to a Federal
11 | Judge or to anyone else, as contrary to Mr. Silver's false statements, they did not
12 | receive any funds from the sale of Nano on BitGrail, they certainly did not obtain
13 | any of the Nano stolen from BitGrail, and they certainly did not profit from a third-
14 | party stealing Nano from BitGrail.

15 |     57.    Mr. Silver's statement that Mr. LeMahieu and the other Nano
16 | developers face the prospect of a jail sentence in a current Federal action is both
17 | categorically false and highly inflammatory.  Mr. LeMahieu and the other Nano
18 | developers are not even the target of a criminal inquiry, much less in Federal court
19 | on criminal charges.  They are parties to a civil action that seeks monetary damages
20 | against them for the third-party hack of BitGrail.  Mr. Silver's false statement to a
21 | convention full of their industry peers and colleagues that they face the prospect of
22 | incarceration in Federal court related to the BitGrail hack – that they committed a
23 | crime – has greatly damaged their reputations, has affected their professional
24 | prospects, has caused them emotional distress, and has caused them considerable
25 | shame.

26
27
28

LAW OFFICES
ROSENFELD,
MEYER &
SUSMAN LLP

519982.01

COMPLAINT

**DEFAMATORY STATEMENT #4**

58.   Mr. Silver continued "Uhhhhh Nano, the CEO and the head guy at Nano who holds 90% of the Nano at like $15 it was worth $1.4 billion, I think it's down to like $4, so I think it's only worth like $400,000,000 now.  Uhhh, he got divorced from his wife last year.  He decided that he was ready.  He deserved better because he was now rich.  She took all the money.  And then, the financial affidavit, she, they, argued about how much the Nano was worth and what the Nano was.  But I will tell you this: he said it had value and he said that he believed it was going up and he believed it was a security cause [sic] he put it on his security side of the affidavit."

59.   Mr. Silver's statements were not truthful.

60.   Mr. LeMahieu does not own 90% of the Nano coins in circulation.  He owns less than 2% of the Nano in circulation.

61.   Mr. LeMahieu did not divorce his wife because he was rich.  In fact, at the time of their divorce, Nano lacked any value at all and was not traded on any exchange.

62.   The Nano was not discussed in any financial affidavit in their divorce.  Mr. Silver's claims to the contrary are false.

63.   It was not listed anywhere in any affidavits, much less on the "security side" of the affidavit.

64.   Mr. LeMahieu did not say that the Nano had value in his divorce filings.  At the time, it did not.

65.   Mr. LeMahieu did not say that he believed the Nano was going up in his divorce filings.  At the time of his divorce, he did not believe that, nor did he have any reason to believe that.  It was not even on an exchange, yet.

66.   Mr. LeMahieu did not say that it was a security.  It is a cryptocurrency, not an ICO.

LAW OFFICES
ROSENFELD,
MEYER &
SUSMAN LLP

519982.01

12

COMPLAINT

1    67.    Mr. Silver's false statements regarding Mr. LeMahieu's divorce to a
2  convention full of his industry peers and colleagues have caused him considerable
3  emotional distress, have greatly damaged his reputation, and have caused him
4  considerable shame.

5

6                                  **FIRST CLAIM**
7            **Defamation Per Se – By Plaintiff Conor LeMahieu**
8                          **(Against Defendants)**
9    68.    Plaintiffs re-allege and incorporate paragraphs 1-67 of the Complaint as
10  if fully stated herein.
11    69.    Mr. LeMahieu is a private citizen.  He is the chief developer and chief
12  executive of Nano Foundation, a widely known fact to people within his industry.
13  The Blockchain Convention was attended by Mr. LeMahieu's industry peers and
14  colleagues.
15    70.    Mr. Silver in a presentation at that convention stated of Mr. LeMahieu
16  and his colleague at the Nano Foundation: "They tell their customers 'if you really
17  believe in Nano….. go to this small exchange in Italy that we don't know anybody
18  and we have nothing to do but we completely vouch for him and he's running a
19  legitimate exchange', we're gonna [sic] give him the Nano, he's gonna [sic] give us
20  money every time he sells a Nano, he's gonna [sic] take half and we're gonna take
21  half, we're gonna [sic] get rich and then one day there's gonna [sic] be an exit scam
22  and then you're gonna [sic] be out $150 million."
23    71.    The audience would reasonably understand this to mean that Mr.
24  LeMahieu had committed a crime, fraudulently profiting from and causing a
25  $150,000,000 hack.  Further, they would understand that he had committed a second
26  crime, an exit scam detailed more fully herein in Paragraph 52.
27    72.    Mr. Silver further stated: "When [the Nano developers] were asked to
28  fix the problem and fork it [sic], their response was 'it's against our ethos.' … I don't

1  care where [sic] your ethos is, you live in the United states of America, there are
2  laws here, those laws will be followed.  We are now in Federal Court.  When they
3  tell the judge 'well, we don't wanna [sic] give back the money' a Federal Court
4  judge is gonna say 'well if you wanna [sic] stay here and you don't wanna [sic] go to
5  jail, you're gonna [sic] give back the money'."

6      73.   Mr. Silver's statement that Mr. LeMahieu and the other Nano
7  developers received anything of value from the BitGrail hack and face the prospect
8  of a jail sentence in a current Federal action as a result of that hack is both
9  categorically false and highly inflammatory. Mr. LeMahieu and the other Nano
10  developers are not even the target of a criminal inquiry, much less in Federal court
11  on criminal charges.  They are parties to a civil action that seeks monetary damages
12  against them for the third-party hack of BitGrail.  Mr. Silver's false statement to a
13  convention full of their industry peers and colleagues that they face the prospect of
14  incarceration in Federal court related to the BitGrail hack would cause his audience
15  to believe that Mr. LeMahieu had committed a crime and was in Court on a Federal
16  criminal indictment.

17      74.   None of Mr. Silver's statements were true.

18      75.   Mr. Silver failed to use any care, much less reasonable care to
19  determine the truth or falsity of the statements he made.  Mr. Silver's statements lack
20  a basis in fact and have no evidentiary support.

21      76.   Mr. Silver's false statements have caused Mr. LeMahieu significant
22  emotional distress, have greatly damaged his reputation, and have caused him
23  considerable shame, damaging him in an amount to be proven at trial, but that in any
24  event exceeds the $75,000 jurisdictional limits.

25      77.   As these statements were made to a convention full of Mr. LeMahieu's
26  industry peers and colleagues, he has suffered considerable harm to his professional
27  reputation, damaging him in an amount to be proven at trial, but that in any event
28  exceeds jurisdictional limits.

1    78.    Mr. Silver's statements were malicious and vindictive such that punitive

2  damages should be issued against him.

3

4                                **SECOND CLAIM**

5              **Defamation Per Quod – By Plaintiff Conor LeMahieu**

6                              **(Against Defandants)**

7    79.    Plaintiffs re-allege and incorporate paragraphs 1-78 of the Complaint as

8  if fully stated herein.

9    80.    Mr. LeMahieu is a private citizen.  He is the chief developer and chief

10  executive of Nano Foundation, a widely known fact to people within his industry.

11  The Blockchain Convention was attended by Mr. LeMahieu's industry peers and

12  colleagues.

13    81.    Mr. Silver made the following statements about Mr. LeMahieu in a

14  panel speech at the Blockchain Convention:

15          A.    "They tell their customers 'if you really believe in Nano..... go to

16  this small exchange in Italy that we don't know anybody and we have nothing to do

17  but we completely vouch for him and he's running a legitimate exchange', we're

18  gonna [sic] give him the Nano, he's gonna [sic] give us money every time he sells a

19  Nano, he's gonna [sic] take half and we're gonna take half, we're gonna [sic] get

20  rich and then one day there's gonna [sic] be an exit scam and then you're gonna [sic]

21  be out $150 million."

22          B.    "When [the Nano developers] were asked to fix the problem and

23  fork it [sic], their response was 'it's against our ethos.' ... I don't care where [sic]

24  your ethos is, you live in the United states of America, there are laws here, those

25  laws will be followed.  We are now in Federal Court.  When they tell the judge 'well,

26  we don't wanna [sic] give back the money' a Federal Court judge is gonna say 'well

27  if you wanna [sic] stay here and you don't wanna [sic] go to jail, you're gonna [sic]

28  give back the money'."

1           C.    "Uhhhhh Nano, the CEO and the head guy at Nano who holds

2   90% of the Nano at like $15 it was worth $1.4 billion, I think it's down to like $4, so

3   I think it's only worth like $400,000,000 now.  Uhhh, he got divorced from his wife

4   last year.  He decided that he was ready.  He deserved better because he was now

5   rich.  She took all the money.  And then, the financial affidavit, she, they, argued

6   about how much the Nano was worth and what the Nano was.  But I will tell you

7   this: he said it had value and he said that he believed it was going up and he believed

8   it was a security cause [sic] he put it on his security side of the affidavit."

9         82.    As detailed herein in Paragraphs 48 – 52, 55 – 57, and 76 – 78, none of

10  Mr. Silver's statements were true.

11        83.    Mr. Silver failed to use any care, much less reasonable care to

12  determine the truth or falsity of the statements he made.  Mr. Silver's statements lack

13  evidentiary support.

14        84.    These statements, made to an audience of his professional colleagues

15  and peers, harmed Mr. LeMahieu.  They caused him significant emotional distress,

16  have greatly damaged his reputation, and have caused him considerable shame.  His

17  professional reputation has taken an irreparable hit as a result of these statements.

18  He has been damaged in an amount to be proven at trial, but that in any event

19  exceeds the $75,000 jurisdictional limits.

20        85.    Mr. Silver's entirely fabricated statements regarding Mr. LeMahieu's

21  divorce made to an audience of his professional colleagues and peers caused him

22  considerable pain and embarrassment.   They were an unseemly, gratuitous, and

23  particularly personal attack.

24        86.    Mr. Silver's statements were malicious and vindictive such that punitive

25  damages should be issued against him.

26

27

28

LAW OFFICES
ROSENFELD,
MEYER &
SUSMAN LLP

519982.01

16

COMPLAINT

## THIRD CLAIM

### Trade Libel – By Plaintiff Nano Foundation

### (Against Defendants)

87.     Plaintiffs re-allege and incorporate paragraphs 1-86 of the Complaint as if fully stated herein.

88.     Mr. Silver made numerous statements to an audience of Nano Foundation's peers that would be necessarily understood to disparage:

A.     The quality of the product it develops and services, the Nano; and

B.     The quality, honesty, and trustworthiness of the team that develops and services the Nano.

89.     Saliently, he stated:

A.     "Nano is not really a real coin, they claim to be a real coin but what they couldn't get, uh, any recognition in the United States Coinbase, Kraken, Poloniex, Bitfinex, Gemini, no one was willing to put them on their exchange.  Why? Cause [sic] they were an alternative coin and they weren't really a real coin."

B.     "They tell their customers 'if you really believe in Nano….. go to this small exchange in Italy that we don't know anybody and we have nothing to do but we completely vouch for him and he's running a legitimate exchange', we're gonna [sic] give him the Nano, he's gonna [sic] give us money every time he sells a Nano, he's gonna [sic] take half and we're gonna take half, we're gonna [sic] get rich and then one day there's gonna [sic] be an exit scam and then you're gonna [sic] be out $150 million."

C.     "When [the Nano developers] were asked to fix the problem and fork it [sic], their response was 'it's against our ethos.' … I don't care where [sic] your ethos is, you live in the United states of America, there are laws here, those laws will be followed.  We are now in Federal Court.  When they tell the judge 'well, we don't wanna [sic] give back the money' a Federal Court judge is gonna say 'well

1  if you wanna [sic] stay here and you don't wanna [sic] go to jail, you're gonna [sic]
2  give back the money'."
3       90.    As detailed fully herein in Paragraphs 45, 48 – 52, and 55 – 57, Mr.
4  Silver's statements were not true.
5       91.    Mr. Silver acted with reckless disregard of the truth and falsity of his
6  statements as evidenced by the fact that they lack evidentiary support.
7       92.    Mr. Silver knew or should have known that an audience of the Nano
8  Foundation's industry peers would rely on his statements, which had the indicia of
9  reliability as he was an official panelist at a leading industry conference.
10      93.    Nano Foundation suffered direct harm as a result of Mr. Silver's false
11 statements.  It has been falsely cast as a criminal enterprise.  Its signature product
12 has been mischaracterized as "an alternative coin".  It was falsely alleged to have
13 refused to assist in the investigation of third-party criminal acts, that somehow
14 aiding and abetting criminal behavior was part of its ethos.
15      94.    The damage has been done by Mr. Silver's false statements and it
16 exceeds the $75,000 jurisdictional limits of this court.  They were malicious,
17 intentional, and vindictive such that punitive damages should issue against him.
18
19                         **FOURTH CLAIM**
20  **Intentional Interference with Prospective Economic Advantage – By Plaintiff**
21                          **Conor LeMahieu**
22                       **(Against Defendants)**
23      95.    Plaintiffs re-allege and incorporate paragraphs 1-94 of the Complaint as
24 if fully stated herein.
25      96.    Mr. LeMahieu worked and has for some time worked in the
26 cryptocurrency industry.
27      97.    Mr. Silver was aware of this relationship, a fact he confirmed in his
28 statements at issue.

LAW OFFICES
ROSENFELD,
MEYER &
SUSMAN LLP

98.    As detailed herein in detail in Paragraphs 48 – 52, 55 – 57, and 76 – 78, Mr. Silver made false, defamatory, and highly inflammatory remarks regarding Mr. LeMahieu as part of a panel speech to an audience of Mr. LeMahieu's peers at the Blockchain Convention.

99.    In so doing, Mr. Silver intended to disrupt Mr. LeMahieu's business relationship with his industry peers and knew or reasonably should have known that this outcome would result.

100.    Lest there be any doubt of Mr. Silver's intent to harm Mr. LeMahieu personally, he made Mr. LeMahieu's marital divorce a topic of his presentation at an industry conference and made a series of false statements regarding the filings in that divorce.

101.    Mr. LeMahieu was harmed by Mr. Silver's defamatory statements, which directly caused and were intended to cause that harm.  He has lost professional credibility and his good name has been destroyed in his industry by Mr. Silver's intentional acts.

102.    Mr. Silver's actions were malicious, intentional, and vindictive such that punitive damages should issue against him.  He has been damaged in an amount to be proven at trial, but that in any event exceeds the $75,000 jurisdictional limits.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

1.    For all actual, compensatory, and consequential damages for an amount to be proven at trial, but which in any event exceeds $100,000.

2.    For punitive and exemplary damages.

///
///

1       3.     For the costs of suit incurred herein.

2       4.     For such other and further relief that the Court may deem just and

3 proper.

4

5 DATED:  May 15, 2019               RYAN M. LAPINE, ESQ.
ROSENFELD, MEYER & SUSMAN LLP

6

7                                 By: _____ */s/ Ryan M. Lapine* _____

8                                     Ryan M. Lapine
Attorneys for Plaintiffs NANO

9                                 FOUNDATION, LTD. and COLIN
LeMAHIEU

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES
ROSENFELD,
MEYER &
SUSMAN LLP

# DEMAND FOR JURY TRIAL

Plaintiffs NANO FOUNDATION, LTD. and COLIN LeMAHIEU demand a trial by jury for all causes of action.

DATED:  May 15, 2019

RYAN M. LAPINE, ESQ.
ROSENFELD, MEYER & SUSMAN LLP


By: _____  */s/ Ryan M. Lapine*  _____
         Ryan M. Lapine
Attorneys for Plaintiffs NANO
FOUNDATION, LTD. and COLIN
LeMAHIEU

LAW OFFICES
ROSENFELD,
MEYER &
SUSMAN LLP

519982.01

21

COMPLAINT