# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### Civil Action No. 2:19-cv-04237-SVW-PJW

NANO FOUNDATION, LTD., a New York non-profit corporation; and
COLIN LeMAHIEU, an individual

     Plaintiffs,

v.

DAVID C. SILVER, an individual;

     Defendant.

_____/

### DECLARATION OF DAVID C. SILVER

Pursuant to 28 U.S.C. § 1746, I, DAVID C. SILVER, declare and affirm the following:

1.     My name is David C. Silver.  I am more than 21-years-old and make this Declaration based upon my personal knowledge and review of the relevant documents.

2.     I am the named defendant in the above-captioned lawsuit.

3.     To this Declaration, I have attached as **Exhibit "A"** a true and correct copy of the Class Action Complaint filed in *Brola v. Nano, et al.*, U.S. District Court - E.D.N.Y. - Case No: 1:18-cv-02049-NG-RML (the "First NANO Lawsuit").  My law firm (Silver Miller), along with The Braunstein Law Firm PLLC, represented the plaintiff and putative plaintiff class in the First NANO Lawsuit.

4.     To this Declaration, I have attached as **Exhibit "B"** a true and correct copy of records obtained online from the website for the New York State Department of State's Division of Corporations, which shows information pertaining to the Division's registration of NANO FOUNDATION LIMITED as an entity authorized to do business in the State of New York. According to the information contained within the Division's records, NANO FOUNDATION LIMITED is a domestic not-for-profit corporation that was initially registered with the Division on March 15, 2018.

5.     To this Declaration, I have attached as **Exhibit "C"** a true and correct copy of statistics compiled by YouTube showing how many times the videos recorded at the May 24, 2018 Blockchain Law Summit have subsequently been viewed online since they were posted by the organizers of the conference.

6.     To this Declaration, I have attached as **Exhibit "D"** a redacted copy of the September 18, 2018 Settlement Agreement negotiated and executed by the parties in the First NANO Lawsuit.

7.     To this Declaration, I have attached as **Exhibit "E"** a true and correct copy of the Class Action Complaint filed in *Fabian v. Nano, et al.*, U.S. District Court - N.D. Cal. - Case No.:

4-19-cv-00054-YRG (the "Second NANO Lawsuit").  My law firm (Silver Miller), along with Levi & Korsinsky, LLP, currently represents the plaintiff and putative plaintiff class in the Second NANO Lawsuit.

## **<u>VERIFICATION</u>**

I, DAVID C. SILVER, hereby verify and declare under penalty of perjury that I have read the foregoing Declaration and know the contents thereof, and that the matters contained in the Declaration are true to my own knowledge.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

_____
DAVID C. SILVER

DATED this __12th__ day of June 2019.

Michael L. Braunstein, Esq.
**THE BRAUNSTEIN LAW FIRM, PLLC**
3 Eberling Drive
New City, New York 10956
Telephone:    (845) 642-5062
E-mail: mbraunstein@braunsteinfirm.com

David C. Silver, Esq. (*pro hac vice forthcoming*)
Jason S. Miller, Esq. (*pro hac vice forthcoming*)
**SILVER MILLER**
11780 W. Sample Road
Coral Springs, Florida 33065
Telephone:    (954) 516-6000
E-mail: DSilver@SilverMillerLaw.com
E-mail: JMiller@SilverMillerLaw.com
*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

**Civil Action No. _____**

ALEX BROLA, individually;
and on behalf of All Others Similarly Situated;
       Plaintiff,

v.

NANO f/k/a RAIBLOCKS f/k/a HIEUSYS, LLC, a Texas company;
COLIN LEMAHIEU, an individual;
MICA BUSCH, an individual;
ZACH SHAPIRO, an individual;
and TROY RETZER, an individual;
       Defendants.
_____/

## CLASS ACTION COMPLAINT

Plaintiff ALEX BROLA ("Plaintiff"), individually and on behalf of all other persons similarly situated as defined herein ("the Class"), by and through undersigned counsel, hereby sues NANO f/k/a RAIBLOCKS f/k/a HIEUSYS, LLC, a Texas company ("NANO"); COLIN LEMAHIEU, an individual; MICA BUSCH, an individual; ZACH SHAPIRO, an individual; and TROY RETZER, an individual; for damages and for equitable relief.  In support thereof, Plaintiff alleges as follows:

**EXHIBIT "A"**

## PRELIMINARY STATEMENT

1.       This action is brought by Plaintiff ALEX BROLA who -- upon investment solicitations and specific instructions and representations of safety and security made by NANO representatives -- opened a customer account at BitGrail, an Italian-based cryptocurrency exchange[1], for the primary purpose of investing in and exchanging a cryptocurrency called Nano (f/k/a RaiBlocks) [XRB], which was developed and promoted (but never registered with any regulatory authority) by Defendants, who are based in the United States.

2.       The original RaiBlocks White Paper and first beta implementation of XRB were published in December 2014.  Since that time, the maximum supply of 133,248,290 XRB have been generated; and Defendants -- for their work in conceiving, developing, promoting, and selling XRB to the public -- withheld for themselves millions if not tens of millions of XRB, most of which are owned by Defendant LEMAHIEU.

3.       Plaintiff and the Class are among the members of the public who invested in tens of millions of dollars' worth of XRB to be held in, and exchanged from, their BitGrail accounts.

4.       Based on Defendants' assistance, promotion, and instruction, BitGrail became the predominant and nearly exclusive home for XRB.  In fact, XRB/BTC[2] was the most popular trading pair at BitGrail and constituted more than eighty percent (80%) of BitGrail's overall trading volume.

5.       Defendants publicly promoted BitGrail as a safe and reliable place for XRB holders to stake and exchange their XRB, and XRB holders relied on that endorsement by Defendants in choosing the exchange that would house their valuable assets.

---

[1] BitGrail SRL f/k/a Webcoin Solutions is a foreign for-profit corporation which lists its principal place of business in Florence, Italy.

[2] "XRB/BTC" represents the exchange of XRB for bitcoin (BTC), the most widely-used and recognizable alternative currency in the world.

6.      For example, when one concerned XRB holder questioned Defendants about the sagacity of relying upon the otherwise unknown BitGrail exchange and its founder and principal operator, Francesco "The Bomber" Firano, Defendant SHAPIRO publicly represented on Twitter that he speaks with Mr. Firano every day and that both Mr. Firano and BitGrail can be trusted:



7.      However, in early-February 2018, when BitGrail announced that it had "lost" $170 Million worth of XRB from its exchange -- approximately eighty percent (80%) of the XRB that BitGrail customers held in their accounts -- Defendants suddenly sought to put more distance between themselves and BitGrail than even the Atlantic Ocean could provide.

8.      Simply stated, Defendants created the XRB currency, they directed XRB investors to place their assets at BitGrail; and when nearly all of the XRB purportedly safeguarded at BitGrail disappeared, Defendants disavowed any responsibility for the harm the XRB investors suffered.

9.      Moreover, even though the most direct solution to the XRB investors' problems resides squarely within Defendants' hands, Defendants have refused to implement any such solution. Specifically, Defendants can rewrite the XRB code and simply restore ownership to Plaintiff and the

Class. In crypto terms, Defendants can create a "rescue fork" to protect Plaintiff's and the Class' property rights. Defendants, however, have refused to implement that strategy because it is not in their own best interests. The reason is simple: Defendants still own and control millions if not tens of millions of XRB and do not want to sacrifice any financial advantage they currently hold over the average XRB investor victimized by the XRB disappearance at BitGrail, which Defendants would do by "rescue forking" and returning the stolen digital assets.

10. Plaintiff and the Class seek compensatory and equitable relief rescinding their purchases of/investments in XRB and/or restoring to them the assets and funds they were wrongfully induced into investing.

## GENERAL ALLEGATIONS

### THE PARTIES

#### Plaintiff

11. Plaintiff ALEX BROLA ("BROLA") is an individual domiciled in Chandler, Arizona and is *sui juris*. On or about December 10, 2017, Plaintiff BROLA transmitted to BitGrail Fifty Thousand Dollars ($50,000.00) as his purchase of, and initial investment in, XRB. Over time, Plaintiff BROLA's BitGrail account grew to hold 16,790.17119100 XRB -- valued on or about February 8, 2018 at over Two Hundred Thirty-Seven Thousand Dollars ($237,000.00).

#### Defendants

12. Defendant NANO is a Texas company which lists its principal place of business in Austin, Texas. According to NANO's own published promotional materials, NANO is a "low-latency payment platform" that "utilizes a novel block-lattice architecture" on which "each account has [its] own blockchain as part of a larger directed acyclic graph." In layman's terms, NANO purports to have created a faster, cheaper, and more easily scalable blockchain and cryptocurrency that improves upon earlier blockchains and cryptocurrencies such as the widely-popular bitcoin.

13.     Defendant COLIN LEMAHIEU ("LEMAHIEU") is an individual domiciled in Austin, Texas and is *sui juris*.  According to NANO's own published promotional materials, LEMAHIEU co-founded NANO in 2014 and serves as the company's Lead Developer, "spearheading development of the core protocol."

14.     Defendant MICA BUSCH ("BUSCH") is an individual domiciled in Chicago, Illinois and is *sui juris*.  According to NANO's own published promotional materials, BUSCH is a key member of NANO's core team, serving as a Control System developer for NANO's web and Android systems.

15.     Defendant ZACH SHAPIRO ("SHAPIRO") is an individual domiciled in Brooklyn, New York and is *sui juris*.  According to NANO's own published promotional materials, SHAPIRO is a key member of NANO's core team, as he "runs Mobile, Wallets, and Product" for the company and serves as the company's head iOS Developer.

16.     Defendant TROY RETZER ("RETZER") is an individual domiciled in Hilton Head Island, South Carolina and is *sui juris*.  According to NANO's own published promotional materials, RETZER is a key member of NANO's core team, as he manages and directs the company's marketing and Community and Public Relations efforts.

### Other Liable Persons/Entities

17.     In addition to those persons and entities set forth as Defendants herein, there are likely other parties who may well be liable to Plaintiff and the Class but respecting whom Plaintiff currently lacks specific facts to permit him to name such person or persons as a party defendant.  By not naming such persons or entities at this time, Plaintiff is not waiving his right to amend this pleading to add such parties, should the facts warrant adding such parties.

<u>**JURISDICTION AND VENUE**</u>

**<u>Subject Matter Jurisdiction</u>**

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because the matter in controversy exceeds Five Million Dollars ($5,000,000.00), exclusive of interest and costs, and is a class action in which some members of the Class are citizens of different states than Defendants.  *See*, 28 U.S.C. § 1332(a) and 1332(d)(2)(A).  This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

**<u>Personal Jurisdiction</u>**

19.     This Court has personal jurisdiction over Defendants because: (a) at least one Defendant is operating, present, and/or doing business within this District, and (b) Defendants' breaches and unlawful activity occurred within this District.

20.     Defendants solicited investors in this jurisdiction to invested in millions of dollars' worth of XRB to be held in, and exchanged from, their BitGrail accounts.

21.     In light of the foregoing, Defendants purposefully availed themselves of the benefits of operating in this jurisdiction; and this Court may exercise personal jurisdiction over Defendants.

**<u>Venue</u>**

22.     Venue is proper pursuant to 28 U.S.C. § 1391 in that a substantial part of the events or omissions giving rise to the claims set forth herein occurred in this judicial district, as several of the XRB investors reside in New York.

23.     In light of the foregoing, this District is a proper venue in which to adjudicate this dispute.

### FACTUAL ALLEGATIONS APPLICABLE TO ALL COUNTS

### The Allure of XRB

24.     There are many different cryptocurrencies in the alternative currency world, and not all cryptocurrencies are the same or serve the same function. Cryptocurrencies differ in many ways, including how widely accepted they are, how quickly they can be used in a transaction, and how costly they are to transact.

25.     Defendants promote XRB as having the following relative advantages over other cryptocurrencies: XRB transactions are instant, with no fees, and have no limit to their scalability. There is no mining of XRB, as the 133,248,290 that already exist are anticipated to be the only XRB that ever exist. Moreover, the amount of power required to transact XRB is miniscule, which puts everyday transactions of XRB within the realistic reach of even the most novice XRB consumer.

26.     Although NANO was originally launched in or about December 2014 under the brand name RaiBlocks, the company was rebranded as "Nano" on or about January 31, 2018.

### Nano's Close Relationship with BitGrail

27.     A consumer's desire to purchase a particular cryptocurrency is one thing; finding a place to purchase that cryptocurrency is another.

28.     Prior to February 2018, by Defendants' calculated choice, XRB was available at essentially only one cryptocurrency exchange in the world: BitGrail.

29.     BitGrail has long been far-and-away XRB's largest marketplace -- a result of strategic positioning and widespread marketing efforts by Defendants.

30.     Defendants had a very close relationship with BitGrail, from which they mutually profited.

31.     Defendants were eager to gain access to a large platform on which investors could purchase, stake, and liquidate XRB; and Defendants chose BitGrail as the exchange to which

Defendants would drive all XRB investor interest -- primarily those investors who are non-accredited, U.S.-based investors.

32.     To have its XRB accepted and listed on BitGrail's trading exchange, NANO worked closely with BitGrail to integrate XRB and its blockchain protocol into BitGrail's platform -- a task that required significant time, effort, and communication between BitGrail and NANO.

33.     In return for having XRB listed for purchase and sale at BitGrail, Defendants were compensated -- first, with the ability to liquidate the XRB; and second, upon information and belief, as a source of referrals.

34.     Moreover, Defendants recommended BitGrail on NANO's Twitter feed, on Reddit, on Medium, and on its official website multiple times.

35.     In addition, several of Defendants herein made to members of the Class specific representations that BitGrail was a safe and secure exchange at which to deposit and hold XRB for investment purposes and for future transactions.

36.     At times relevant hereto, COLIN LEMAHIEU, MICA BUSCH, JAMES COXON, ZACH SHAPIRO, and TROY RETZER each took to social media outlets -- including Twitter, Facebook, Medium, and Reddit -- to promote XRB and BitGrail as a purported safe haven at which investors could stake and trade their XRB for profit.

37.     Unfortunately, in their fervent push to drive XRB investors to BitGrail, Defendants either failed in their due diligence or knowingly disregarded many material concerns about BitGrail's operations, safety, and reliability and/or deficiencies in the XRB code itself.

**Nano's Recommendations Are Belied by BitGrail's Security Problems and Lack of Reliability**

38.     Notwithstanding Defendants' widespread promotion of BitGrail as a safe haven for XRB investors, BitGrail's troubled past, uncertain present, and questionable future make Defendants' recommendations highly suspect, if not outright reckless.

### a. The Trading Platform Problem

39.     In early-January 2018, many BitGrail users reportedly experienced problems with the reliability and security of BitGrail's trading platform.

40.     For some users, account balances would inexplicably (and inaccurately) slip into negative figures.

41.     For some users, single account deposits were processed twice.

42.     BitGrail accountholders took to social media to decry the lack of reliability and trustworthiness of BitGrail's operations or the reliability of the XRB code itself.

43.     Despite the account glitches and functionality concerns that affected so many BitGrail users, Defendants did not distance themselves from BitGrail as a direct result of the problems.

### b. The Verification Problem

44.     In or about mid-January 2017, BitGrail proved itself unable to timely verify its new users, which left those users incapable of engaging in anything more than a very meager volume of transactions -- a frustrating circumstance that rendered the users' accounts effectively useless with regard to the purpose for which the accounts were opened

45.     NANO and BitGrail had a public spat over BitGrail's verification problem, and some asserted that the problem stemmed from NANO's failure to cooperation with BitGrail's business model.

46.     Despite the verification issue that plagued so many BitGrail users, Defendants did not distance themselves from BitGrail as a direct result of the problem.

### c. The $170 Million Disappearing XRB Problem

47.     In early-February 2018, BitGrail announced that it had "lost" $170 Million worth of XRB from its exchange due to "unauthorized transactions." The "missing" XRB amounted to approximately eighty percent (80%) of the XRB that BitGrail customers held in their accounts and amounts to nearly fifteen percent (15%) of all XRB that exists.

48.    In the aftermath of the purported XRB theft that devastated BitGrail's inventory of the cryptocurrency, BitGrail and Defendants got into another very public dispute over the cause of the problem and how it should be resolved.

49.    Defendants accused BitGrail CEO Francesco "The Bomber" Firano of trying to cover-up the event and of asking NANO to engage in purportedly unethical behavior to solve the problem.  According to NANO, the problem stemmed from flaws related to BitGrail's software, not any issue in the XRB protocol.

50.    BitGrail denied all allegations of wrongdoing and alleged that NANO was unwilling to cooperate in formulating a solution.

51.    In the wake of the latest of the calamities in the relationship between BitGrail and NANO, BitGrail users have sought to move their XRB off of the BitGrail exchange into private cryptocurrency wallets; however, BitGrail has made such withdrawals impossible by suspending all account activity.

52.    The XRB holders at BitGrail -- including Plaintiff and the Class -- were ushered there by Defendants, those users relied on Defendants' representations in investing their assets at BitGrail, and those users have now been burned by both BitGrail and Defendants.

53.    NANO has the ability to make whole all those who lost XRB in the purported theft from BitGrail by simply "forking" its blockchain, creating a commensurate number of new tokens for those aggrieved by the purported theft, and distributing them to each BitGrail user affected by the purported theft.

54.    Notwithstanding the fact that NANO has within its power the ability to remedy the situation, NANO has chosen instead to make the very community of supporters who give value to NANO's cryptocurrency suffer for their reliance on NANO's unqualified recommendation of, and public representations of trust of, BitGrail as the place where XRB should be kept and traded.

## XRB Are Investment Contract Securities
## that Were Never Registered or Exempted From Registration With Regulatory Authorities

55. In addition to recklessly directing XRB investors to utilize BitGrail, NANO's XRB themselves are securities; which Defendants offered and sold without either registering with the necessary governmental authorities or obtaining an exemption from such registration.

56. Under the Securities Act, a "security" is defined as including any "note," "investment contract," or "instrument commonly known as a 'security.'" *See* 15 U.S.C. §§ 77b(a)(1). Here, XRB are investment contracts. In *SEC v. W.J. Howey Co.*, the United States Supreme Court established a three-part test to determine whether an offering, contract, transaction, or scheme constitutes an investment contract.[3] Under the test articulated in *Howey*, a contract, transaction, or scheme is an "investment contract" if it involves: (*i*) the investment of money; (*ii*) in a common enterprise; (*iii*) with the expectation of profits to come solely from the efforts of others.

57. When determining whether a security has been offered and sold, the focus must be on the economic realities underlying the transaction. Here, the economic realities are that Plaintiff and the Class invested funds and assets to stake and trade XRB -- each of which they expected would lead to lucrative returns. Investors in XRB used cryptocurrency or fiat currency to purchase the XRB required to make their investments. Accordingly, Plaintiff's and the Class' investment of cryptocurrency or fiat currency constitutes an investment of money for the purposes of determining whether an investment involved a security.

58. Plaintiff and the Class were investing in a common enterprise with Defendants, as the cryptocurrency and fiat currency were pooled under the control of Defendants, and the success of XRB -- and thus potential profits stemming from the future valuation of XRB -- was entirely reliant

---

[3] *See SEC v. W.J. Howey, Co.*, 328 U.S. 293 (1946); *see also Intern. Bhd. of Teamsters v. Daniel*, 421 U.S. 837, 852 (1979) (noting that the *Howey* test is not the only test for determining a security but has been held to embody "all the attributes that run through all of the Court's decisions defining a security").

on Defendants' actions, primarily Defendants' ability to maintain and expand the functionality of XRB, thus providing financial returns to investors.

59.     In short, it is indisputable that Defendants were selling investment contracts and that any success from Defendants' development, maintenance, and expansion of the functionality of XRB -- as well as any future potential increases to the value of XRB -- were entirely dependent on Defendants' actions.

60.     Despite XRB's clear characterization as a "security," Defendants did not register XRB with any regulatory authority in the United States as required by federal securities laws.

61.     Furthermore, Defendants neither applied for, nor received, an exemption from registration of XRB with regulatory authorities in the United States as required by federal securities laws.

62.     U.S. securities regulation focuses on, *inter alia*, mandatory disclosures that require issuers of securities to make publicly available certain information that regulators deem material to investors.  When those necessary disclosures are not made -- and regulators have not granted an exemption to the normal requirement of such disclosures -- investors are at risk of undue harm.  Indeed, in the instant matter, XRB investors were lured into investing their funds and assets in the self-issued cryptocurrency being offered by NANO and were further lured by Defendants into staking and exchanging those investments at BitGrail.  Without adequate protections in place, Plaintiff and the Class have suffered millions of dollars of harm; and Defendants -- without regard to the regulatory environment in which they live and operate their business -- have distanced themselves from that harm and have refused to institute the remedy well within their grasp, simply because it does not suit their own financial interests.

## No Safe Harbor

63.     The statutory safe-harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

64.     Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.

65.     To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

66.     Alternatively, to the extent the statutory safe-harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false or that the forward-looking statement was authorized or approved by an executive officer of NANO, who knew those statements were false when made.

## FACTS SPECIFIC TO INVESTOR PLAINTIFF

### Alex Brola

67.     On or about December 10, 2017, Plaintiff BROLA opened a BitGrail account and funded that account by transmitting to BitGrail Fifty Thousand Dollars ($50,000.00) as his initial purchase of, and investment in, XRB.

68.     To open and manage his BitGrail account, Plaintiff BROLA logged onto BitGrail's website from his home and followed the instructions provided.

69.     In deciding to invest in XRB and open an account at BitGrail, Plaintiff BROLA reviewed and relied upon Defendants' promotions on social media channels and/or statements made on NANO's own website representing that BitGrail is a safe and reliable exchange on which to purchase and stake XRB.

70.     On or about February 8, 2018, Plaintiff BROLA's BitGrail account grew to hold 16,790.17119100 XRB.

## CLASS ACTION ALLEGATIONS

71.     A class action is the proper form to bring Plaintiff's and the Class' claims under FRCP 23. The potential class is so large that joinder of all members would be impractical. Additionally, there are questions of law or fact common to the class, the claims or defenses of the representative parties are typical of the claims or defenses of the class, and the representative parties will fairly and adequately protect the interests of the class.

72.     Plaintiff brings this nationwide class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all members of the following class:

> **All BitGrail investors and accountholders who are citizens of the United States and who, between January 1, 2015 and March 31, 2018, having seen or heard representations made by or on behalf of Defendants touting BitGrail as the cryptocurrency exchange at which to purchase and hold XRB, transferred bitcoins, alternative cryptocurrencies, or any other form of monies or currency to BitGrail to purchase, invest in, or stake XRB. Excluded from the class are: Defendants themselves, Defendants' retail employees, Defendants' corporate officers, members of Defendants' boards of directors, Defendants' senior executives, Defendants' affiliates, and any and all judicial officers (and their staff) assigned to hear or adjudicate any aspect of this litigation.**

> **The Class asserts claims for Unregistered Offer and Sale of Securities in Violation of Sections 12(a)(1) and 15 of the Securities Act; Negligent Misrepresentation; Unjust Enrichment; and Civil Conspiracy.**

73.     This action satisfies all of the requirements of Federal Rules of Civil Procedure, including numerosity, commonality, predominance, typicality, adequacy, and superiority.

## Numerosity

74.     Members of the Class are so numerous and geographically dispersed that joinder of all members is impractical.

75.     While the exact number of class members remains unknown at this time, upon information and belief, there are at least hundreds if not thousands of putative Class members.

76.     Again, while the exact number is not known at this time, it is easily and generally ascertainable by appropriate discovery.

77.     It is impractical for each class member to bring suit individually.

78.     Plaintiff does not anticipate any difficulties in managing this action as a class action.

### Commonality and Predominance

79.     There are many common questions of law and fact involving and affecting the parties to be represented.

80.     When determining whether common questions predominate, courts focus on the issue of liability; and if the issue of liability is common to the class and can be determined on a class-wide basis, as in the instant matter, common questions will be held to predominate over individual questions.

81.     Common questions include, but are not limited to, the following:

(a) Whether the XRB offered for sale by Defendants constitute securities under federal securities laws;

(b) Whether Defendants violated federal securities laws in failing to register XRB as securities;

(c) Whether Defendants are liable for steering Plaintiff and the Class to BitGrail;

(d) Whether statements made by Defendants about BitGrail were false or were made without due regard for the safety of those who read or heard the statements;

(e) Whether Defendants have converted the funds belonging to Plaintiff and the Class;

(f) Whether Defendants owed duties to Plaintiff and the Class, what the scope of those duties were, and whether Defendants breached those duties;

(g) Whether Defendants' conduct was unfair or unlawful;

(h) Whether Defendants has been unjustly enriched;

(i) Whether Plaintiff and the Class have sustained damages as a result of Defendants' conduct; and

(j) Whether Defendants have within their power the ability to, and should, institute an equitable remedy that would resolve the harm that has befallen Plaintiff and the Class.

82. These common questions of law or fact predominate over any questions affecting only individual members of the Class.

## Typicality

83. Plaintiff's claims are typical of those of the other Class members because, *inter alia*, all members of the Class were injured through the common misconduct described above and were subject to Defendants' unfair and unlawful conduct.

84. Plaintiff is advancing the same claims and legal theories on behalf of himself and all members of the Class.

## Adequacy of Representation

85. Plaintiff will fairly and adequately represent and protect the interests of the Class in that he has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class.

86. Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel, experienced in complex consumer class action litigation of this nature, to represent him.

87. Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class.

88. The infringement of the rights and the damages Plaintiff has suffered are typical of other Class members.

89.     To prosecute this case, Plaintiff has chosen the law firm of Silver Miller.  Silver Miller is experienced in class action litigation and has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

**Superiority**

90.     Class action litigation is an appropriate method for fair and efficient adjudication of the claims involved herein.

91.     Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; as it will permit a large number of Class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require.

92.     Class action treatment will permit the adjudication of relatively modest claims by certain Class members, who could not individually afford to litigate a complex claim against well-funded corporate defendants like NANO.

93.     Further, even for those Class members who could afford to litigate such a claim, it would still be economically impractical.

94.     The nature of this action and the nature of laws available to Plaintiff make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and the Class for the wrongs alleged because:

    (a) Defendants would necessarily gain an unconscionable advantage if they were allowed to exploit and overwhelm the limited resources of each individual Class member with superior financial and legal resources;

    (b) The costs of individual suits could unreasonably consume the amounts that would be recovered;

    (c) Proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each member of the Class to recover on the cause of action alleged;

(d) Individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation;

(e) The Class is geographically dispersed all over the world, thus rendering it inconvenient and an extreme hardship to effectuate joinder of their individual claims into one lawsuit;

(f) There are no known Class members who are interested in individually controlling the prosecution of separate actions; and

(g) The interests of justice will be well served by resolving the common disputes of potential Class members in one forum.

95. Plaintiff reserves the right to modify or amend the definition of the proposed class and to modify, amend, or create proposed subclasses before the Court determines whether certification is appropriate and as the parties engage in discovery.

96. The class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

97. Because of the number and nature of common questions of fact and law, multiple separate lawsuits would not serve the interest of judicial economy.

98. As a result of the foregoing, Plaintiff and the Class have been damaged in an amount that will be proven at trial.

99. Plaintiff has duly performed all of his duties and obligations, and any conditions precedent to Plaintiff bringing this action have occurred, have been performed, or else have been excused or waived.

100. To enforce his rights, Plaintiff has retained undersigned counsel and is obligated to pay counsel a reasonable fee for its services, for which Defendants are liable as a result of their bad faith and otherwise.

## COUNT I - VIOLATION OF SECTION 12(a)(1) OF THE SECURITIES ACT
[AGAINST ALL DEFENDANTS]

Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1-100 above, and further alleges:

101.     Section 12(a)(1) grants Plaintiff a private right of action against any person who offers

or sells a security in violation of Section 5, and states that such person,

> Shall be liable . . . to the person purchasing such security from him,
> who may sue either at law or in equity in any court of competent
> jurisdiction, to recover the consideration for such security with interest
> thereon, less the amount of any income received thereon, upon the
> tender of such security, or for damages if he no longer owns the security.

102.     Between January 2015 and March 2018, in connection with the offer and sale of XRB,

Defendants unlawfully made use of means or instruments of transportation or communication in

interstate commerce or of the mails for the purposes of offering, selling, or delivering unregistered

securities in direct violation of the Securities Act.

103.     The offer and sale of XRB constituted the offer and sale of unregistered securities

under controlling federal law.  XRB exhibit the following particular hallmarks of a security under the

*Howey* test: (a) to receive any XRB, an investment of money, in the form of cryptocurrency and/or fiat

currencies was required; (b) the investment of money was made into the common enterprise that is

Defendant NANO and its ability to provide value to the XRB through the functionality and popularity

of its self-created XRB; and (c) the success of the investment opportunities and any potential returns

thereon were entirely reliant on Defendants' ability to maintain and expand the functionality and

popularity of XRB, thus providing financial returns to investors.

104.     Each of the individual Defendants constitute "seller[s]" under the Securities Act and

are thus equally liable for selling unregistered securities in connection with XRB.

105.     As such, Defendants have participated in the offer and sale of unregistered securities

in violation of the Securities Act and are liable to Plaintiff and the Class for rescission and/or

compensatory damages.

## COUNT II - VIOLATION OF SECTION 15(a) OF THE SECURITIES ACT
### [AGAINST DEFENDANTS LEMAHIEU, BUSCH, SHAPIRO, AND RETZER]

Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1-100 above, and further alleges:

106.    Due to their ownership in and/or control over the business operations of Defendant NANO, Defendants COLIN LEMAHIEU, MICA BUSCH, ZACH SHAPIRO, and TROY RETZER acted as controlling persons of NANO within the meaning of Section 15(a) of the Securities Act as alleged herein.

107.    By virtue of their positions as managers, directors, and key members of NANO's core team and by their participation in and/or awareness of Defendant NANO's operations, Defendants COLIN LEMAHIEU, MICA BUSCH, ZACH SHAPIRO, and TROY RETZER had the power to influence and control and did influence and control, directly or indirectly, the decision making relating to the development and success of XRB, including the decision to engage in the sale of unregistered securities in furtherance thereof.

108.    By virtue of the foregoing, Defendants COLIN LEMAHIEU, MICA BUSCH, ZACH SHAPIRO, and TROY RETZER are liable to Plaintiff and the Class as control persons of Defendant NANO under Section 15(a) of the Securities Act.

## COUNT III – NEGLIGENT MISREPRESENTATION
### [AGAINST ALL DEFENDANTS]

Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1-100 above, and further alleges:

109.    Defendants, by acts of both omission and commission, made to Plaintiff and the Class false statements of material facts about the services Plaintiff and the Class would receive from BitGrail upon opening a BitGrail account and investing in XRB in exchange for the fees they were compelled to pay to maintain accounts at BitGrail.

110.    Specifically, Defendants' representations to Plaintiff and the Class that, among other things:

(a) BitGrail had in place adequate security measures to properly safeguard BitGrail accountholders' assets;

(b) BitGrail's software was free of inherent flaws that might expose XRB holders to transactional irregularities, failures, or falsely-reported negative account balances;

(c) BitGrail was solvent and able to satisfy its obligations to its accountholders;

(d) NANO's blockchain protocol was free of inherent flaws that might expose XRB holders to attacks, security breaches, or transactional failures

were false, and Defendants knew, or should have known, at the time the statements were made that the statements were false.

111.    Defendants had no reasonable grounds upon which to believe the statements were true when made to Plaintiff and the Class.

112.    Defendants intended that Plaintiff and the Class would be induced into action by relying upon the statements of fact made to them by and on behalf of Defendants.

113.    In considering whether to open accounts at BitGrail, invest in XRB, and entrust to BitGrail their valuable assets; Plaintiff and the Class reasonably and justifiably relied on the statements of fact made to them by and on behalf of Defendants.

114.    As a direct and proximate result of Plaintiff's and the Class' reliance on the statements made to them by Defendants, Plaintiff and the Class have suffered damage

## COUNT IV - UNJUST ENRICHMENT
### [AGAINST ALL DEFENDANTS]

Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1-100 above, and further alleges:

115.    Defendants have reaped the benefits from inducing Plaintiff and the Class to invest in XRB-filled accounts at BitGrail, thereby causing actual harm to thousands of investors.

116.    It would be unconscionable and against the fundamental principles of justice, equity, and good conscience for Defendants to retain the substantial monetary benefits they have received as a result of their misconduct.

117. To remedy Defendants' unjust enrichment, the Court should order Defendants to immediately return Plaintiff's and the Class' investments and disgorge any amounts received by Defendants as a result of their misconduct alleged herein.

## COUNT V – CIVIL CONSPIRACY
### [AGAINST ALL DEFENDANTS]

Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1-100 above, and further alleges:

118. Defendants conspired with one another to perpetrate an unlawful act upon Plaintiff and the Class or to perpetrate a lawful act by unlawful means, *to wit*: they recklessly made to Plaintiff and the Class multiple misrepresentations of fact about the safety and security of BitGrail's trading exchange as well as NANO's own blockchain network in an effort to extract from Plaintiff and the Class funds, assets, and cryptocurrency to fund NANO's business expenses and to enrich their Directors, shareholders, and the NANO Core Developers and representatives, including Defendants COLIN LEMAHIEU, MICA BUSCH, ZACH SHAPIRO, and TROY RETZER -- all of which put Defendants' own pecuniary interest ahead of Plaintiff's and the Class' welfare and economic safety.

119. Defendants solicited and/or accepted from Plaintiff and the Class large sums of funds, assets, and cryptocurrency while withholding from Plaintiff and the Class certain material facts, including:

(a) Defendants were compensated by having XRB liquidated at BitGrail;

(b) BitGrail did not have in place adequate security measures to properly safeguard BitGrail accountholders' assets;

(c) NANO's blockchain protocol had inherent flaws, including an unreliable timestamp record; and

(d) BitGrail was, at times material to this matter, insolvent and thus unable to satisfy its obligations to its accountholders.

120. All Defendants agreed to the illicit purpose for garnering investment monies from Plaintiff and the Class so that NANO's Directors, shareholders, and Defendants could enjoy well-compensated lifestyles with Plaintiff's and the Class' funds, assets, and cryptocurrency.

121.    Defendants were each aware of, and consented to, the misrepresentations detailed above and knew that the efforts to garner funds, assets, and cryptocurrency from Plaintiff and the Class was all part of a relationship aimed solely at enriching NANO's Directors, shareholders, and Defendants without due regard for the safety of those who entrusted their valuable funds, assets, and cryptocurrency to BitGrail and NANO.

122.    In furtherance of their conspiracy, Defendants made to Plaintiff and the Class, or agreed to have someone make on their behalf, the false, misleading, and reckless statements of fact detailed above and purposefully withheld from Plaintiff and the Class certain material facts detailed above in a concerted effort to obtain Plaintiff's and the Class' funds, assets, and cryptocurrency.

123.    To fulfill its role in the conspiracy, NANO -- by and through Defendants, amongst others -- referred thousands of investors to BitGrail to open up accounts at the exchange, in return for which NANO received large payments in connection with XRB being traded on the BitGrail exchange.

124.    To fulfill their role in the conspiracy, Defendants COLIN LEMAHIEU, MICA BUSCH, ZACH SHAPIRO, and TROY RETZER created and managed the XRB network and used social media channels such as Twitter, Medium, and Reddit to recruit unsuspecting investors in the United States and abroad to purchase XRB investments and allow the liquidation of XRB coins and/or store those valuable assets at the inherently unsafe BitGrail exchange.  For their efforts, Defendants COLIN LEMAHIEU, MICA BUSCH, ZACH SHAPIRO, and TROY RETZER were paid sizeable incomes and/or retain valuable XRB coins that were not hacked at BitGrail.

125.    BitGrail and/or NANO's systems were inherently flawed and dangerously exposed XRB investors to significant if not total loss of their investments -- something of which Defendants COLIN LEMAHIEU, MICA BUSCH, ZACH SHAPIRO, and TROY RETZER were aware and

which they accepted as part of the scheme to lure investors into purchasing XRB and storing those assets at BitGrail.

126.   In addition, Defendants agreed to sell XRB investment contracts without registering them with the necessary governmental authorities or obtain from those authorities an exemption from having to register the XRB.

127.   Moreover, Defendants have conferred and agreed amongst themselves to not implement any form of relief for Plaintiff and the Class that would impact Defendants' war chest of the millions if not tens of millions of XRB they retained and hold -- once again elevating their own pecuniary interest ahead of Plaintiff's and the Class' welfare and economic safety.

128.   As a direct and proximate result of Defendants' conspiracy, Plaintiff and the Class have suffered damage; and Defendants should be ordered to rescind Plaintiff's and the Class' purchases of/investments in XRB and/or restore to Plaintiff and the Class -- by a "rescue fork" or some other procedure -- the assets and funds wrongfully taken from them.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff ALEX BROLA ("Plaintiff"), individually and on behalf of all other persons similarly situated as defined herein; respectfully pray for relief as follows:

(a) Declaring that this action is properly maintainable as a class action and certifying Plaintiff as the Class representative and his counsel as Class counsel;

(b) Declaring that Defendants offered and sold unregistered securities in violation of the federal securities laws;

(c) Declaring Defendants are liable to Plaintiff and the Class under Sections 12(a)(1) and/or 15(a) of the Securities Act;

(d) A judgment awarding Plaintiff and the Class equitable restitution, including, without limitation, rescission of their investments in all XRB held in accounts at BitGrail, restoration of the *status quo ante*, return to Plaintiff and the Class all cryptocurrency or fiat currency they paid as a result of Defendants' unlawful and unfair business practices and conduct, and an order requiring NANO to "rescue fork" the allegedly missing XRB into a new cryptocurrency in a manner

that would fairly compensate Plaintiff and the Class for each missing XRB and would eliminate all of the "missing" XRB;

(e) An award of any and all additional damages recoverable under law -- jointly and severally entered against Defendants -- including but not limited to compensatory damages, punitive damages, incidental damages, and consequential damages;

(f) An Order requiring an accounting of the remaining funds and assets raised from Plaintiff and the Class in connection with XRB;

(g) An Order imposing a constructive trust over the funds and assets rightfully belonging to Plaintiff and the Class;

(h) Pre- and post-judgment interest;

(i) Attorneys' fees, expenses, and the costs of this action; and

(j) All other and further relief as this Court deems necessary, just, and proper.


## PLAINTIFF'S DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

Respectfully submitted,

**THE BRAUNSTEIN LAW FIRM, PLLC**

By: _/s/ MICHAEL L. BRAUNSTEIN_
Michael L. Braunstein, Esq.
3 Eberling Drive
New City, New York 10956
Telephone: (845) 642-5062
E-mail: mbraunstein@braunsteinfirm.com

- and -

**SILVER MILLER**
11780 W. Sample Road
Coral Springs, Florida 33065
Telephone: (954) 516-6000
DAVID C. SILVER (*pro hac vice forthcoming*)
E-mail: DSilver@SilverMillerLaw.com
JASON S. MILLER (*pro hac vice forthcoming*)
E-mail: JMiller@SilverMillerLaw.com

*Counsel for Plaintiff*

Dated: __April 5, 2018__

## CERTIFICATION OF REPRESENTATIVE PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Alex Brola, as one of the named plaintiffs in this matter (the "Lawsuit"), declare that:

1. I have reviewed the Complaint in the Lawsuit against Nano f/k/a RaiBlocks f/k/a Hieusys, LLC, *et al.*, alleging, *inter alia*, violations of federal securities laws; and I authorized its filing.

2. I did not purchase the security that is the subject of this action at the direction of my counsel or to participate in this private action.

3. I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. My investment holdings in the Nano securities that are the subject of this action during the Class Period set forth in the Complaint are as follows:

| Date of Initial Nano Investment | Nano Coins held on February 8, 2018 |
|---|---|
| December 10, 2017 | 16,790.17119100 |

5. During the three year period preceding the date of this certification, I have not sought to serve as a representative party for a class action filed under the Securities Exchange Act of 1934 or the Securities Act of 1933.

6. I, either directly or indirectly, have not received, been promised, been offered, and will not accept, any form of compensation for service as a representative party on behalf of the class, except for: (*i*) such damages or other relief as the Court may award to me as my *pro rata* share of any recovery or judgment; (*ii*) such reasonable fees, costs, or other payments (including lost wages) as the Court expressly approves to be paid to me or on my behalf; or (*iii*) reimbursement, paid by my attorneys, of actual or reasonable out-of-pocket expenses incurred directly in connection with the prosecution of this action.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on _____ April 4th , 2018 ___ in Chandler, Arizona.

*alex Brola*
_____
Alex Brola

# NYS Department of State

## Division of Corporations

### Entity Information

The information contained in this database is current through May 17, 2019.

Selected Entity Name: NANO FOUNDATION LIMITED
Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | NANO FOUNDATION LIMITED |
| **DOS ID #:** | 5304986 |
| **Initial DOS Filing Date:** | MARCH 15, 2018 |
| **County:** | KINGS |
| **Jurisdiction:** | NEW YORK |
| **Entity Type:** | DOMESTIC NOT-FOR-PROFIT CORPORATION |
| **Current Entity Status:** | ACTIVE |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**

NANO FOUNDATION LIMITED
195 MONTAGUE STREET
BROOKLYN, NEW YORK, 11201

**Registered Agent**

NONE

This office does not record information regarding the names and addresses of officers, shareholders or directors of nonprofessional corporations except the chief executive officer, if provided, which would be listed above. Professional corporations must include the name(s) and address(es) of the initial officers, directors, and shareholders in the initial certificate of incorporation, however this information is not recorded and only available by viewing the certificate.

***Stock Information**

<span style="color:red">EXHIBIT "B"</span>

| # of Shares | Type of Stock | $ Value per Share |
|---|---|---|

No Information Available

*Stock information is applicable to domestic business corporations.

**Name History**

| Filing Date | Name Type | Entity Name |
|---|---|---|
| MAR 15, 2018 | Actual | NANO FOUNDATION LIMITED |

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in New York State. The entity must use the fictitious name when conducting its activities or business in New York State.

NOTE: New York State does not issue organizational identification numbers.

Search Results    New Search

Services/Programs    |    Privacy Policy    |    Accessibility Policy    |    Disclaimer    |    Return to DOS Homepage    |    Contact Us



Blockchain Enterprise Forum - Yo
https://www.youtube.com/channel/UCle8_dlnyoPdwXSxG9fShNQ/videos
Campaign Manage... David's Account Suggested Sites David Silver - YouT... Bitcoin, Ethereum, a... Web Slice Gallery Apple Disney ESPN Yahoo! Breaking News & T... Google News Celebrity Gossip | E... Amazon.com: Onlin... Other bookmarks
YouTube
Search
HOME VIDEOS PLAYLISTS CHANNELS DISCUSSION ABOUT
Home
Trending
Subscriptions
Library
History
Watch later
Purchases 5
Liked videos
SUBSCRIPTIONS
David Silver
ToyScouter
Ryan ToysRevi...
KevsToyFun
Fred Zimmerm...
Primitive
haggie76
Show 3 more
MORE FROM YOUTUBE
YouTube Premium
Movies & Shows
Gaming
Uploads PLAY ALL
SORT BY
21:30
BLS 2018: Regulation & Cryptocurrency: A Brief...
188 views • 11 months ago
1:00:31
BLS2018: Panel - Blockchain and Cryptocurrencies...
120 views • 11 months ago
25:45
BLS2018: Cryptocurrency, Blockchain and US Litigatio...
87 views • 11 months ago
9:09
BLS2018: A. Jason Velez
27 views • 11 months ago
16:00
BLS2018: Remediating an ICO
35 views • 11 months ago
17:02
BLS2018: Can Blockchain Technology Revolutionize t...
106 views • 11 months ago
21:55
BLS2018: Fireside chat with Greg Gilman
20 views • 11 months ago
16:56
BLS2018: Blockchain and IP Law
92 views • 11 months ago
49:25
BLS2018: Panel - Making Tokenization Accessible by...
37 views • 11 months ago
55:10
BLS2018: Panel - Path Toward Exchanges
79 views • 11 months ago
22:36
BLS2018: Panel - Identity Management and Verification
99 views • 11 months ago
28:56
BLS2018: Issuing an STO - one company's experience
112 views • 11 months ago
45:47
BLS2018: Panel - The Evolution of Security Tokens
104 views • 11 months ago
31:06
BLS2018: Amy Wan
77 views • 11 months ago
17:29
BLS2018: Why Accredited Investors
85 views • 11 months ago
BLOCKCHAIN LAW SUMMIT 2018
2:19
BLS2018: Welcome!
225 views • 11 months ago

# EXHIBIT "C"

### SETTLEMENT AGREEMENT

**This Settlement Agreement** (the "Agreement") is made and entered into this 17th day of September 2018, by and between the following, sometimes referred to hereafter collectively as the "Parties" and individually as a "Party":

**Alex Brola**, sometimes referred to hereafter as "**Brola**,"

- and -

**Hieusys, LLC; Colin LeMahieu; Mica Busch; Zachary Shapiro; and Troy Retzer;** sometimes referred to hereafter collectively as "**the Nano Parties**."

**WHEREAS**, there is currently pending in the United States District Court - Eastern District of New York (the "Court") a lawsuit between the Parties styled *Brola, et al. v. Nano, et al.*, U.S. Dist. Ct. - EDNY - Case No. 1:18-cv-02049, referred to hereafter as the "Lawsuit";



Silver Miller

<span style="color:red">**EXHIBIT "D"**</span>



4.   **Mutual General Release:** Each Party hereby remises, releases, acquits, satisfies, and forever discharges each and every other Party (including: (i) with regard to each Party who is a natural person, that Party's guardians, successors, assigns, heirs, executors, administrators, trustees, accountants, and insurers, and (ii) with regard to each Party which is not a natural person, each such Party's past and present parent, subsidiary, affiliated, related, or predecessor entities, their successors and assigns, and any and all of each such Party's past and present officers, directors, agents, accountants, insurers, servants, employees, shareholders, members, and partners, all of the foregoing in (i) and (ii) hereinafter collectively referred to as the "Releasees"), of and from any and all, and all manner of, claims, actions, causes of action, suits, debts, sums of money, accounts, reckonings, contracts, controversies, agreements, promises, damages, and demands whatsoever, in law or in equity, which each Party had or now has, or which any successor or assign of each Party hereafter can, shall or may have, against any of the Releasees for, upon, or by reason of any matter, cause or thing whatsoever, from the beginning of the world to the date of this Agreement, whether known or unknown, direct or indirect, vested or contingent. Without limiting the generality of the foregoing, this Release includes the release of any and all claims, rights, and causes of action, of any type or kind whatsoever, which were or which could have been raised or asserted by each Party against the Releasees in the Lawsuit.  Notwithstanding the foregoing, each Party expressly excludes from the effect of this Release and does not release the Releasees from the terms and conditions of this Agreement.  Moreover, the Parties agree that the mutual releases expressed herein shall be held in escrow by each Party's counsel of record in the Lawsuit and will only become effective upon the Nano Parties' publication of the statement set forth in Section 6 below. Brola covenants and agrees to withdraw any claims he has filed with the Securities Exchange Commission concerning Nano and to the extent permissible under law to cease any further action with that agency regarding such claims.





**Settlement Agreement -- Page 3 of 5**



**ALEX BROLA**

By: _alex Brola_
   Alex Brola, individually

Date: __09/18/18__

**HIEUSYS, LLC, A TEXAS CORPORATION**

By: _____

**COLIN LEMAHIEU**

By: _____

Settlement Agreement -- Page 4 of 5



189
190
191 **ALEX BROLA**
192
193 By: _____
194       Alex Brola, individually
195
196 Date: _____
197
198
199
200
201 **HIEUSYS, LLC, A TEXAS CORPORATION**      **COLIN LEMAHIEU**
202
203 By: _____      By: _____
         6636ACADA3EF4BA...                        6636ACADA3EF4BA...

**Settlement Agreement -- Page 4 of 5**

204
205   Name: Colin LeMahieu, as
206
207   Title: Managing Member
208
209   Date: _____
210
211
212
213   **MICA BUSCH**
214
215   By: _____
216           Mica Busch, individually
217
218   Date: ____09/17/2018_____
219
220
221
222   **TROY RETZER**
223
224   By: _____
225           Troy Retzer, individually
226
227   Date: _____
228
229
230
231
232
233
234

Colin LeMahieu, individually

Date: _____

**ZACHARY SHAPIRO**

By: _____
        Zachary Shapiro, individually

Date: _____

204
205   Name: Colin LeMahieu, as
206
207   Title: Managing Member
208
209   Date: _____
210
211
212

Colin LeMahieu, individually

Date: _____

213   **MICA BUSCH**
214
215   By: _____
216        Mica Busch, individually
217
218   Date: _____
219
220
221
222   **TROY RETZER**
223
224   By: _____
225        Troy Retzer, individually
226
227   Date: _____
228
229
230
231
232
233
234

**ZACHARY SHAPIRO**

By: _____
      Zachary Shapiro, individually

Date: ___9.18.18_____

**Settlement Agreement -- Page 5 of 5**

Name: Colin LeMahieu, as

Colin LeMahieu, individually

Title: Managing Member

Date: _____

Date: _____

**MICA BUSCH**

**ZACHARY SHAPIRO**

By: _____
    Mica Busch, individually

By: _____
    Zachary Shapiro, individually

Date: _____

Date: _____

**TROY RETZER**

By: _____
    Troy Retzer, individually

Date: __9-18-2018_____

1  Rosanne L. Mah (State Bar No. 242628)
   Email: rmah@zlk.com
2  **LEVI & KORSINSKY, LLP**
   44 Montgomery Street, Suite 650
3  San Francisco, California 94104
   Telephone: (415) 373-1671
4  Facsimile: (415) 484-1294

5  *Counsel for Plaintiff JAMES FABIAN*

6  [*Additional Counsel listed on signature block*]

7

8              **UNITED STATES DISTRICT COURT**

9           **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10  JAMES FABIAN, individually and on behalf of    Case No._____
    all others similarly situated,
11                                                 **CLASS ACTION COMPLAINT**
                 Plaintiff,
12                                                 **JURY TRIAL DEMANDED**
           v.
13
    NANO F/K/A RAIBLOCKS F/K/A HIEUSYS,
14  LLC; COLIN LEMAHIEU; MICA BUSCH;
    ZACH SHAPIRO; TROY RETZER; BG
15  SERVICES, S.R.L. F/K/A BITGRAIL S.R.L.
    F/K/A WEBCOIN SOLUTIONS; AND
16  FRANCESCO "THE BOMBER" FIRANO,

17               Defendants.

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT "E"**                    Case No._____

Plaintiff James Fabian ("Plaintiff" or "Fabian"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, allege in this complaint for (i) violations of Sections 12(a)(1) and 15(a) of the Securities Act of 1933 (the "Securities Act"); (ii) breach/rescission of contract, (iii) breach of fiduciary duty; (iv) aiding and abetting a breach of fiduciary duty; (v) fraud; (vi) aiding and abetting fraud; (vii) negligent misrepresentation; (viii) constructive fraud; (ix) negligence; (x) unjust enrichment; and (xi) conspiracy (the "Complaint"), the following based upon knowledge with respect to himself and his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) documents and solicitation materials released by Defendants Nano f/k/a RaiBlocks f/k/a Hieusys, LLC ("Nano" or the "Company"), Colin LeMahieu ("LeMahieu"), Mica Busch ("Busch"), Zach Shapiro ("Shapiro"), Troy Retzer ("Retzer" and together with Nano, LeMahieu, Busch and Shapiro, the "Nano Defendants"), B.G. Services SRL f/k/a BitGrail SRL f/k/a Webcoin Solutions ("BitGrail"), and Francesco "The Bomber" Firano ("Firano" and together with BitGrail, the "BitGrail Defendants") (collectively, "Defendants") in connection with their promotion of a cryptocurrency called NANO (f/k/a RaiBlocks) ("XRB"); (b) public statements made by Defendants concerning XRB and its listing on BitGrail-- an Italian-based cryptocurrency exchange; and (c) media publications concerning XRB and BitGrail.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

### NATURE AND SUMMARY OF THE ACTION

1. This is a class action on behalf of a class of investors consisting of all individuals and entities who transferred fiat currency or cryptocurrency to BitGrail to invest in XRB from October 24, 2015 through February 8, 2018, inclusive, and who suffered financial injury as a result thereof (the "Class" who held XRB on BitGrail during the "Class Period"). This action seeks to recover rescissory, compensatory, punitive and injunctive relief under Sections 12(a)(1) and 15(a) of the Securities Act [15 U.S.C. §§ 77l(a)(1) & 77o(a)] and various state and common law claims against Nano, certain of its top officials, certain influential promoters that received compensation in exchange

for selling XRB or soliciting the general public to purchase XRB, and its partner the BitGrail Defendants.

2. The Nano Defendants developed XRB, which they each promoted, offered, traded and sold for their personal financial benefit to the general public. XRB has never been registered as a security with the Securities and Exchange Commission and is not exempt from registration.

3. Throughout the Class Period as defined below, Defendants directed the investing public to purchase XRB through BitGrail by providing specific investment instructions and assurances that the cryptocurrency exchange was secure and could be trusted to safeguard investment assets.

4. On or about February 8, 2018, over 15 million XRB, bearing a market value of approximately $170 million, supposedly safely stored on BitGrail were "lost."

5. Less than 24 hours after investors learned that the entirety of their XRB holdings were "lost," the Nano Defendants released their "Official Statement Regarding BitGrail Insolvency," to their XRB investors denying any responsibility and pointing their finger at BitGrail:

> BitGrail is an independent business and Nano is not responsible for the way Firano or BitGrail conduct their business. We have no visibility into the BitGrail organization, nor do we have control over how they operate.

*See* Nano Core Team, *Official Statement Regarding BitGrail Insolvency* (Feb. 9, 2018)

6. Since that announcement, the Nano Defendants have made every effort they could conceive of to distance themselves from BitGrail and erase the fact that each was substantially involved with BitGrail's operations related to XRB. Indeed, the Nano Defendants have even gone so far as to fund a lawsuit against its former partner-in-crime, the BitGrail Defendants, so as to avoid unwanted attention for their actions. For example, on April 6, 2018, a putative class action (which has since been settled on an individual non-public basis) was filed in the United States District Court for the Southern District of New York. A mere three (3) days later, on April 9, 2018, the Nano Defendants announced that the Company was "sponsoring" a "legal fund" purportedly designed to "provide all victims of the hack of the cryptocurrency exchange BitGrail with equal access to representation" and enable such investors to seek recourse against the exchange.

7. Defendants' attempted abdication of culpability is unavailing due to the indisputable facts that each of them, *inter alia*, (a) unlawfully issued, distributed, and promoted the ongoing sale of XRB -- an unregistered security; (b) were responsible for managing BitGrail's safekeeping of the such unregistered security on BitGrail – itself an unregistered exchange; (c) successfully solicited the general public to entrust BitGrail with their substantial assets by promoting, encouraging, and otherwise directing investors to establish XRB trading accounts at BitGrail; (d) expressly endorsed and assured the public that BitGrail was a safe, secure, and valid exchange; (e) continued to endorse and promote the use of BitGrail as a safe, secure, and valid exchange, notwithstanding having direct insider information of specific issues likely to jeopardize accountholders XRB investments months prior to the February 8, 2018 announcement; and (f) profited from the purchase and sale of XRB on BitGrail and other exchanges.

8. Defendants' offer and sale of XRB Tokens was a clear of and sale of an investment contract security because, *inter alia*, Defendants touted, and Plaintiff and XRB purchasers were conditioned to expect, and did reasonably expect, that XRB Tokens received would increase in value and become worth more than the fiat or digital currencies invested. Defendants are strictly liable for the offering and selling of these unregistered securities.

9. Plaintiff and the Class initially defined below, are among the members of the public who invested in tens of millions of dollars' worth of XRB to be held in, and exchanged from, their BitGrail accounts, and who, in early-February 2018, through no fault of their own, suffered a loss of more than $170 million worth of XRB when their investment holdings were simply "lost."

10. For these reasons, Plaintiff on behalf of himself, and all similarly situated XRB investors, seek compensatory, injunctive, and rescissory relief, providing rescission and repayment of all investments made to purchase, or store, XRB Tokens on BitGrail prior to February 8, 2018.

**JURISDICTION AND VENUE**

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) and 1332(d)(2)(A) because this is a class action in which the matter or controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs, and in which some members of the Class are citizens of a state different from Defendants.

3

12.   This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and Section 22 of the Securities Act [15 U.S.C. § 77v] because Plaintiffs allege violations of Sections 12(a)(1) and 15(a) of the Securities Act [15 U.S.C. §§ 77l(a)(1) and 77o(a)]. Plaintiff's federal claims further provide this Court with supplemental jurisdiction over their state and common law claims under 28 U.S.C. § 1367.

13.   The Court has personal jurisdiction over each of the Defendants because each either conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

14.   Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C. § 77v, as well as under 28 U.S.C. § 1391, because: (a) the conduct at issue took place and had an effect in this District; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect in this District.

## PARTIES

15.   Plaintiff is an individual domiciled in Discovery Bay, California and is *sui juris*. On February 8, 2018, Plaintiff had 23,033 XRB frozen by Defendants -- valued on or about February 8, 2018 at over Two Hundred Sixty Thousand Dollars ($260,000.00).

16.   Defendant Nano f/k/a RaiBlocks f/k/a Hieusys, LLC is a Texas company which lists its principal place of business in Austin, Texas. According to NANO's own published promotional materials, NANO is a "low-latency payment platform" that "utilizes a novel block-lattice architecture" on which "each account has [its] own blockchain as part of a larger directed acyclic graph." In layman's terms, NANO purports to have created a faster, cheaper, and more easily scalable blockchain and cryptocurrency that improves upon earlier blockchains and cryptocurrencies such as the widely-popular bitcoin.

17.   Defendant Colin LeMahieu ("LeMahieu") is an individual domiciled in Austin, Texas and is *sui juris*. According to Nano's own published promotional materials, LeMahieu founded

NANO in 2014 and serves as the Company's Lead Developer, "spearheading development of the core protocol."

18.     Defendant Mica Busch ("Busch") is an individual domiciled in Chicago, Illinois and is *sui juris*.  According to NANO's own published promotional materials, at all relevant times, Busch was a key member of Nano's core team, serving as a "Control System Developer" for Nano's "Residential" and "Enterprise" markets.

19.     Defendant Zach Shapiro ("Shapiro") is an individual domiciled in Brooklyn, New York and is *sui juris*.  According to Nano's own published promotional materials, at all relevant times, Shapiro was a key member of Nano's core team, as he "runs Mobile, Wallets, and Product" for the company and serves as the company's head iOS Developer.

20.     Defendant Troy Retzer ("Retzer") is an individual domiciled in Hilton Head Island, South Carolina and is *sui juris*.  According to Nano's own published promotional materials, Retzer is a key member of Nano's core team, as he manages and directs the company's marketing and Community and Public Relations efforts.

21.     Defendant B.G. Services SRL f/k/a BitGrail SRL f/k/a Webcoin Solutions ("BitGrail") was a cryptocurrency exchange operating in Italy which was primarily focused on creating and sustaining a market for XRB/Nano.  In July 2018, an Italian Court of Appeals orders BitGrail's assets to be frozen with the anticipation that the minimal funds remaining will eventually be used to refund investors such as Plaintiff.

22.     Defendant Francesco "The Bomber" Firano ("Firano") is an individual believed to be domiciled in Italy and the sole proprietor of BitGrail.  Much like his partners the Nano Defendants, Firano has consistently blamed the Nano Defendants for the "loss"/theft of the putative class's funds from BitGrail.

23.     In addition to those persons and entities set forth as Defendants herein, there are likely other parties who may well be liable to Plaintiff and the Class but respecting whom Plaintiff currently lacks specific facts to permit him to name such person or persons as a party defendant.  By not naming such persons or entities at this time, Plaintiff is not waiving his right to amend this pleading to add such parties, should the facts warrant the addition of such parties.

## CLASS ACTION ALLEGATIONS

24.     A class action is the proper form to bring Plaintiff's and the Class' claims under Rule 23 of the Federal Rules of Civil Procedure.  The proposed class is so large that joinder of all members would be impractical.  Additionally, there are questions of law or fact common to the class, the claims or defenses of the representative parties are typical of the claims or defenses of the class, and the representative parties will fairly and adequately protect the interests of the class.

25.     Plaintiff brings this nationwide class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all members of the following class:

> **All BitGrail investors and accountholders who are citizens of the United States and who, between January 1, 2015 and March 31, 2018, and who transferred bitcoins, alternative cryptocurrencies, or any other form of monies or currency to BitGrail to purchase, invest in, or stake XRB.  Excluded from the class are: Defendants themselves, Defendants' retail employees, Defendants' corporate officers, members of Defendants' boards of directors, Defendants' senior executives, Defendants' affiliates, and any and all judicial officers (and their staff) assigned to hear or adjudicate any aspect of this litigation.**

26.     This action satisfies all of the requirements of Federal Rules of Civil Procedure, including numerosity, commonality, predominance, typicality, adequacy, and superiority.

27.     Members of the Class are so numerous and geographically dispersed that joinder of all members is impractical.

28.     While the exact number of class members remains unknown at this time, upon information and belief, there are at least hundreds if not thousands of putative Class members.

29.     Again, while the exact number is not known at this time, it is easily and generally ascertainable by appropriate discovery.

30.     It is impractical for each class member to bring suit individually.

31.     Plaintiff does not anticipate any difficulties in managing this action as a class action.

32.     There are many common questions of law and fact involving and affecting the parties to be represented.

33.     When determining whether common questions predominate, courts focus on the issue of liability; and if the issue of liability is common to the class and can be determined on a class-wide basis, as in the instant matter, common questions will be held to predominate over individual questions

34.     Common questions include, but are not limited to, the following: (i) whether the XRB offered for sale by Defendants constitute securities under federal securities laws; (ii) whether Defendants violated federal securities laws in failing to register XRB as securities; (iii) whether by virtue of Defendants' custodianship over the proposed class' investments or by their control over the Nano network, Defendants' owed a fiduciary duty to Plaintiff and the proposed class and if so, whether that duty was breached; (iv) whether Defendants promoted XRP and BitGrail despite being aware of the exchange's shortcomings; (v) whether Defendants are liable for steering Plaintiff and the Class to BitGrail; (vi) whether statements made by Defendants about BitGrail were false or were made without due regard for the safety of those who read or heard the statements; (vii) whether Defendants have converted the funds belonging to Plaintiff and the Class; (viii) whether Defendants owed duties to Plaintiff and the Class, what the scope of those duties were, and whether Defendants breached those duties; (ix) whether Defendants' conduct was unfair or unlawful; (x) whether Defendants has been unjustly enriched; (xi) whether Plaintiff and the Class have sustained damages as a result of Defendants' conduct; and (xii) whether Defendants have within their power the ability to, and should, institute an equitable remedy that would resolve the harm that has befallen Plaintiff and the Class.

35.     These common questions of law or fact predominate over any questions affecting only individual members of the Class.

36.     Plaintiff's claims are typical of those of the other Class members because, inter alia, all members of the Class were injured through the common misconduct described above and were subject to Defendants' unfair and unlawful conduct.

37.     Plaintiff is advancing the same claims and legal theories on behalf of himself and all members of the Class.

38.     Plaintiff will fairly and adequately represent and protect the interests of the Class in that he has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class.

39.     Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel, experienced in complex consumer class action litigation of this nature, to represent him.  Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class.

40.     The infringement of the rights and the damages Plaintiff has suffered are typical of other Class members.

41.     To prosecute this case, Plaintiff has retained counsel experienced in class action litigation and has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

42.     Class action litigation is an appropriate method for fair and efficient adjudication of the claims involved herein.  Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; as it will permit a large number of Class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require.

43.     Class action treatment will permit the adjudication of relatively modest claims by certain Class members, who could not individually afford to litigate a complex claim against well-funded corporate defendants like Nano.

44.     Further, even for those Class members who could afford to litigate such a claim, it would still be economically impractical.  The nature of this action and the nature of laws available to Plaintiff make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and the Class for the wrongs alleged because:  Defendants would necessarily gain an unconscionable advantage if they were allowed to exploit and overwhelm the limited resources of each individual Class member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the

Class and will establish the right of each member of the Class to recover on the cause of action alleged; individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation; the Class is geographically dispersed all over the world, thus rendering it inconvenient and an extreme hardship to effectuate joinder of their individual claims into one lawsuit; there are no known Class members who are interested in individually controlling the prosecution of separate actions; and the interests of justice will be well served by resolving the common disputes of potential Class members in one forum.

45. Plaintiff reserves the right to modify or amend the definition of the proposed class and to modify, amend, or create proposed subclasses before the Court determines whether certification is appropriate and as the parties engage in discovery.

46. The class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

47. Because of the number and nature of common questions of fact and law, multiple separate lawsuits would not serve the interest of judicial economy.

48. As a result of the foregoing, Plaintiff and the Class have been damaged in an amount that will be proven at trial.

49. Plaintiff has duly performed all of his duties and obligations, and any conditions precedent to Plaintiff bringing this action have occurred, have been performed, or else have been excused or waived.

## SUBSTANTIVE ALLEGATIONS

### I.  Background on Blockchain Technology

50. A "blockchain" is essentially a digitized, decentralized, public ledger that cryptographically records, preserves, and presents information. The general idea is that each "block" contains information, such as details on transactions that are made. After a "block" is created (with cryptography so as to verify its contents), the information inside of it cannot be changed. The "block" then becomes part of the "blockchain" and an encrypted version of the information contained therein becomes publicly available along with all the previous "blocks" in the chain. After this process is complete, another block is created with additional information and so on and so forth.

51.     To date, most "blockchains" are used to record transactions involving virtual currencies, *e.g.*, bitcoin.  However, a "blockchain" could be used to record all types of information.  For example, a blockchain could be used for deed recordation/transfers or even transfers of stock certificates.

## II.     The Allure of XRB

52.     NANO was originally launched in or about December 2014 under the brand name RaiBlocks, and as a result, it is represented by the stock ticker symbol, XRB:



53.     On or about January 31, 2018, the company was rebranded as "Nano".   There are many different cryptocurrencies in the alternative currency world, and not all cryptocurrencies are the same or serve the same function.  Cryptocurrencies differ in many ways, including how widely accepted they are, how quickly they can be used in a transaction, and how costly they are to transact.

54.     The Nano Defendants promote XRB as having the following relative advantages over other cryptocurrencies: transactions in XRB are purportedly instant, carry no fees, and have no limit to their scalability.  By comparison to payments via credit or debit card, XRB purports to offer nearly instantaneous settlement of transactions with no transaction fees.

55.     Yet, like all cryptocurrencies, XRB experiences extreme price volatility.  Within the past year, XRB has commanded valuations between $0.10 and $37.62; it currently hovers below $1.00.

56.     Defendants have repeatedly acknowledged the speculative nature of XRB.  For example, when a Reddit user suggested that Nano peg XRB to another nomination of value (*e.g.*, the U.S. Dollar) to stabilize the valuation, Defendant Retzer replied, "It is only stable to another currency. If the pegged currency fails, so does the stable coin. **We are still in the highly speculative stage of cryptocurrencies.** As time goes on and projects gain adoption and success, the volitality [sic] will decrease."

57.     Similarly, in August 2018, when users on the Internet forum, Reddit.com, raised concern over the fact that the Nano Developer's Wallet had sold over $600,000 of XRB, Defendant Retzer assured the public that the funds were sold to pay for regular expenses, including salaries. However, Defendant Retzer also added, "[w]ith the current state of the market, it makes sense for the Nano foundation to hold cash to protect the dev fund in case of the price dropping in order to ensure that development continues into the future."

58.     The following month, in September 2018, when Reddit users again asked the Nano Core Team about the large positions sold by the Nano Core Team, Defendant Retzer again acknowledged the highly-speculative nature of XRB's future: "I said a few weeks ago, when the FUD [fear, uncertainty, doubt] was that we were cashing some of the dev funds, that we were simply hedging against a further market crash (It seems a bit backwards that there was FUD that we were selling and now FUD that we are quitting because no money, but alas..)."

///

///

///

///

///

///

///

11

59.     At times, Defendants offered investment advice to XRB holders:





60.     Indeed, Defendants even promoted XRB's coverage on investment shows such as CNBC's Fast Money:



61.     Defendant Shapiro went so far as to create an application specifically designed to monitor XRB's price:



## III.     XRB is Not Decentralized

62.     XRB is not a decentralized cryptocurrency.

63.     The Nano Defendants have made multiple representations to imply that they are merely part of a larger network that has collectively developed and maintained a decentralized protocol.  Such representations from the Nano Defendants are demonstrably false.  Investors in XRB rely almost exclusively on the efforts of Defendants and their core team.[1]

64.     To illustrate, on or about September 10, 2018, Reddit user DeepBlueMachine presented the following questions and concerns to the Nano Team concerning its apparent centralized nature:

1.     NANO centralization concerns, where 70-80% NANO are centralized even        currently.

2.     90% of github commits by one person working on the team Colin.

. . .

3.     Whales initially might have hired third-world country folks to solve captcha                and gain control of Nano. Currently 100 addresses hold 65% of all 133                million NANO which is kind of crazy.

---

[1]     *See* https://www.nano.org/en/team/ (last visited Oct. 8, 2018).

65. In response, Defendant Retzer acknowledged that Nano is centralized, that Defendant LeMahieu is responsible for developing at least 90 percent of all of Nano's underlying coding and programing, and that just 100 unique accounts own and hold at least 65 percent of the existing XRB:

> 1. **Nano has been steadily moving towards decentralization this year without really       any active programs pushing it.** As it becomes more of a focus I expect this trend to continue.
>
> 2. **Colin was the lone dev for a few years, so if you look at total commits then yea, he   is going to have the majority of them**. He also has not led the last 2 releases.
> . . .
> 3. **The did hire people to solve the captcha. Anyone was able to do this.** People buy     more bitcoin miners in order to have more bitcoin.

(Emphasis added).

66. Moreover, the Nano Core Team possesses more than 50 percent of the total voting power.  In addition to the Nano Core Team, a total of nine other representatives comprise the ownership of over 96 percent of the total voting power.

67. The Nano Core Team handles all aspects of business development and marketing.  As Defendant LeMahieu wrote in January 2018 on Reddit, it is merely wishful thinking that non-Nano Core Team members will contribute to Nano's development, and the Nano Core Team will not wait for those contributions to materialize:

> Right now we have about 12 people, half core and half business developers. I think this count is good for working on what we're doing right now which is getting wallets and exchanges worked on. I**deally people outside our team will start developing technology around xrb taking advantage of the network effect to build more technology faster than we could internally. That being said we're going to look in a few months to see if there's anything out there people aren't developing that should be and we'll see what people we need to make it happen.**

(Emphasis added).

68. While Nano might claim it is working towards the goal being a decentralized, that goal has yet to be achieved.  As Defendant LeMahieu  acknowledged in a post contrasting Nano from Ripple on Reddit on September 27, 2018, Nano is not yet decentralized (rather, that is the goal the Nano Core Team is working toward), the Nano Defendants make the important decisions, and the

1    Nano Defendants implement those important decisions: "Nano is 100% **aiming** for decentralized

2    interbank settlement though our approach is compared to [Ripple]. **We're** plugging in to the existing

3    FX trading economy with a currency that has instant settlement. . . **We're** taking incremental steps

4    which will be far, far easier for FX to adopt instead of trying to boil the oceans from the start."

5    (Emphasis added).

6        69.    Stated otherwise, the Nano Defendants wield absolute control over essentially every

7    aspect of XRB and its value—and continued existence—is based entirely on their actions, or

8    inactions.  This significant control creates a special relationship giving rise to a fiduciary duty that the

9    Nano Defendants owed investors such as Plaintiff and the proposed Class.

10   **IV.    Cryptocurrency Faucets**

11       70.    To incentivize the adoption and use of XRB, Defendants focused on distributing XRB

12   to as many people as possible.  Rather than sell XRB for a price per coin, Defendants used a method

13   of distribution known as a "faucet."

14       71.    It is critical to keep in mind that developers utilize faucets to generate public use,

15   adoption and interest.  By giving away cryptocurrency for free, individuals can amass cryptocurrency

16   without spending any money on purchasing the cryptocurrency.   Individuals who collect

17   cryptocurrencies have a vested interest in their development, use, and mass adoption.  Consequently,

18   faucets provide a way to build and grow a community of people who are interested in increasing the

19   value of that particular cryptocurrency.

20       72.    To collect cryptocurrency from a faucet, an individual takes the following steps: (1)

21   visit a website featuring the subject faucet; (2) type in the wallet address where the individual wants

22   the cryptocurrency delivered; (3) click on a captcha (e.g., clicking an "I am not a robot" box); and (4)

23   wait for a period of time before repeating the process (e.g., 10 minutes, 1 hour, etc.).

24   ///

25   ///

26   ///

27   ///

28   ///

73. Below is an example of a faucet distributing XRB:



74. Once an individual completes this simple process, the faucet then distributes a (small) percentage of the total amount of cryptocurrency dedicated to the faucet. For example, a developer team might assign 10 million of its coins to a faucet, and then permit 100 individuals per hour to collect .01 percent of that allocated sum from the faucet. In practice, this means that the first 100 people to go to the faucet's website, type in their wallet address, and click on the captcha, will collect 1,000 coins per hour.

## V. The Nano Faucet

75. Beginning in early 2016, Defendants opened a faucet for distributing XRB (hereafter, the "Nano Faucet"). The Nano Faucet operated for approximately one and a half years before closing on or about October 15, 2017.

76. The Nano faucet was an undeniable success. Defendants assigned the then-total-existing supply of XRB to the faucet. They permitted between 100 and 150 individuals to claim approximately 1,000 XRB per hour throughout that time period. By October 2017, individuals across the world had claimed more than 120 million XRB, or approximately 40 percent of the then-existing total supply of XRB.

///

///

77.     In fact, the Nano Defendants acknowledged that many individuals devoted themselves to collecting XRB (among other cryptocurrencies) full-time, like a job:



78.     With a robust network of individuals who owned and possessed XRB, Defendants were positioned to lead that network toward a shared goal to see XRB appreciate in value.

79.     Contemporaneous with the termination of the Nano Faucet, Defendants (a) withheld seven million XRB for themselves for their work in conceiving, developing, promoting, and selling XRB to the public; and (b) "burned" (meaning, purportedly sent to three digitals wallets that are inaccessible) the undistributed 60 percent of XRB that was not claimed during the Nano Faucet.  In other words, Defendants condensed the entire value of XRB supply into the remaining 40 percent:



80.     Consistent therewith, the price of XRB nearly doubled at that time, from $0.09 to nearly $0.17:



81.     As Defendant Busch acknowledged, during the Nano Faucet, the constant distribution of XRB to the public diluted the value of his shares, but Defendants' strategy of patiently waiting to grow a robust and interested network of holders resulted in substantial price appreciation:



82.     In addition, Defendant Busch wrote that the termination of the Nano Faucet eased "sell pressure." In other words, the end of the Nano Faucet meant that individuals who acquired XRB by purchasing it with fiat or cryptocurrency translated into in holders of XRB who were less interested in quickly selling their holdings:



83.     In sum, Defendants stood to reap enormous returns by virtue of a robust and widespread network of individuals buying, selling, and trading XRB.

84.     The Nano Faucet served as the tool by which Defendants created and grew a public network of individuals invested in the development, adoption, and sustained growth of XRB.

85.     After the termination of the Nano Faucet, Defendants focused on promoting and encouraging individuals to purchase, sell, and trade XRB on online exchanges.

86.     Although the termination of the Nano Faucet briefly doubled the price of XRB to nearly seventeen cents ($0.17), it was trading on an exchange known as BitGrail that drove the price of XRB up to nearly twelve dollars ($12.00) as of the February 8, 2018 loss.

**VI.     Nano's Close Relationship With BitGrail**

87.     A consumer's desire to purchase a particular cryptocurrency is one thing; finding a place to purchase that cryptocurrency is another.

88.     Prior to February 2018, by Defendants' calculated choice, XRB was available at essentially only one cryptocurrency exchange in the world: BitGrail.

89.     BitGrail was far-and-away XRB's largest marketplace -- a result of strategic positioning and widespread marketing efforts by Defendants.

90.     As evident, the Nano Defendants and the BitGrail Defendants had a very close relationship, from which they mutually profited.

91.     Defendants were eager to gain access to a large platform on which investors could purchase, stake, and liquidate XRB; and Defendants chose BitGrail as the exchange to which Defendants would drive all XRB investor interest -- primarily those investors who are non-accredited, U.S.-based investors.

92.     To have its XRB accepted and listed on BitGrail's trading exchange, Nano worked closely with BitGrail to integrate XRB and its blockchain protocol into BitGrail's platform -- a task that required significant time, effort, and communication between BitGrail and Nano.

93.     In return for having XRB listed for purchase and sale at BitGrail, Defendants were compensated -- first, with the ability to liquidate the XRB; and second, upon information and belief, as a source of referrals.

94.     Moreover, Defendants recommended BitGrail on NANO's Twitter feed, on Reddit, on Slack, on Telegram, on Medium, and on its official website multiple times:



95.     In addition, several of Defendants herein made to members of the Class specific representations that BitGrail was a safe and secure exchange at which to deposit and hold XRB for investment purposes and for future transactions.  For example:



96.     Based on Defendants' assistance, promotion, and instruction, BitGrail became the predominate and nearly exclusive home for XRB.  In fact, XRB/BTC[2] was the most popular trading pair at BitGrail and constituted more than eighty percent (80%) of BitGrail's overall trading volume.

97.     Defendants publicly promoted BitGrail as a safe and reliable place for XRB holders to stake and exchange their XRB, and XRB holders relied on that endorsement by Defendants in choosing the exchange that would house their valuable assets.

_____

[2]  "XRB/BTC" represents the exchange of XRB for bitcoin (BTC), the most widely-used and recognizable alternative currency in the world.  In other words, participants on the exchange traded bitcoin for XRB (and vice versa).

98. For example, when one concerned XRB holder questioned Defendants about the sagacity of relying upon the otherwise unknown BitGrail exchange and its founder and principal operator, Francesco "The Bomber" Firano, Defendant Shapiro publicly represented on Twitter that he speaks with Mr. Firano every day and that both Mr. Firano and BitGrail can be trusted:



99. As another example, a mere four days before the loss of $170 million of XRB, Defendants represented that all of BitGrail's issues were "100% on our radar":



100. However, in early-February 2018, when BitGrail announced that it had "lost" $170 Million worth of XRB from its exchange -- approximately eighty percent (80%) of the XRB that BitGrail customers held in their accounts – the Nano Defendants suddenly sought to put more

distance between themselves and the BitGrail Defendants than even the Atlantic Ocean could provide. So much so that Defendant Firano described Nano, his relationship with the Company and their subsequent falling out as follows:

> As we continued to work with the NANO team consistently, the majority of the time I highly recommended to them that we close the markets because of major issues with the NANO protocol, but they were hesitant and forced me to keep it open and sometimes begged as well.
>
> To mention again, the NANO team, especially Colin LeMahieu had complete access to our servers for a while as we gave him direct access to the database and servers. That is how close we worked as a team and as a preferred exchange which they forced me to keep open, despite my constant warnings about the technology and problems we were having for months.
> . . .
> The Nano team was relentless in directing users to the BitGrail exchange despite the major issues I had consistently warned them about. . . .
> . . .
> They used me and BitGrail to gain entry into the virtual cryptocurrency market.

101. Simply stated, the Nano Defendants created the XRB currency, they directed XRB investors to place their assets at BitGrail (an exchange that they essentially controlled); and when nearly all of the XRB purportedly safeguarded at BitGrail disappeared, Defendants disavowed any responsibility for the harm the XRB investors suffered.

102. Moreover, even though the most direct solution to the XRB investors' problems resides squarely within Defendants' hands, Defendants have refused to implement any such solution. Specifically, Defendants can rewrite the XRB code and simply restore ownership to Plaintiff and the Class. In crypto terms, Defendants can create a "rescue fork" to protect Plaintiff's and the Class' property rights. Defendants, however, have refused to implement that strategy because it is not in their own best interests. The reason is simple: Defendants still own and control millions if not tens of millions of XRB and do not want to sacrifice any financial advantage they currently hold over the average XRB investor victimized by the XRB disappearance at BitGrail, which Defendants would do by "rescue forking" and returning the stolen digital assets. At times relevant hereto, Lemahieu, Busch Coxon, Shapiro, and Retzer each took to social media outlets -- including Twitter, Facebook,

Medium, and Reddit -- to promote XRB and BitGrail as a purported safe haven at which investors
could stake and trade their XRB for profit.

103.    Unfortunately, in their fervent push to drive XRB investors to BitGrail, Defendants
either failed in their due diligence or knowingly disregarded many material concerns about BitGrail's
operations, safety, and reliability and/or deficiencies in the XRB code itself.

**VII.    Nano's Recommendations Omit BitGrail's Security Problems and Lack of Reliability**

104.    Notwithstanding Defendants' widespread promotion of BitGrail as a safe haven for
XRB investors, BitGrail's troubled past, uncertain present, and questionable future make Defendants'
recommendations highly suspect, if not outright reckless.

      A.    The Trading Platform Problem

105.    In early-January 2018, many BitGrail users reportedly experienced problems with the
reliability and security of BitGrail's trading platform.

106.    For some users, account balances would inexplicably (and inaccurately) slip into
negative figures.

107.    For some users, single account deposits were processed twice.

108.    BitGrail accountholders took to social media to decry the lack of reliability and
trustworthiness of BitGrail's operations or the reliability of the XRB code itself.

109.    Despite the account glitches and functionality concerns that affected so many BitGrail
users, the Nano Defendants did not distance themselves from the BitGrail Defendants as a direct
result of the problems.  Rather, according to Defendant Firano, the Nano Defendants "forced" him to
keep XRB on BitGrail despite his warnings.

      B.    The Verification Problem

110.    In or about mid-January 2017, BitGrail proved itself unable to timely verify its new
users, which left those users incapable of engaging in anything more than a very meager volume of
transactions -- a frustrating circumstance that rendered the users' accounts effectively useless with
regard to the purpose for which the accounts were opened.

111. NANO and BitGrail had a public spat over BitGrail's verification problem, and some asserted that the problem stemmed from NANO's failure to cooperation with BitGrail's business model.

112. Despite the verification issue that plagued so many BitGrail users, Defendants did not distance themselves from BitGrail as a direct result of the problem.

C. The $170 Million Disappearing XRB Problem

113. In early-February 2018, BitGrail announced that it had "lost" $170 Million worth of XRB from its exchange due to "unauthorized transactions." The "missing" XRB amounted to approximately eighty percent (80%) of the XRB that BitGrail customers held in their accounts and amounts to nearly fifteen percent (15%) of all XRB in existence.

114. In the aftermath of the purported XRB theft that devastated BitGrail's inventory of the cryptocurrency, the Nano Defendants and the Bitgrail Defendants engaged in yet another very public dispute over the cause of the problem and how it should be resolved.

115. The Nano Defendants accused Defendant Firano of trying to cover-up the event and of asking NANO to engage in purportedly unethical behavior to solve the problem. According to NANO, the problem stemmed from flaws related to BitGrail's software, not any issue in the XRB protocol.

116. BitGrail denied all allegations of wrongdoing and alleged that NANO was unwilling to cooperate in formulating a solution.

117. In the wake of the latest of the calamities in the relationship between BitGrail and NANO, BitGrail users have sought to move their XRB off of the BitGrail exchange into private cryptocurrency wallets; however, BitGrail has made such withdrawals impossible by suspending all account activity.

118. The XRB holders at BitGrail -- including Plaintiff and the Class -- were ushered there by the Nano Defendants, those users relied on Defendants' representations in investing their assets at BitGrail, and those users have now been burned by the Nano Defendants and the BitGrail Defendants.

119. NANO has the ability to make whole all those who lost XRB in the purported theft from BitGrail by simply "forking" its blockchain, creating a commensurate number of new tokens for

those aggrieved by the purported theft, and distributing them to each BitGrail user affected by the purported theft.

120.    Notwithstanding the fact that NANO has within its power the ability to remedy the situation, NANO has chosen instead to make the very community of supporters who give value to NANO's cryptocurrency suffer for their reliance on NANO's unqualified recommendation of, and public representations of trust of, BitGrail as the place where XRB should be kept and traded.

**VIII.    XRB Are Unregistered Investment Contract Securities**

121.    In addition to recklessly directing XRB investors to utilize BitGrail, NANO's XRB themselves are securities; which Defendants offered and sold without either registering with the necessary governmental authorities or obtaining an exemption from such registration.

122.    Under the Securities Act, a "security" is defined as including any "note," "investment contract," or "instrument commonly known as a 'security.'" *See* 15 U.S.C. §§ 77b(a)(1).  Here, XRB are investment contracts.  In *SEC v. W.J. Howey Co.*, the United States Supreme Court established a three-part test to determine whether an offering, contract, transaction, or scheme constitutes an investment contract.[3]  Under the test articulated in *Howey*, a contract, transaction, or scheme is an "investment contract" if it involves: (*i*) the investment of money; (*ii*) in a common enterprise; (*iii*) with the expectation of profits to come solely from the efforts of others.

123.    When determining whether a security has been offered and sold, the focus must be on the economic realities underlying the transaction.  Here, the economic realities are that Plaintiff and the Class invested funds and assets to stake and trade XRB -- each of which they expected would lead to lucrative returns.  Investors in XRB used cryptocurrency or fiat currency to purchase the XRB required to make their investments.    Accordingly, Plaintiff's and the Class' investment of cryptocurrency or fiat currency constitutes an investment of money for the purposes of determining whether an investment involved a security.

---

[3] *See SEC v. W.J. Howey, Co.*, 328 U.S. 293 (1946); *see also Intern. Bhd. of Teamsters v. Daniel*, 421 U.S. 837, 852 (1979) (noting that the *Howey* test is not the only test for determining a security but has been held to embody "all the attributes that run through all of the Court's decisions defining a security").

124.     Plaintiff and the Class were investing in a common enterprise with Defendants, as the cryptocurrency and fiat currency were pooled under the control of Defendants, and the success of XRB -- and thus potential profits stemming from the future valuation of XRB -- was entirely reliant on Defendants' actions, primarily Defendants' ability to maintain and expand the functionality of XRB, thus providing financial returns to investors.

125.     In short, it is indisputable that Defendants were selling investment contracts and that any success from Defendants' development, maintenance, and expansion of the functionality of XRB -- as well as any future potential increases to the value of XRB -- were entirely dependent on Defendants' actions.

126.     Despite XRB's clear characterization as a "security," Defendants did not register XRB with any regulatory authority in the United States as required by federal securities laws.

127.     Furthermore, Defendants neither applied for, nor received, an exemption from registration of XRB with regulatory authorities in the United States as required by federal securities laws.

128.     U.S. securities regulation focuses on, *inter alia*, mandatory disclosures that require issuers of securities to make publicly available certain information that regulators deem material to investors.  When those necessary disclosures are not made -- and regulators have not granted an exemption to the normal requirement of such disclosures -- investors are at risk of undue harm.  Indeed, in the instant matter, XRB investors were lured into investing their funds and assets in the self-issued cryptocurrency being offered by Nano and were further lured by Defendants into staking and exchanging those investments at BitGrail.  Without adequate protections in place, Plaintiff and the Class have suffered millions of dollars of harm; and the Nano Defendants -- without regard to the regulatory environment in which they live and operate their business -- have tried to distance themselves from that harm and have refused to institute the remedy well within their grasp, simply because it does not suit their own financial interests.

///

///

///

## FACTS SPECIFIC TO INVESTOR PLAINTIFF JAMES FABIAN

129.    On or about August 16, 2017, Plaintiff Fabian purchased 1.62457112 bitcoin (BTC) on Coinbase's website (www.coinbase.com) using a credit card.  The total purchase price was $7,104.30 with each bitcoin worth $4,308.83.

130.    On August 22, 2017, Plaintiff Fabian transferred his entire 1.62457112 BTC to Bittrex, a cryptocurrency exchange (www.bittrex.com).

131.    On August 31, 2017, Plaintiff Fabian opened an account on BitGrail and then transferred .66971933 BTC from his Bittrex bitcoin wallet to BitGrail.  At the time, the .66971933 BTC had a value of approximately $3,220.

132.    To open and manage his BitGrail account, Plaintiff logged onto BitGrail's website from his home and followed the instructions provided.

133.    On September 1, 2017, the .66971933 BTC became available on BitGrail, and Plaintiff Fabian used that entire sum to purchase approximately 21,143 XRB.

134.    On December 12, 2017, Plaintiff Fabian transferred $2,850.00 to BitGrail to purchase another 2,000 XRB.

135.    As of December 12, 2017, Plaintiff Fabian purchased and held on BitGrail 23,143 XRB with a total purchase price of $6,070.00.

136.    In deciding to invest in XRB and open an account at BitGrail, Plaintiff Fabian reviewed and relied upon Defendants' promotions on social media channels and/or statements made on NANO's own website representing that BitGrail is a safe and reliable exchange on which to purchase and stake XRB.

137.    Shortly before Plaintiff Fabian lost control and possession of his 23,143 XRB on BitGrail, he transferred 110 XRB to a separate XRB wallet off of BitGrail.  Therefore, he owned and held a total of 23,033 XRB in his BitGrail wallet.

138.    The 23,033 XRB had a market value of approximately $275,000 as of February 8, 2018.

///

///

## COUNT I

### Claim for Violation of Section 12(a)(1) of the Securities Act of 1933
### Against All Defendants

139.     Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 137 above, and further alleges:

140.     Section 12(a)(1) grants Plaintiff a private right of action against any person who offers or sells a security in violation of Section 5, and states that such person,

> Shall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

141.     Between January 2015 and March 2018, in connection with the offer and sale of XRB, Defendants unlawfully made use of means or instruments of transportation or communication in interstate commerce or of the mails for the purposes of offering, selling, or delivering unregistered securities in direct violation of the Securities Act.

142.     The offer and sale of XRB constituted the offer and sale of unregistered securities under controlling federal law.  XRB exhibit the following particular hallmarks of a security under the *Howey* test: (a) to receive any XRB, an investment of money, in the form of cryptocurrency and/or fiat currencies was required; (b) the investment of money was made into the common enterprise that is Defendant NANO and its ability to provide value to the XRB through the functionality and popularity of its self-created XRB; and (c) the success of the investment opportunities and any potential returns thereon were entirely reliant on Defendants' ability to maintain and expand the functionality and popularity of XRB, thus providing financial returns to investors.

143.     Each of the individual Defendants constitute "seller[s]" under the Securities Act and are thus equally liable for selling unregistered securities in connection with XRB.  As such, Defendants have participated in the offer and sale of unregistered securities in violation of the Securities Act and are liable to Plaintiff and the Class for rescission and/or compensatory damages

///

///

///

**COUNT II**

**Claim for Violation of Section 15(a) of the Securities Act of 1933**
**Against the Individual Defendants**

144.   Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 137 above, and further alleges:

145.   Due to their ownership in and/or control over the business operations of Defendant Nano and/or BitGrail, Defendants Lemahieu, Busch, Shapiro, Retzer and Firano acted as controlling persons of Nano and/or BitGrail within the meaning of Section 15(a) of the Securities Act as alleged herein.

146.   By virtue of their positions as managers, directors, and key members of Nano's core team and by their participation in and/or awareness of Defendant Nano's operations, Defendants Colin LeMahieu, Mica Busch, Zach Shapiro, Troy Retzer and Firano had the power to influence and control and did influence and control, directly or indirectly, the decision making relating to the development and success of XRB, including the decision to engage in the sale of unregistered securities in furtherance thereof.

147.   By virtue of the foregoing, Defendants Colin LeMahieu, Mica Busch, Zach Shapiro, Troy Retzer and Francesco "The Bomber" Firano are liable to Plaintiff and the Class as control persons of Defendant NANO and/or BitGrail under Section 15(a) of the Securities Act.

**COUNT III**
**Breach of Contract**
**Against All Defendants**

148.   Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 137 above, and further alleges:

149.   The BitGrail Defendants breached its contracts with Plaintiff and the Class by failing to safeguard their funds and disabling the ability for accountholders to withdraw their XRB assets from the exchange.  Similarly, by virtue of the Nano Defendants' control over BitGrail's actions relating to XRP, they were also parties to these same implied contracts.  BitGrail converted Plaintiff's and the Class' investments into non-existent XRB.

150.     By virtue of the foregoing, Defendants are liable to Plaintiff and the Class for damages resulting from Defendant BitGrail's and Nano's breaches of contract.

## COUNT IV
### Breach of Fiduciary Duty
### Against All Defendants

151.     Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 137 above, and further alleges:

152.     The BitGrail Defendants, as custodian over Plaintiff's and the Class's investment deposits, unquestionably had a duty to its accountholders to safeguard their funds and make such funds available upon request.  The BitGrail Defendants breached this duty when they allowed nearly $20 million in XRB to simply vanish.

153.     Similarly, the Nano Defendants, by virtue of their unbounded control over the XRB protocol and partnership with BitGrail for coding and running the website's XRB-related programing, security and exchange place, Defendants, also had a special fiduciary relationship with Plaintiff and the Class and is liable for breaching that duty.

## COUNT V
### Aiding and Abetting Breach of Fiduciary Duty
### Against the Individual Defendants

154.     Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 137 above, and further alleges:

155.     The BitGrail Defendants, as custodian over Plaintiff's and the Class's investment deposits, unquestionably had a duty to its accountholders to safeguard their funds and make such funds available upon request.  The BitGrail Defendants breached this duty when they allowed nearly $20 million in XRB to simply vanish.

156.     If the Nano Defendants control over the XRB protocol or involvement with BitGrail's operations did not create the existence of a special fiduciary relationship, at minimum their actions, or inactions, aided and abetted the BitGrail Defendants' breaches of their duties to the Class.

///

///

## COUNT VI
### Fraud
### Against All Defendants

157. Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 137 above, and further alleges:

158. Actual fraud consists of, inter alia, any of the following acts "committed by a party to the contract, or with his connivance, with intent to deceive another party thereto, or to induce him to enter into the contract": (1) the "suggestion, as a fact, of that which is not true, by one who does not believe it to be true"; (2) the "positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true"; (3) the "suppression of that which is true, by one having knowledge or belief of the fact"; or (4) "[a]ny other act fitted to deceive."

159. Due to Defendants actual knowledge that BitGrail lacked the safeguards necessary to manage Plaintiff's and the Class's investment assets, Defendants are liable to Plaintiff and the Class for damages. Similarly, due to the fact that the Individual Defendants knew or were grossly negligent in not knowing that BitGrail should not be entrusted with the Class's investments—the Individual Defendants are likewise liable for committing actual fraud and thus, are liable to Plaintiff and the Class for damages.

## COUNT VII
### Negligent Misrepresentation
### Against All Defendants

160. Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 137 above, and further alleges:

161. Defendants, by acts of both omission and commission, made to Plaintiff and the Class false statements of material facts about the services Plaintiff and the Class would receive from BitGrail upon opening a BitGrail account and investing in XRB in exchange for the fees they were compelled to pay to maintain accounts at BitGrail.

162. Specifically, Defendants' representations to Plaintiff and the Class that, among other things:

(a) BitGrail had in place adequate security measures to properly safeguard BitGrail accountholders' assets;

(b) BitGrail's software was free of inherent flaws that might expose XRB holders to transactional irregularities, failures, or falsely-reported negative account balances;

(c) BitGrail was solvent and able to satisfy its obligations to its accountholders; and

(d) NANO's blockchain protocol was free of inherent flaws that might expose XRB holders to attacks, security breaches, or transactional failures;

were false, and Defendants knew, or should have known, at the time the statements were made that the statements were false.

163. Defendants had no reasonable grounds upon which to believe the statements were true when made to Plaintiff and the Class.

164. Defendants intended that Plaintiff and the Class would be induced into action by relying upon the statements of fact made to them by and on behalf of Defendants.

165. In considering whether to open accounts at BitGrail, invest in XRB, and entrust to BitGrail their valuable assets; Plaintiff and the Class reasonably and justifiably relied on the statements of fact made to them by and on behalf of Defendants.

166. As a direct and proximate result of Plaintiff's and the Class' reliance on the statements made to them by Defendants, Plaintiff and the Class have suffered damage.

## COUNT VIII
### Constructive Fraud
### Against All Defendants

167. Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 137 above, and further alleges:

168. Constructive fraud includes: "any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or anyone claiming under him, by misleading another to his prejudice, or to the prejudice of any one claiming under him" or "any such act or omission as the law specially declares to be fraudulent, without respect to actual fraud."

169. The Individual Defendants each undertook substantial efforts to promote XRB and the use of BitGrail. In the event the Individual Defendants are not found liable for "actual fraud," at minimum, each Individual Defendant gained substantial personal benefits as a result of their significant and persistent efforts to induce the unwitting public to invest in BitGrail knowing full-well that it lacked the necessary security features to safeguard deposits, constituting constructive fraud and thus, are liable to Plaintiff and the Class for damages.

## COUNT IX
### Unjust Enrichment
### Against All Defendants

170.  Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 137 above, and further alleges:

171.  Defendants have reaped the benefits from inducing Plaintiff and the Class to invest in XRB-filled accounts at BitGrail, thereby causing actual harm to thousands of investors.

172.  It would be unconscionable and against the fundamental principles of justice, equity, and good conscience for Defendants to retain the substantial monetary benefits they have received as a result of their misconduct.

173.  To remedy Defendants' unjust enrichment, the Court should order Defendants to immediately return Plaintiff's and the Class' investments and disgorge any amounts received by Defendants as a result of their misconduct alleged herein.

## COUNT XI
### Civil Conspiracy
### Against All Defendants

174.  Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 – 137 above, and further alleges:

175.  Defendants conspired with one another to perpetrate an unlawful act upon Plaintiff and the Class or to perpetrate a lawful act by unlawful means, *to wit*: they recklessly made to Plaintiff and the Class multiple misrepresentations of fact about the safety and security of BitGrail's trading exchange as well as Nano's own blockchain network in an effort to extract from Plaintiff and the Class funds, assets, and cryptocurrency to fund Nano's business expenses and to enrich their Directors, shareholders, and the Nano Core Developers and representatives, including Defendants Colin Lemahieu, Mica Busch, Zach Shapiro, and Troy Retzer -- all of which put Defendants' own pecuniary interest ahead of Plaintiff's and the Class' welfare and economic safety.

176.  Defendants solicited and/or accepted from Plaintiff and the Class large sums of funds, assets, and cryptocurrency while withholding from Plaintiff and the Class certain material facts, including:

(a) Defendants were compensated by having XRB liquidated at BitGrail;

(b) BitGrail did not have in place adequate security measures to properly safeguard BitGrail accountholders' assets;

(c) NANO's blockchain protocol had inherent flaws, including an unreliable timestamp record; and

(d) BitGrail was, at times material to this matter, insolvent and thus unable to satisfy its obligations to its accountholders.

177. All Defendants agreed to the illicit purpose for garnering investment monies from Plaintiff and the Class so that Nano's Directors, shareholders, and Defendants could enjoy well-compensated lifestyles with Plaintiff's and the Class' funds, assets, and cryptocurrency.

178. Defendants were each aware of, and consented to, the misrepresentations detailed above and knew that the efforts to garner funds, assets, and cryptocurrency from Plaintiff and the Class was all part of a relationship aimed solely at enriching Nano's Directors, shareholders, and Defendants without due regard for the safety of those who entrusted their valuable funds, assets, and cryptocurrency to BitGrail and Nano.

179. In furtherance of their conspiracy, Defendants made to Plaintiff and the Class, or agreed to have someone make on their behalf, the false, misleading, and reckless statements of fact detailed above and purposefully withheld from Plaintiff and the Class certain material facts detailed above in a concerted effort to obtain Plaintiff's and the Class' funds, assets, and cryptocurrency.

180. To fulfill its role in the conspiracy, Nano -- by and through Defendants, amongst others -- referred thousands of investors to BitGrail to open up accounts at the exchange, in return for which NANO received large payments in connection with XRB being traded on the BitGrail exchange.

181. To fulfill their role in the conspiracy, Defendants Colin LeMahieu, Mica Busch, Zach Shapiro, and Troy Retzer created and managed the XRB network and used social media channels such as Twitter, Medium, and Reddit to recruit unsuspecting investors in the United States and abroad to purchase XRB investments and allow the liquidation of XRB coins and/or store those valuable assets at the inherently unsafe BitGrail exchange. For their efforts, Defendants Colin LeMahieu, Mica Busch, Zach Shapiro, and Troy Retzer were paid sizeable incomes and/or retain valuable XRB coins that were not hacked at BitGrail.

182.     BitGrail and/or Nano's systems were inherently flawed and dangerously exposed XRB investors to significant if not total loss of their investments -- something of which Defendants Colin LeMahieu, Mica Busch, Zach Shapiro, and Troy Retzer were aware and which they accepted as part of the scheme to lure investors into purchasing XRB and storing those assets at BitGrail.

183.     In addition, Defendants agreed to sell XRB investment contracts without registering them with the necessary governmental authorities or obtain from those authorities an exemption from having to register the XRB.

184.     Moreover, Defendants have conferred and agreed amongst themselves to not implement any form of relief for Plaintiff and the Class that would impact Defendants' war chest of the millions if not tens of millions of XRB they retained and hold -- once again elevating their own pecuniary interest ahead of Plaintiff's and the Class' welfare and economic safety.

185.     As a direct and proximate result of Defendants' conspiracy, Plaintiff and the Class have suffered damage; and Defendants should be ordered to rescind Plaintiff's and the Class' purchases of/investments in XRB and/or restore to Plaintiff and the Class -- by a "rescue fork" or some other procedure -- the assets and funds wrongfully taken from them.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the proposed Class pray for relief and judgment against Defendants, as follows:

A.     Declaring that this action is properly maintainable as a class action and certifying Plaintiff as the Class representative and his counsel as Class counsel;

B.     Declaring that Defendants offered and sold unregistered securities in violation of the federal securities laws;

C.     Declaring Defendants are liable to Plaintiff and the Class under Sections 12(a)(1) and/or 15(a) of the Securities Act;

D.     A judgment awarding Plaintiff and the Class equitable restitution, including, without limitation, rescission of their investments in all XRB held in accounts at BitGrail, restoration of the *status quo ante*, return to Plaintiff and the Class all cryptocurrency or fiat currency they paid as a result of Defendants' unlawful and unfair business practices and conduct, and an order requiring

NANO to "rescue fork" the allegedly missing XRB into a new cryptocurrency in a manner that would fairly compensate Plaintiff and the Class for each missing XRB and would eliminate all of the "missing" XRB;

E.     An award of any and all additional damages recoverable under law -- jointly and severally entered against Defendants -- including but not limited to compensatory damages, punitive damages, incidental damages, and consequential damages;

F.     An Order requiring an accounting of the remaining funds and assets raised from Plaintiff and the Class in connection with XRB;

G.     An Order imposing a constructive trust over the funds and assets rightfully belonging to Plaintiff and the Class;

H.     Awarding pre-judgment and post-judgment interest;

I.     Awarding Plaintiff and the Class reasonable attorneys' fees, expenses, and the costs of this action; and

J.     Granting other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury of all claims so triable.

Dated: January 3, 2019                    **LEVI & KORSINSKY, LLP**

By: _/s/ Rosanne L. Mah_
Rosanne L. Mah
**LEVI & KORSINSKY, LLP**
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 373-1671
Facsimile: (415) 484-1294

Donald J. Enright (to be admitted *pro hac vice* )
Email: denright@zlk.com
John A. Carriel (to be admitted *pro hac vice* )
Email: jcarriel@zlk.com
**LEVI & KORSINSKY, LLP**
1101 30th St., NW, Ste. 115
Washington, DC 20007
Telephone: (202) 524-4290
Facsimile: (202) 333-2121

David C. Silver (to be admitted *pro hac vice*)
E-mail: DSilver@SilverMillerLaw.com
Jason S. Miller (to be admitted *pro hac vice*)

E-mail: JMiller@SilverMillerLaw.com
Todd R. Friedman (to be admitted *pro hac vice*)
E-mail: TFriedman@SilverMillerLaw.com
**SILVER MILLER**
11780 W. Sample Road
Coral Springs, Florida 33065
Telephone:(954) 516-6000

*Counsel for Plaintiff JAMES FABIAN*