RYAN M. LAPINE, ESQ. (Cal. Bar No. 239316)
*rlapine@rmslaw.com*
JOSHUA H. HERR, ESQ. (Cal. Bar No. 301775)
*jherr@rmslaw.com*
ROSENFELD, MEYER & SUSMAN LLP
232 North Canon Drive
Beverly Hills, California 90210-5302
Telephone: (310) 858-7700
Facsimile: (310) 860-2430

Attorneys for Plaintiffs
NANO FOUNDATION, LTD. and
COLIN LeMahieu

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NANO FOUNDATION, LTD., a New York non-profit corporation; and COLIN LeMAHIEU, an individual, <br><br> Plaintiffs, <br><br> vs. <br><br> DAVID C. SILVER, an individual, <br><br> Defendant. | Case No. 2:19-cv-04237 DDP (PJWx) <br><br> **PLAINTIFFS NANO FOUNDATION, LTD. AND COLIN LEMAHIEU'S OPPOSITION TO DEFENDANT DAVID C. SILVER'S SPECIAL MOTION TO STRIKE COMPLAINT PURSUANT TO CAL. CODE CIV. PROC. § 425.16** <br><br> Date:    August 5, 2019 <br> Time:    1:30 p.m. <br> Judge:   Hon. Stephen V. Wilson <br> Ctrm:    10A - 10th Floor |

LAW OFFICES
**ROSENFELD, MEYER & SUSMAN LLP**

520507.03

_____
PLAINTIFFS' OPPOSITION TO DEFENDANT'S SPECIAL MOTION TO STRIKE COMPLAINT PURSUANT TO C.C.P § 425.16

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES .................................................................... ii

I.    INTRODUCTION ...................................................................1

II.   STATEMENT OF FACTS ........................................................1

    A.   Silver Personally Attacked LeMahieu and Nano.....................1

        1.   Silver Gave a Speech to Industry Insiders and Investors....................................................................1

        2.   A Brief Primer on Relevant Background Facts.............1

        3.   Silver Accused LeMahieu of Committing a Crime...................4

        4.   Silver Stated That LeMahieu Was Facing Criminal Charges in an Active Federal Case and Faced a Prison Sentence.........................................................4

        5.   Silver Spoke in Detail About LeMahieu's Divorce ...................5

        6.   Silver Mischaracterized Nano .....................................5

    B.   Silver's Statements Were False ............................................5

        1.   LeMahieu Did Not Commit a Crime ..........................5

        2.   LeMahieu Was and Is Not Facing Criminal Charges Or Jail Time ................................................................6

        3.   Silver's Statements About LeMahieu's Divorce Were False ...................................................................6

        4.   Silver's Statements About Nano Were False ...............6

    C.   Silver's False Statements Caused Damage.............................6

        1.   Silver's False Statements Damaged LeMahieu ...........6

    D.   Silver's False Statements Harmed Nano Foundation..............7

    E.   The Release in the Brola Action Did Not Release Silver.............7

III.  LEGAL ANALYSIS ................................................................8

    A.   LEGAL STANDARD.............................................................8

        1.   Under *Planned Parenthood,* An Anti-SLAPP Motion Based on Factual Insufficiency Cannot Be Granted Before Discovery is Taken .............................9

LAW OFFICES
**ROSENFELD,**
**MEYER &**
**SUSMAN LLP**

15918-001000
520507.03

i

PLAINTIFFS' OPPOSITION TO DEFENDANT'S SPECIAL MOTION TO
STRIKE COMPLAINT PURSUANT TO C.C.P § 425.16

**Page**

B.   SILVER FAILS TO ESTABLISH THE FIRST ANTI-
SLAPP PRONG ...............................................................................10

1.   The Statements Were Not Made Before An Official
Proceeding .............................................................................11

2.   They Were Not Made In Connection With An
Official Proceeding................................................................11

3.   They Were Not Made Connected to An Issue Of
Public Interest .......................................................................13

C.   DENIAL IS PROPER AS IT IS REASONABLY
PROBABLE THAT PLAINTIFFS WILL SUCCEED ON
THEIR CLAIMS ...............................................................................16

1.   LeMahieu Is Likely To Succeed On His Defamation
Claims ...................................................................................17

(a)   The Statements are Not Privileged Under
Section 47 ....................................................................18

(b)   Plaintiffs are not public figures. ....................................21

2.   Nano Is Likely to Succeed on its Trade Libel Claim ..............24

3.   The Intentional Interference Claim Should Succeed................25

D.   PLAINTIFFS SHOULD BE AWARDED THEIR FEES ..................25

LAW OFFICES
ROSENFELD,
MEYER &
SUSMAN LLP

15918-001000
520507.03

PLAINTIFFS' OPPOSITION TO DEFENDANT'S SPECIAL MOTION TO
STRIKE COMPLAINT PURSUANT TO C.C.P § 425.16

# TABLE OF AUTHORITIES

Page(s)

## CASES

### Federal

*Abbas v. Foreign Policy Grp., LLC,*
  783 F.3d 1328 (D.C. Cir. 2015) ................................................................. 9

*Aetna Casualty & Sur. Co. v. Centennial Ins. Co.,*
  838 F.2d 346 (9th Cir. 1988) ................................................................... 24

*Browne v. McCain,*
  611 F.Supp.2d 1062 (C.D. Cal. 2009) ..................................................... 17

*Cepeda v. Cowles Magazine & Broad, Inc.,*
  392 F.2d 417 (9th Cir. 1968) ................................................................... 21

*Dorsett v. Bd. of Trustees for State Colleges & Universities,*
  940 F.2d 121 (5th Cir. 1991) ................................................................... 22

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,*
  472 U.S. 749 (1985) ................................................................................ 22

*Flowers v. Carville,*
  310 F.3d 1118 (9th Cir 2002) .................................................................. 23

*Gertz v Robert Welch, Inc.*
  418 U.S. 323 (1974) ................................................................................ 21

*Herbert v. Lando,*
  441 U.S. 153 (1979) ................................................................................ 22

*Hilton v. Hallmark Cards,*
  599 F.3d 894 (9th Cir. 2009) ..................................................................... 8

*Kamfar v. New World Restaurant Group, Inc.,*
  347 F.Supp.2d 38 (S.D.N.Y. 2004) ......................................................... 21

*Lawlor v. Gallagher Presidents' Report, Inc.,*
  394 F.Supp. 721 (S.D.N.Y. 1975) ........................................................... 21

*Los Lobos Renewable Power, LLC v. Americulture, Inc.,*
  885 F.3d 659 (10th Cir. 2018), *cert denied,* 139 S. Ct. 591 (2018) .............. 9

*Makaeff v. Trump University, LLC,*
  26 F.Supp.3d 1002 (S.D. Cal. 2014) ....................................................... 23

*Makaeff v. Trump University, LLC,*
  715 F.3d 254 (9th Cir. 2013) ..................................................................... 9

*Manzari v. Associated Newspapers,*
  830 F.3d 881 (9th Cir. 2016) ....................................................... 16-17, 21

*Masson v. New Yorker Magazine, Inc.*,
    501 U.S. 496 (1991) ............................................................................23-24

*Milkovich v. Lorain Journal Co.*,
    497 U.S. 1 (1990) ...................................................................................22

*Mindys Cosmetics, Inc. v. Dakar*,
    611 F.3d 590 (9th Cir. 2010) .......................................................... 16

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ..........................................................................22-23

*Planned Parenthood Federation of America, Inc.*
    *v. Center for Medical Progress*,
    890 F.3d 828, *amended* 897 F.3d 1224 (9th Cir. 2018) ........... 1, 9-10, 17, 24

*Time, Inc. v. Firestone*,
    424 U.S. 448 (1976) ................................................................................ 15

*Waldbaum v. Fairchild Publications, Inc.*,
    627 F.2d 1287 (D.C. Cir. 1980) .................................................. 21

**<u>State</u>**

*1-800 Contacts, Inc. v. Steinberg*,
    107 Cal.App.4th 568 (2003) ................................................................ 24

*Ampex Corp. v. Cargle*,
    128 Cal.App.4th 1569 (2005) ........................................................ 20

*Baral v. Schnitt*,
    1 Cal.5th 376 (2016) ......................................................................... 8

*Bikkina v. Mahadevan*,
    241 Cal.App.4th 70 (2015); ................................................................ 15

*Christian Research Inst. v. Alnor*,
    55 Cal.Rptr.3d 600 (2007) ................................................................. 23

*City of Cotati v. Cashman*,
    29 Cal.4th 69 (2002) ........................................................................... 17

*Commonwealth Energy Corp. v. Investor Data Exchange, Inc.*,
    110 Cal.App.4th 26 (2003).................................................................. 15

*ComputerXpress, Inc. v. Jackson*,
    93 Cal.App.4th 993 (2001) ................................................................. 24

*Consumer Justice Center v. Trimedica International, Inc.*,
    107 Cal.App.4th 595 (2003) ............................................................... 15

*FilmOn.com Inc. v. DoubleVerify Inc.*,
    7 Cal.5th 133 (2019) ......................................................................14-15

LAW OFFICES
**ROSENFELD,
MEYER &
SUSMAN LLP**

520599.01

PLAINTIFFS' OPPOSITION TO DEFENDANT'S SPECIAL MOTION TO
STRIKE COMPLAINT PURSUANT TO C.C.P § 425.16

*GetFugu, Inc. v. Patton Boggs LLP,*
    220 Cal.App.4th 141 (2013) ................................................................19-20

*Integrated Healthcare Holdings, Inc. v. Fitzgibbons*
    140 Cal.App.4th 515 (2006).................................................................. 17

*Jackson v. Mayweather,*
    10 Cal.App.5th 1240 (2017) ................................................................. 17

*Korea Supply Co. v. Lockheed Martin Corp.,*
    29 Cal.4th 1134 (2003) ........................................................................ 25

*Lefebvre v. Lefebvre,*
    199 Cal.App.4th 696 (2011) ................................................................. 11

*Neville v. Chudacoff,*
    160 Cal.App.4th 1255 (2008) ............................................................... 12

*Paul v. Friedman,*
    95 Cal.App.4th 853 (2002) ................................................................... 13

*Rancho La Costa, Inc. v. Superior Court,*
    106 Cal.App.3d 646 (1980) ............................................................21, 22

*Rand Resources, LLC v. City of Carson,*
    6 Cal.5th 610 (2019) .............................................................12, 14-15

*Rosenthal v. Irell & Manella,*
    135 Cal.App.3d 121 (1982) .................................................................. 12

*Rothman v. Jackson,*
    49 Cal.App.4th 1134 (1996) ...........................................................19, 20

*Rubin v. Green,*
    4 Cal.4th 1187 (1993).......................................................................... 12

*Rusheen v. Cohen,*
    37 Cal.4th 1048 (2006) ........................................................................ 12

*Savage v. Pac. Gas & Elec. Co.,*
    21 Cal.App.4th 434 (1993) ................................................................... 22

*Silberg v. Anderson,*
    50 Cal.3d 205 (1990) .......................................................................19-21

*Sommer v. Gabor,*
    40 Cal.App.4th 1455 (1995) ................................................................. 18

*Susan A. v. County of Sonoma,*
    2 Cal.App.4th 88 (1991) ...................................................................... 19

*Varian Medical Systems, Inc. v. Delfino,*
    35 Cal.4th 180 (2005) .......................................................................... 13

LAW OFFICES
**ROSENFELD,
MEYER &
SUSMAN LLP**

520599.01

v

PLAINTIFFS' OPPOSITION TO DEFENDANT'S SPECIAL MOTION TO
STRIKE COMPLAINT PURSUANT TO C.C.P § 425.16

1

# STATUTES AND RULES

2 <u>**Federal**</u>

3 Fed. R. Civ. P. 8 ....................................................................................... 9

4 Fed. R. Civ. P. 12 ..................................................................................... 9

5 Fed. R. Civ. P. 12(b)(6) ......................................................................... 10

6 Fed. R. Civ. P. 56..................................................................................... 10

7 <u>**State**</u>

8 Cal. Civil Code § 47 .......................................................................... 11, 18

9 Cal. Civil Code § 47(b)........................................................................18-19

10 Cal. Civil Code § 47(d)(1) ..................................................................... 20

11 Cal. Code Civ. P. §425.16 ....................................................... 8, 11, 13, 20

12 Cal. Code Civ. P. §425.16, subd. (a) ...................................................... 13

13 Cal. Code Civ. P. §425.16(c)(1) ............................................................. 25

14 Cal. Code Civ. P. §425.16(e)................................................................... 10

15 Cal. Code Civ. P. §425.16(e)(1) .........................................................10-11

16 Cal. Code Civ. P. §425.16(e)(2) .........................................................11-12

17 Cal. Code Civ. P. §425.16(e)(3) ............................................................. 11

18 Cal. Code Civ. P. §425.16(e)(4) ............................................................. 11

19 Cal. Code Civ. P. §425.16(g)................................................................... 24

20

21

22

23

24

25

26

27

28

LAW OFFICES
**ROSENFELD,
MEYER &
SUSMAN LLP**

520599.01

vi

PLAINTIFFS' OPPOSITION TO DEFENDANT'S SPECIAL MOTION TO
STRIKE COMPLAINT PURSUANT TO C.C.P § 425.16

# I.   INTRODUCTION

Because (i) defendant David C. Silver's ("Silver") special motion to strike, which relies upon outdated cases while ignoring applicable authority, cannot be granted prior to discovery under the Ninth Circuit's *Planned Parenthood* decision, (ii) Silver's statements were not in connection with a public issue, and (iii) Plaintiffs are likely to prevail, Silver's instant anti-SLAPP motion should be denied.

## II.   STATEMENT OF FACTS

### A.   Silver Personally Attacked LeMahieu and Nano

#### 1.   Silver Gave a Speech to Industry Insiders and Investors

Silver gave a keynote speech at The Blockchain Law Summit 2018 (the "Blockchain Summit") entitled *Cryptocurrency, Blockchain and US Litigation - Yesterday, Today and Tomorrow* (the "Speech").  (Declaration of Peter Scoolidge ("Scoolidge Decl."), Ex. A.)  Blockchain is a "mathematical structure for storing data in a way that is nearly impossible to fake".  (Declaration of Ryan Lapine ("Lapine Decl."), Ex. 1.)  Cryptocurrency is an electronic form of currency stored in a blockchain, as the blockchain "makes it virtually impossible for someone to spend the same [cryptocurrency] twice, solving a problem that had hindered previous attempts to create digital cash." (*Id.*)  The Blockchain Summit was a large cryptocurrency industry conference.  (Scoolidge Decl., ¶ 3.)  In attendance were the leaders from the major cryptocurrency startups, along with industry investors and scholars.  (*Id.*)

#### 2.   A Brief Primer on Relevant Background Facts

Colin LeMahieu, in 2015, released a cryptocurrency that utilized a novel block-lattice design to make transactions more efficient without sacrificing security. (Declaration of Colin LeMahieu ("LeMahieu Decl"), ¶ 2.)  It came to be known as Nano.  (*Id.*) Nano developed a sterling reputation.  In early 2018, a periodical evaluating cryptocurrencies wrote that Nano "is objectively the best pure cryptocurrency"; it wrote "[o]f the pure cryptocurrencies (coins like Bitcoin, Bitcoin Cash and Litecoin that operate solely as currencies) it has no equal."  (Lapine Decl.,

LAW OFFICES
**ROSENFELD,
MEYER &
SUSMAN LLP**

520507.03

PLAINTIFFS' OPPOSITION TO DEFENDANT'S SPECIAL MOTION TO
STRIKE COMPLAINT PURSUANT TO C.C.P § 425.16

1   Ex. 2.)  LeMahieu formed Nano Foundation, LTD to service the software that

2   operates Nano.  (LeMahieu Decl., ¶ 3.)  Within the small cryptocurrency industry,

3   LeMahieu was known to be Nano's developer and chief executive.  (Scoolidge Decl.,

4   ¶ 4.)  Those at the Blockchain Summit would know the Nano developer, "head guy",

5   and chief executive was LeMahieu, though random people on the street would not.

6   (*Id.*)

7       When Nano was lauded by industry periodicals as a "pure cryptocurrency"

8   (Lapine Decl., Ex. 2), this was to differentiate it from alternative coins, otherwise

9   known as internet coin offerings ("ICO").  An alternative coin or ICO is a cash-

10  backed token given out as security in exchange for capital.  (LeMahieu Decl., ¶ 4.)

11  Alternative coin issuers profit if the market rate for their tokens exceed their initial

12  capital backing.  (*Id.*)  Cryptocurrency coins, on the other hand, are released as

13  computer code, mined by users from an internet site or application, called a faucet,

14  and obtain value if and only if users view them as a reliable and trustworthy tool to

15  facilitate electronic exchanges of goods and services.  (*Id.*)  Cryptocurrency coins

16  are commodities that vary in value as a function of demand versus supply.  (*Id.*)

17  Because they are not cash-backed like alternative coins and, therefore, cannot be

18  diluted by increased market saturation with a large cash-backed subsequent issuance

19  that reduces scarcity and drives down value, cryptocurrency coins released at a

20  known frequency from faucets derive inherent value from their existence as "pure

21  cryptocurrency".  (*Id.*)  This would be a point widely known to the industry insiders

22  and investors present at the Blockchain Summit.  As *Medium* reported, Nano is a

23  "pure cryptocurrency". (LeMahieu Decl, ¶ 2; Lapine Decl., Ex. 2.)

24      Indeed, between the release of Nano on October 4, 2015 and October 20, 2017,

25  126,248,289 Nano coins were generated.  (LeMahieu Decl., ¶ 5.)  On October 20,

26  2017, LeMahieu publicly "closed the faucet" on the currency by stopping creation and

27  distribution of Nano.  (*Id.* at ¶ 6.)  This is accomplished by destroying ("burning") the

28  remaining Nano that could be generated.  (*Id.*)  On that date, LeMahieu burned the

LAW OFFICES
**ROSENFELD,
MEYER &
SUSMAN LLP**

520507.03

2

PLAINTIFFS' OPPOSITION TO DEFENDANT'S SPECIAL MOTION TO
STRIKE COMPLAINT PURSUANT TO C.C.P § 425.16

1  remaining Nano on camera on a video that he posted to YouTube.  (*Id.*)  By the time

2  of the Blockchain Summit, this was widely known within the cryptocurrency space

3  and among cryptocurrency investors, executives, and startups.  (Scoolidge Decl., ¶ 5.)

4     Cryptocurrencies, like foreign currencies, are traded on exchanges.

5  (LeMahieu Decl., ¶ 7.)  An exchange is a third-party business that allows customers

6  to purchase and sell cryptocurrency for other currencies, including national

7  currencies like the dollar.  (*Id.*)  Beginning in March 2017, Nano was traded on

8  cryptocurrency exchanges.  (*Id.*)

9     On April 20, 2017, Nano began being traded on a new cryptocurrency

10  exchange called BitGrail, an Italy-based exchange run by an individual named

11  Francesco Firano.  (LeMahieu Decl., ¶ 8.)  Neither LeMahieu nor Nano Foundation

12  ever vouched for BitGrail or made any representations about it at all.  (*Id.*)

13  LeMahieu and Nano Foundation were never paid by BitGrail, nor did they ever

14  make money off the Nano transactions that occurred through BitGrail.  (*Id.*)

15  However, BitGrail became a popular medium for the sale of Nano.  (*Id.*)

16     BitGrail suffered multiple hacks between July and October 2017 wherein

17  approximately 10 million Nano coins were stolen by third-party hackers, including a

18  hack in July 2017 wherein approximately 2.5 million Nano coins were stolen and

19  another hack in October 2017 wherein approximately 7.5 million Nano coins were

20  stolen.  (LeMahieu Decl., ¶ 9.)  The hackers were unrelated in any way to Nano

21  Foundation, to LeMahieu, or to, on information and belief, Mr. Firano and BitGrail.

22  (*Id.*)  At the time, the approximately 10 million Nano coins stolen had a value of

23  approximately $150,000,000.  (*Id.*)

24     Within minutes of learning of the hack on February 8, 2018, Nano Foundation

25  immediately reported it to the Federal Bureau of Investigation.  (LeMahieu Decl.,

26  ¶ 10.)  Nano Foundation and LeMahieu have taken all steps within their power to

27  assist law enforcement in attempting to remedy the hack:  they have exchanged

28  numerous communications with the FBI, offered investigatory reports to law

LAW OFFICES
ROSENFELD,
MEYER &
SUSMAN LLP

520507.03

3

PLAINTIFFS' OPPOSITION TO DEFENDANT'S SPECIAL MOTION TO
STRIKE COMPLAINT PURSUANT TO C.C.P § 425.16

1   enforcement, traveled to Italy to work with law enforcement there to discover the

2   source of the hack, and created a forensic "block explorer" to track transactions to

3   attempt to locate the stolen Nano.  (*Id.*)  Nano Foundation donated $1 million to

4   fund legal efforts to assist victims recover their stolen coins.  (*Id.*)

5        This was not an "exit scam" perpetrated by LeMahieu and/or Nano as they took

6   nothing from this theft, were not involved in it in any way, and did not own, control

7   or operate BitGrail.  (*Id.*)  An "exit scam" is a complex theft that occurs when the

8   owners of a purported cryptocurrency sell all or substantially all of their holdings for

9   top dollar.  (Scoolidge Decl., ¶ 6.)  They then leave the cryptocurrency unsupported,

10  they themselves disappear, they shut down dummy exchanges that they control on

11  which the coin was traded, they steal for themselves some or all coins from those

12  exchanges in so acting, they sell the cryptocurrency stolen from those exchanges on

13  other exchanges for top dollar before the market becomes aware and can respond to

14  their theft, and they thereby devalue those remaining, unsupported coins to next to

15  nothing. (*Id.*) The term "exit scam" is well-known to those in the cryptocurrency

16  industry and those in attendance at the Blockchain Summit.  (*Id.*)

17      **3.**    <u>**Silver Accused LeMahieu of Committing a Crime**</u>

18       The Speech quickly went off the rails and devolved into a personal attack on

19  LeMahieu and on Nano.  Silver accused LeMahieu of committing a $150,000,000

20  theft.  He said of Nano and its executives:

21      *"They tell their customers 'if you really believe in Nano….. go to this small*

22      *exchange in Italy that we don't know anybody and we have nothing to do but we*

23      *completely vouch for him and he's running a legitimate exchange', we're gonna*

24      *give him the Nano, he's gonna give us money every time he sells a Nano, he's*

25      *gonna take half and we're gonna take half, we're gonna get rich and then one*

26      *day there's gonna be an exit scam and then you're gonna be out $150 million*."

27  (Scoolidge Decl., Ex. A.)

28      **4.**    <u>**Silver Stated That LeMahieu Was Facing Criminal Charges in an**</u>

LAW OFFICES
**ROSENFELD,
MEYER &
SUSMAN LLP**

4

520507.03

PLAINTIFFS' OPPOSITION TO DEFENDANT'S SPECIAL MOTION TO
STRIKE COMPLAINT PURSUANT TO C.C.P § 425.16

### Active Federal Case and Faced a Prison Sentence

Silver doubled down on his accusation that LeMahieu committed a crime.  He went on to say in the Speech:

*"When [the Nano developers] were asked to fix the problem and fork it, their response was 'it's against our ethos.' … I don't care where your ethos is, you live in the United states of America, there are laws here, those laws will be followed. We are now in Federal Court.  When they tell the judge 'well, we don't wanna give back the money' a Federal Court judge is gonna say 'well if you wanna stay here and you don't wanna go to jail, you're gonna give back the money'."* (Id.)

### 5.   Silver Spoke in Detail About LeMahieu's Divorce

Silver turned to LeMahieu's marital troubles in the Speech, saying:

*"Uhhh Nano, the CEO and the head guy at Nano who holds 90% of the Nano at like $15 it was worth $1.4 billion, I think it's down to like $4, so I think it's only worth like $400,000,000 now.  Uhhh, he got divorced from his wife last year.  He decided that he was ready.  He deserved better because he was now rich.  She took all the money.  And then, the financial affidavit, she, they, argued about how much the Nano was worth and what the Nano was.  But I will tell you this: he said it had value and he said that he believed it was going up and he believed it was a security cause he put it on his security side of the affidavit."* (Id.)

### 6.   Silver Mischaracterized Nano

Of the Nano, itself, Silver had this to say:

*"Nano is not really a real coin, they claim to be a real coin but what they couldn't get, uh, any recognition in the United States Coinbase, Kraken, Poloniex, Bitfinex, Gemini, no one was willing to put them on their exchange.  Why? 'Cause they were an alternative coin and they weren't really a real coin."* (Id.)

### B.   Silver's Statements Were False

### 1.   LeMahieu Did Not Commit a Crime

As detailed, *supra*, there was no exit scam.  LeMahieu and the other Nano

1  team members took nothing from BitGrail.  (LeMahieu Decl., ¶ 10.) They did not

2  receive anything from Nano sales on BitGrail.  (*Id*.)  They did not participate in or

3  otherwise profit or take anything from the $150,000,000 BitGrail loss.  (*Id*.)

4  LeMahieu never encouraged anyone to use BitGrail.  (*Id*.)

5       **2.     LeMahieu Was and Is Not Facing Criminal Charges Or Jail Time**

6       As detailed *supra*, Nano went to extraordinary lengths to help remedy the

7  BitGrail loss.  (LeMahieu Decl., ¶ 10.)  Nobody from Nano ever said "it's against our

8  ethos" to fix the problem.  (*Id.* at ¶ 11.)  A federal court judge could not have said to

9  LeMahieu or his colleagues "if you wanna stay here and you don't wanna go to jail,

10  you're gonna give back the money" as (1) none were facing criminal charges; and (2)

11  they received nothing from the BitGrail loss that they could even return.  (*Id.*)

12       **3.     Silver's Statements About LeMahieu's Divorce Were False**

13       On June 15, 2016, LeMahieu's wife filed for divorce, which LeMahieu did not

14  contest. (LeMahieu Decl., ¶12.) At no time since June 15, 2016, has LeMahieu owned

15  90% of the Nano in circulation. (*Id.*) He did not decide he "deserved better because he

16  was now rich." (*Id.*)  His wife did not "take all the money". (*Id.*)  They did not fill out

17  a financial affidavit in which they argued about the value of Nano, nor did LeMahieu

18  put it on a "security side" of any such affidavit, nor did he make any statement as to

19  the value of Nano in that proceeding.  (*Id.*)  It was a no-contest divorce.

20       **4.     Silver's Statements About Nano Were False**

21       Nano is a "pure cryptocurrency," not an alternative coin/ICO. (LeMahieu

22  Decl, ¶ 2; Lapine Decl., Ex. 2.) Nano is and was on exchanges including Binance,

23  the largest cryptocurrency exchange, and KuCoin.  (LeMahieu Decl., ¶ 13.)

24  **C.   Silver's False Statements Caused Damage**

25       **1.     Silver's False Statements Damaged LeMahieu**

26       LeMahieu's peers in the cryptocurrency industry were present for the Speech.

27  (LeMahieu Decl., ¶ 14.)  Having been falsely accused by the keynote speaker thereat

28  of, *inter alia*, committing a crime, facing jail time, and divorcing his wife because

LAW OFFICES
**ROSENFELD,
MEYER &
SUSMAN LLP**

6

520507.03

PLAINTIFFS' OPPOSITION TO DEFENDANT'S SPECIAL MOTION TO
STRIKE COMPLAINT PURSUANT TO C.C.P § 425.16

1  he "deserved better", LeMahieu was humiliated.  (*Id.*)  He suffered considerable

2  emotional distress as a result of these outrageous false accusations.  (*Id.*)   Further,

3  he has been shunned by certain of his industry peers, dimming his job prospects

4  within his chosen profession.  (*Id.*) Silver's statements have perpetuated industry

5  confusion and have caused LeMaheu to be viewed as a criminal.  (*Id.*)

6  **D.    Silver's False Statements Harmed Nano Foundation**

7         When Silver made his defamatory statements on May 24, 2018, one Nano

8  coin was selling at approximately $4.56.  (LeMahieu Decl., ¶ 15.)  Almost

9  immediately following Silver's mischaracterization of it to lead investors, demand

10  waned.  Nano's value plumetted, reaching a floor of less than $1 before leveling out

11  at its current value of approximately $1.25.  (*Id.*)  Nano Foundation suffered a loss

12  in excess of $500,000 given its Nano holdings.  (*Id.*)  Further, it was forced to incur

13  extraordinary expenses to counter the defamatory statements made by Silver.  (*Id.*)

14  **E.    The Release in the Brola Action Did Not Release Silver**

15         On April 6, 2018, Alex Brola filed a securities class action in the Eastern

16  District of New York against defendants Mica Busch, Colin LeMahieu, Nano

17  Foundation, Troy Retzer, and Zach Shapiro (the "Brola Action").  Silver represented

18  Brola.  (Dkt. 15-2, Ex. A.)  The Brola Action did not include allegations regarding

19  LeMahieu's marital divorce, why his marriage ended, or any allocation of his marital

20  property.  (*Id.*)   Brola dismissed that action with prejudice, on September 28, 2018.

21  (Plaintiffs' Request for Judicial Notice ("RJN"), Ex. 1.) On January 3, 2019, James

22  Fabian filed a new and substantially similar class action lawsuit against, *inter alia*,

23  Nano Foundation and LeMahieu in the Northern District of California.  (RJN, Ex. 2.)

24  Silver represented Fabian.  (*Id.*)  On July 11, 2019, the district court granted the

25  defendants' motion to dismiss that action.  (RJN, Ex. 3.)

26  █████████████████████████████████████████

27  ████████████████████████████████████████

28  ████████████████████████████████████████



The release did not release him.

### III.   LEGAL ANALYSIS

**A.   LEGAL STANDARD**

California state law allows for pre-trial dismissal of strategic lawsuits against public participation, otherwise known as SLAPPs.  Cal. Code Civ. P. § 425.16.

Application of the law to a special motion to strike "involves two steps.  First, the defendant must establish that the challenged claim arises from activity protected by section 425.16.  If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success."  *Baral v. Schnitt*, 1 Cal.5th 376, 384-85 (2016) (citation omitted); accord *Hilton v. Hallmark Cards*, 599 F.3d 894, 901-902 (9th Cir. 2009).

California's anti-SLAPP law is not absolute and "does not insulate defendants from *any* liability for claims arising from the protected rights of petition or speech. It only provides a procedure for weeding out, at an early stage, *meritless* claims arising from protected activity."  *Baral, supra*, 1 Cal.5th at 384 (emphases in original).

To show a reasonable probability of success, "the plaintiff must demonstrate that the complaint is legally sufficient and supported by a prima facie showing of

LAW OFFICES
**ROSENFELD,
MEYER &
SUSMAN LLP**

1  facts to sustain a favorable judgment if the evidence submitted by the plaintiff is
2  credited." *Planned Parenthood Federation of America, Inc. v. Center for Medical*
3  *Progress*, 890 F.3d 828, 833, *amended* 897 F.3d 1224 (9th Cir. 2018)  Only "when a
4  plaintiff presents an insufficient legal basis for his or her claim *or* when no
5  sufficiently substantial evidence exists to support a judgment for him or her" should
6  "a defendant's anti-SLAPP motion [] be granted."  *Id.* at 833.

### 1.   Under *Planned Parenthood,* An Anti-SLAPP Motion Based on Factual Insufficiency Cannot Be Granted Before Discovery is Taken

9       Given recent Ninth Circuit opinions, continued application of California's
10 anti-SLAPP statute in federal court is questionable.  See *Planned Parenthood*, 890
11 F.3d at 833; *Makaeff v. Trump University, LLC*, 715 F.3d 254, 274 (9th Cir. 2013)
12 (Kozinski, C.J., concurring) (rejecting application of the California anti-SLAPP
13 statute in federal court on *Erie* grounds), 715 F.3d 254, 276 (Paez, J., concurring);
14 accord *Los Lobos Renewable Power, LLC v. Americulture, Inc.*, 885 F.3d 659, 672-
15 73 (10th Cir. 2018), *cert denied*, 139 S.Ct. 591 (2018)(anti-SLAPP statutes do not
16 apply in federal courts); *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1333-
17 37 (D.C. Cir. 2015) (same).

18      *Planned Parenthood* held that to reconcile state and federal procedural rules,
19 anti-SLAPP motions must be evaluated "under different standards depending on the
20 motion's basis." *Planned Parenthood*, 890 F.3d at 833.  If the motion is "based on
21 legal deficiencies, Plaintiff is not required to present prima facie evidence
22 supporting Plaintiff's claims." *Id.*  Fed. R. Civ. P. 8 and 12 standards are applied to
23 an anti-SLAPP motion "founded on purely legal arguments." *Id.*  When the
24 challenge is only to the sufficiency of the pleadings, plaintiffs are not required to
25 "present[] evidence showing that their claims have minimal merit." *Id.* at 834.  If
26 the motion "is a factual challenge, then the motion must be treated as though it were
27 a motion for summary judgment and discovery must be permitted." *Id.* at 833.
28      Elaborating, the court held:  "[O]n the one hand, when an anti-SLAPP motion

1  to strike challenges *only* the legal sufficiency of a claim, a district court should

2  apply the Federal Rule of Civil Procedure 12(b)(6) standard and consider whether a

3  claim is properly stated.  And, on the other hand, when an anti-SLAPP motion to

4  strike challenges the factual sufficiency of a claim, then the Federal Rule of Civil

5  Procedure 56 standard will apply.  But in such a case, discovery must be allowed,

6  with opportunities to supplement evidence based on the factual challenges, before

7  any decision is made by the court."  *Planned Parenthood*, 890 F.3d at 834.

8        Silver's anti-SLAPP motion appears to challenge both the legal and factual

9  sufficiency of Plaintiffs' claims.  See, *e.g.*, Motion at 9:11-12, 14-15 ("In the instant

10  matter, it is apparent that Attorney Silver's challenged statements arise from activity

11  protected by the anti-SLAPP statute. … Moreover, it is clearly improbable that

12  Plaintiffs will prevail on the claims alleged in their lawsuit."), 13:15-16 ("there is no

13  evidence of 'falsity' in Attorney Silver's comments; and Plaintiffs cannot remotely

14  sustain their actual malice burden of proof.").  Therefore, consistent with *Planned*

15  *Parenthood*, should the Court not simply deny Silver's motion on its merits, thorough

16  discovery must be allowed before any decision striking Plaintiffs' Complaint.

17  **B.**    **SILVER FAILS TO ESTABLISH THE FIRST ANTI-SLAPP PRONG**

18        To meet his initial burden of showing that the challenged claim is one 'arising

19  from' protected activity, Silver has to show the act or acts that formed the basis for

20  Plaintiffs' claims were an "act in furtherance of a person's right of petition or free

21  speech under the United States or California Constitution in connection with a public

22  issue" which falls within one of the following four specified categories of conduct set

23  forth in California Code of Civil Procedure § 425.16(e):

24      •  "any written or oral statement or writing made before a legislative,

25         executive, or judicial proceeding, or any other official proceeding

26         authorized by law" [Cal. Code Civ. P. § 425.16(e)(1)]

27      •  "any written or oral statement or writing made in connection with an issue

28         under consideration or review by a legislative, executive, or judicial body,

LAW OFFICES
**ROSENFELD,**
**MEYER &**
**SUSMAN LLP**

520507.03

10

PLAINTIFFS' OPPOSITION TO DEFENDANT'S SPECIAL MOTION TO
STRIKE COMPLAINT PURSUANT TO C.C.P § 425.16

1   or any other official proceeding authorized by law" [§ 425.16(e)(2)]

2   • "any written or oral statement or writing made in a place open to the public or

3   a public forum in connection with an issue of public interest" [§425.16(e)(3)]

4   • "any other conduct in furtherance of the exercise of the constitutional right of

5   petition or the constitutional right of free speech in connection with a public

6   issue or an issue of public interest"  [Cal. Code Civ. P. § 425.16(e)(4).]

7   Silver bases his special motion to strike on § 425.16(e)(1), (2), and (3), but

8   also appears to rely on § 425.16(e)(4).  However, none of the four (4) defamatory

9   statements alleged in Plaintiffs' complaint fall under any of said categories.

10   **1.     The Statements Were Not Made Before An Official Proceeding**

11   The first category of protected speech is completely inapplicable to Silver's

12   defamatory statements.  By Silver's own admission, he made the statements at an

13   industry conference, not "before" any legislative, executive, or judicial proceeding

14   or other official proceeding.  Motion at 3:3-20; Silver Declaration, ¶ 5.  The

15   statements are not shielded by this category of speech.

16   **2.     They Were Not Made In Connection With An Official Proceeding**

17   The second category of conduct protected by § 425.16 is statements made "in

18   connection with" an issue under consideration in an official proceeding.  This

19   category is narrower than the category protected by the litigation privilege in Civil

20   Code § 47.  *Lefebvre v. Lefebvre,* 199 Cal.App.4th 696, 704-705 (2011) ("By parity

21   of reasoning, Civil Code section 47 does not operate as a limitation on the scope of

22   the anti-SLAPP statute ... *we reject [the] contention that, because some forms of*

23   *illegal litigation-related activity may be privileged under the litigation privilege, that*

24   *activity is necessarily protected under the anti-SLAPP statute"* (citations omitted)).

25   Silver's unsubstantiated assertions to the contrary notwithstanding, Plaintiffs'

26   respective causes of action are not predicated upon any statement made by Silver

27   either before a legislative, executive, or judicial proceeding, or any other official

28   proceeding authorized by law, or in connection with an issue under consideration by

LAW OFFICES
**ROSENFELD,
MEYER &
SUSMAN LLP**

11

PLAINTIFFS' OPPOSITION TO DEFENDANT'S SPECIAL MOTION TO
STRIKE COMPLAINT PURSUANT TO C.C.P § 425.16

520507.03

1   a legislative, executive, or judicial body, or any other official proceeding authorized

2   by law.  See, *e.g., Rand Resources, LLC v. City of Carson*, 6 Cal.5th 610, 620

3   (2019) ("By requiring the communication to be in connection 'with an issue under

4   consideration or review', the terms of subdivision (e)(2) make clear that 'it is

5   insufficient to assert that the acts alleged were 'in connection with' an official

6   proceeding.' Instead, '[t]here must be a connection with an issue under review in

7   that proceeding.'") (citations omitted).

8          While Silver claims a shield from liability exists for communications "related

9   to" judicial proceedings [Motion at 9:13-14], the cases to which he cites in particular[1]

10  and the law in general do not support such a broad construction.  A statement is "in

11  connection with" an issue under consideration by a court in a judicial proceeding if it

12  relates to a substantive issue in the proceeding and is directed to a person having "some

13  interest in the litigation." *Neville v. Chudacoff,* 160 Cal.App.4th 1255, 1266 (2008).

14         Here, Silver's statements were not made to people with an "interest in the

15  litigation."  If Silver had wanted to direct his false accusations to people with an

16  interest in the litigation, he would have directed them toward potential class members

17  whose Nano had been stolen by the third-party hackers.  Instead, he went to a meeting

18  of cryptocurrency industry leaders, branded himself as a cryptocurrency litigation

19  expert, and made a bombastic, self-promoting speech about his accomplishments in

20  the field of cryptocurrency litigation in order to, *inter alia*, drum up additional

21  business.  Such conduct is not protected under § 425.16(e)(2).

22         Further, statements on incidental or tangential issues which are not relevant to

23  the determination of the judicial proceeding or under consideration are not "under

24

_____

25  [1]   In contrast to the present dispute, none of the cases to which Silver cites involved
    actions or statements not directed to achieving the objects of pending or

26  contemplated litigation.  That is because, in order to qualify for protection, out-of-
    court statements must have both a "reasonable relation to the action *and* [be] made

27  to achieve the objects of the litigation …."  *Rosenthal v. Irell & Manella*, 135 Cal.
    App.3d 121, 126 (1982) (emphasis added); see, *e.g., Rusheen v. Cohen*, 37 Cal.4th

28  1048 (2006) (filing of false affidavit of service privileged); *Rubin v. Green*, 4 Cal.4th
    1187 (1993) (notice of intention to commence legal action privileged).

LAW OFFICES
ROSENFELD,
MEYER &
SUSMAN LLP

520507.03

12

PLAINTIFFS' OPPOSITION TO DEFENDANT'S SPECIAL MOTION TO
STRIKE COMPLAINT PURSUANT TO C.C.P § 425.16

1   consideration" or review and therefore not protected.  *Paul v. Friedman,* 95

2   Cal.App. 4th 853, 867-868 (2002) ("However, a lawyer's attempt to inject an issue

3   into a proceeding does not render the issue relevant, nor can the attempted injection

4   of an irrelevant matter transform it into an issue 'under consideration or review' in

5   the proceeding. By definition, irrelevant matters have no tendency in reason to prove

6   or disprove any disputed fact of consequence to the determination of a matter, and

7   are specifically excluded from consideration.").

8          Here, Silver's statements were not mere recitations of allegations made in the

9   lawsuit he filed.  They were wild, utterly false accusations about Nano Foundation

10  and LeMahieu's criminal conspiracy, baseless claims that they were under

11  investigation (which they were not), personal insults about LeMahieu's divorce

12  which had no basis in fact, fabricated claims that Nano Foundation made

13  incriminating public statements (which it never made), and lies about how the Nano

14  technology works at a basic level.

15         "The Legislature enacted section 425.16 to prevent and deter [lawsuits]

16  'brought primarily to chill the *valid* exercise of the constitutional rights of freedom

17  of speech and petition for the redress of grievances.' (§ 425.16, subd. (a).)"  *Varian*

18  *Medical Systems, Inc. v. Delfino,* 35 Cal.4th 180, 192 (2005) (emphasis added).  The

19  statute was not enacted to allow attorneys to run wild with baseless defamatory

20  statements to drum up new clients so long as the attorney was already suing the

21  defamed party on other grounds.  The Court should not allow Silver to do so here.

22     **3.     They Were Not Made Connected to An Issue Of Public Interest**

23         Silver's statements also do not fall under the third or fourth categories of speech

24  in § 425.16, because they were not in connection with an issue of public interest.

25         "[A] defendant must do more than identify some speech touching on a matter

26  of public interest.  As we have explained, ''the defendant's acts underlying the

27  plaintiff's cause of action must *itself* have been an act in furtherance of the right of

28  petition or free speech.''  In other words, a claim does not 'arise from protected

LAW OFFICES
**ROSENFELD,
MEYER &
SUSMAN LLP**

520507.03

13

PLAINTIFFS' OPPOSITION TO DEFENDANT'S SPECIAL MOTION TO
STRIKE COMPLAINT PURSUANT TO C.C.P § 425.16

1   activity simply because it was filed after, or because of, protected activity, or when

2   protected activity merely provides evidentiary support or context for the claim.

3   Rather, the protected activity must supply elements of the challenged claim.'" *Rand*

4   *Resources, LLC v. City of Carson*, 6 Cal.5th 610, 621 (2019) (citations omitted).

5       Even more recently, in *FilmOn.com Inc. v. DoubleVerify Inc.*, 7 Cal.5th 133

6   (2019) ("*FilmOn.com*"), California's Supreme Court confirmed that the

7   determination of the first step is itself dependent upon a two-step analysis, requiring

8   the defendant to prove both a "public issue" and the "connection" to the public issue.

9   In the process, California's Supreme Court substantially narrowed the scope of what

10  a "public issue" is for purposes of the State's anti-SLAPP statute.[2]

11      The public issue inquiry, the court stated, requires its own "two-part analysis

12  rooted in the statute's purpose and internal logic. First, we ask what 'public issue or []

13  issue of public interest' the speech in question implicates – a question we answer by

14  looking to the context of the speech. [Citation.] Second, we ask what functional

15  relationship exists between the speech and the public conversation about some matter

16  of public interest. It is at the latter stage that context proves useful." *Id*. at 1165.

17      Regarding the first part of the analysis, the court opined that "the focus of [the

18  court's] inquiry must be on the 'specific nature of the speech,' rather than on any

19  'generalities that might be abstracted from it.' [Citation.]" *Id*. at 1167.

20      As to the second part, *i.e.*, the functional relationship between the offending

21

22  [2]   *FilmOn.com* involved a plaintiff suing the defendant, a business offering tracking
    and "brand safety" services to its Internet advertiser clients, for disparaging its film
23  distribution business in confidential reports distributed to the defendant's clients that
    described FilmOn's website as containing adult content and copyright-infringing
24  material, which it alleged was false.  Granting and then affirming on appeal the
    defendant's special motion to strike, the lower courts had concluded that the
25  defendant's speech was in connection with a public issue because "the public ha[s] a
    demonstrable interest in knowing what content is available on the Internet, especially
26  with respect to adult content and the illegal distribution of copyrighted materials."
    *FilmOn.com*, 7 Cal.5th at 1160.  California's Supreme Court reversed, holding
27  instead that the defendant's alleged disparagement of the plaintiff's web-based
    entertainment programming as "adult content" or "copyright infringement," contained
28  in confidential reports distributed to the defendant's Internet advertiser clients, did not
    meet the "public issue" requirement.  *Id*. at 1159.

LAW OFFICES
**ROSENFELD,
MEYER &
SUSMAN LLP**

520507.03

PLAINTIFFS' OPPOSITION TO DEFENDANT'S SPECIAL MOTION TO
STRIKE COMPLAINT PURSUANT TO C.C.P § 425.16

1   statement and the asserted public issue, the court held there must be "some degree of

2   closeness between the challenged statements and the asserted public interest." *Id*. at

3   1165 (internal quotes omitted). <u>It is not enough that a defendant's statements refer</u>

4   <u>or relate to a subject of broad public interest, as Silver contends</u>. Rather, "*the*

5   *statement must in some manner itself contribute to the public debate*." *Id*. at 1166

6   (emphasis added). As the court explained, contributing to the public debate means

7   that through a defendant's statements he or she "participated in, or furthered, the

8   discourse that makes an issue one of public interest." *Id*.[3]

9       Applying the foregoing criteria to the matter at hand, Silver's special motion

10   to strike fails to meet either part of the analysis.

11       First, the specific nature of four defamatory statements that form the basis of

12   Plaintiffs' action was not, as Silver contends, about Silver's lawsuit or "putative class

13   victims' actions seeking redress."  They were reckless and offensive lies about

14   LeMahieu's divorce have nothing to do with Silver's lawsuit or with any public issue

15   or issue of public interest.  Silver stated that LeMahieu divorced his wife because he

16   got rich and didn't need her anymore.  Those statements had no basis in fact or

17   relevance to the subject of Silver's lawsuit; instead, it was an attack on LeMahieu's

18   character, an act of puffery to cast Silver as a heroic attorney suing the bad guys.  See

19   *Time, Inc. v. Firestone*, 424 U.S. 448, 454 (1976) (salacious divorce of well-known

20

---

21   [3]   Accord *Rand Resources,* 6 Cal.5th at 625 ("At a sufficiently high level of

22   generalization, any conduct can appear rationally related to a broader issue of public
     importance. What a court scrutinizing the nature of speech in the anti-SLAPP context

23   must focus on is the speech at hand, rather than the prospects that such speech may
     conceivably have indirect consequences for an issue of public concern."); *Bikkina v.*

24   *Mahadevan,* 241 Cal.App.4th 70, 85 (2015) ("Here, the specific nature of the speech
     was about falsified data and plagiarism in two scientific papers, not about global

25   warming."); *Consumer Justice Center v. Trimedica International, Inc.,* 107
     Cal.App.4th 595, 601 (2003) ("If we were to accept [defendant's] argument that we

26   should examine the nature of the speech in terms of generalities instead of specifics,
     then nearly any claim could be sufficiently abstracted to fall within the anti-SLAPP

27   statute."); *Commonwealth Energy Corp. v. Investor Data Exchange, Inc.,* 110
     Cal.App.4th 26, 34 (2003) ("While investment scams *generally* might affect large

28   numbers of people, the specific speech here was a telemarketing pitch for a particular
     service marketed to a very few number of people ... The speech was about
     [defendant's] *services*, not about investment scams in general.")(emphasis in original).

LAW OFFICES
**ROSENFELD,
MEYER &
SUSMAN LLP**

520507.03

1  persons did not involve issue of public interest "even though the marital difficulties of

2  extremely wealthy individuals may be of interest to some portion of the reading

3  public").

4      Silver's defamatory statements also included statements that Nano is "not

5  really a real coin", that it was not on exchanges, that Nano Foundation and

6  LeMahieu tell their customers words to the effect of "if you really believe in Nano ...

7  go to this small exchange in Italy that we don't know anybody and we have nothing

8  to do but we completely vouch for him and he's running a legitimate exchange," that

9  Nano Foundation and LeMahieu received money every time Nano was sold on

10  Bitgrail and that money would be split 50/50, that they would "get rich", that they

11  staged a criminal exit scam, that they said assisting law enforcements was "against

12  [their] ethos," that they were criminals, and would "go to jail."  Thus, these

13  statements were not only false, but also not about the lawsuit or class victims' rights.

14      Second, the connection between Silver's false and defamatory statements

15  about Plaintiffs alleged in the Complaint and the public interest asserted by Silver is

16  attenuated at best.  The presentation was initially made to a group of industry

17  leaders who paid to attend.  It was predominantly, if not entirely, a self-promoting

18  pitch by Silver for other legal business.  Further, attacks on LeMahieu's marriage

19  and divorce do not contribute to any public debate.  Nor do false accusations that he

20  committed a crime, that he profited from exchanges of cryptocurrency, or that he

21  will go to jail if he does not return monies he never received.

22      Silver's failure to meet his burden on the first step is dispositive.

23  **C.   DENIAL IS PROPER AS IT IS REASONABLY PROBABLE THAT**

24      **PLAINTIFFS WILL SUCCEED ON THEIR CLAIMS**

25      "Reasonable probability in the anti-SLAPP statute has a specialized meaning.

26  The statute requires only a minimum level of legal sufficiency and triability. Indeed,

27  the second step of the anti-SLAPP inquiry is often called the minimal merit prong."

28  *Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 598 (9th Cir. 2010); see, *Manzari v.*

LAW OFFICES
**ROSENFELD,
MEYER &
SUSMAN LLP**

16

520507.03

PLAINTIFFS' OPPOSITION TO DEFENDANT'S SPECIAL MOTION TO
STRIKE COMPLAINT PURSUANT TO C.C.P § 425.16

1   *Associated Newspapers*, 830 F.3d 881, 889 (9th Cir. 2016) (plaintiff alleging

2   defamation need only establish "her claim has 'minimal merit'" to survive anti-

3   SLAPP motion).  Plaintiffs need only demonstrate that their complaint is "legally

4   sufficient and supported by a prima facie showing of facts to sustain a favorable

5   judgment if the evidence submitted by the plaintiff is credited."  *Planned*

6   *Parenthood*, 890 F.3d at 833.

7       The motive in bringing the action or in the conduct of the action is irrelevant

8   to the anti-SLAPP analysis.  *City of Cotati v. Cashman*, 29 Cal.4th 69, 78 (2002).

9       "Since an Anti-SLAPP motion is brought at an early stage of proceedings, the

10  plaintiff's burden of establishing a probability of success is not high."  *Browne v.*

11  *McCain*, 611 F.Supp.2d 1062, 1068 (C.D. Cal. 2009).  Plaintiff is to be granted "a

12  degree of leeway in establishing a probability of prevailing on its claims due to 'the

13  early stage at which the [anti-SLAPP] motion is brought and heard and the limited

14  opportunity to conduct discovery.'"  *Integrated Healthcare Holdings, Inc. v.*

15  *Fitzgibbons*, 140 Cal.App.4th 515, 530 (2006) (citation omitted).

16      **1.      LeMahieu Is Likely To Succeed On His Defamation Claims**

17      "The elements of a defamation claim are (1) a publication that is (2) false, (3)

18  defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes

19  special damage. 'In general, … a written communication that is false, that is not

20  protected by any privilege, and that exposes a person to contempt or ridicule or

21  certain other reputational injuries, constitutes libel.' The defamatory statement must

22  specifically refer to, or be '"of [or] concerning,"' the plaintiff."  *Jackson v.*

23  *Mayweather,* 10 Cal.App.5th 1240, 1259 (2017).

24      Silver does not challenge the first element, that the defamatory statements at

25  issue were *published*.  He made the statements at an industry conference and they

26  were republished to YouTube.  Silver does not present any evidence that the

27  defamatory statements were not *false*.  As detailed above, each of the statements

28  was materially and blatantly false.  Silver does not argue that the defamatory

LAW OFFICES
**ROSENFELD,**
**MEYER &**
**SUSMAN LLP**

17
520507.03                    PLAINTIFFS' OPPOSITION TO DEFENDANT'S SPECIAL MOTION TO
                             STRIKE COMPLAINT PURSUANT TO C.C.P § 425.16

1    statements did not cause Plaintiffs harm.  As detailed above, the statements damaged

2    them.  Even were damages not proven, the law presumes damages given the nature

3    of the statements. *Sommer v. Gabor,* 40 Cal.App.4th 1455,1472-73 (1995).

4         Silver argues, instead, that (a) his statements were privileged under the

5    litigation privilege and (b) LeMahieu is a limited public figure and cannot meet the

6    "actual malice" burden of proof.  Silver is wrong on both arguments.

7         **(a)     <u>The Statements are Not Privileged Under Section 47</u>**

8         Silver accused LeMahieu of engaging in criminal acts, specifically an "exit

9    scam" whereby he would "take half" of all Nano sold on an Italian exchange, that

10   the exchange was "gonna give [LeMahieu] money every time" a Nano was sold, that

11   LeMahieu would "get rich" while consumers were "out $150 million" due to the

12   "exit scam".  Silver accused LeMahieu of saying "it's against our ethos" to fix that,

13   countering "you live in the United States of America, there are laws here, those laws

14   will be followed" to indicate LeMahieu committed a crime. Silver doubled down,

15   accusing him of facing active criminal charges, stating "[w]e are now in Federal

16   Court … a Federal Court judge is gonna say 'well if you wanna stay here and you

17   don't wanna go to jail, you're gonna give back the money."  These statements were

18   then republished on the Internet, on YouTube.

19        These statements were false and inflammatory.  LeMahieu and the Nano

20   developers did not receive anything from BitGrail or from the BitGrail hack.  They

21   did not participate in or profit from an exit scam, nor did they ever say that it was

22   against their ethos to return monies, which they could not do, as they received

23   nothing.  Moreover, they are not the target of a criminal inquiry, much less in

24   Federal court on criminal charges.  Silver maliciously and vindictively lied.

25        In his motion, Silver argues that his fantastic lies were privileged under the

26   litigation privilege codified in Civil Code § 47(b).  He is mistaken; they are not.

27        The litigation privilege "applies to any communication (1) made in judicial or

28   quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3)

LAW OFFICES
**ROSENFELD,
MEYER &
SUSMAN LLP**

520507.03

18

PLAINTIFFS' OPPOSITION TO DEFENDANT'S SPECIAL MOTION TO
STRIKE COMPLAINT PURSUANT TO C.C.P § 425.16

1    to achieve the objects of the litigation; and (4) that have some connection or logical

2    relation to the action." *Silberg v. Anderson,* 50 Cal.3d 205, 212 (1990) ("*Silberg*").

3    Commonly called the "furtherance" test, to qualify for the privilege a communication

4    must be made "in furtherance of the objects of the litigation." *Id.* at 219.

5         The privilege "does not apply where publication is to persons in no way

6    connected with the proceeding." *Susan A. v. County of Sonoma,* 2 Cal.App.4th 88,

7    93 (1991).  Statements to nonparticipants in the litigation are not privileged, even if

8    the statement is merely a "republication" of allegations in the case. *Silberg*, 50

9    Cal.3d at 219.  "Statements to nonparticipants in the action are generally not

10   privileged under section 47(b), and are thus actionable unless privileged on some

11   other basis." *Rothman v. Jackson*, 49 Cal.App.4th 1134, 1141 (1996).[4]

12        *GetFugu, Inc. v. Patton Boggs LLP*, 220 Cal.App.4th 141 (2013), is

13   particularly instructive.  There, plaintiffs' attorneys in a shareholder suit issued a

14   press release on the lawsuit and an alleged related FBI investigation on GetFugu and

15   its principal, asking for "investigative leads" and "tips." *Id.* at 145-46.  After the

16   underlying case resolved, GetFugu and its principal sued for defamation.  An anti-

17   SLAPP motion claiming the press release was directed only to the "investment

18   community" and was shielded by the litigation privilege because the investment

19   community had an interest in the outcome of the matter resulted.  *Id.* at 148-49.

20        Reversing the trial court's grant of the anti-SLAPP motion, the appellate court

21   found the press release not privileged: "The press release and Tweet were posted on

22   the Internet and thus were released worldwide. Dissemination of these publications to

23   a segment of the population as large as the 'investment community' is essentially the

24   same as disclosure to the general public. If anyone with an interest in the outcome of

25   the litigation is a person to whom a privileged communication could be made, *Silberg*

26   _____

27   [4]   Indeed, under state law, a finding that out-of-court statements made to non-
     participants are privileged under § 47(b) constitutes reversible error.  *Id.* at 1138 ("We
28   reverse. The challenged statements were made by the defendants in a press
     conference, and not in any context which the litigation privilege exists to protect. The
     privilege in section 47(b) does not apply to the statements made in this case.").

LAW OFFICES
ROSENFELD,
MEYER &
SUSMAN LLP

1  and *Rothman* would be eviscerated. We conclude the March 22, 2010 press release
2  and the August 31, 2010 Tweet are not shielded by the litigation privilege." *Id.* at 154.

3      Silver further argues that he is shielded from liability because his statements
4  were a "fair and true" report of the lawsuit he filed on behalf of Alex Brola. As with
5  many of Silver's arguments[5], he grossly mischaracterizes the law when asserting
6  that any "fair and true" report of a judicial proceeding is absolutely privileged.
7  California Civil Code § 47(d)(1) expressly states that the privilege to which Silver
8  refers applies to "a fair and true *report in, or a communication to, a public journal."*
9  If it were otherwise, any litigant could publicly defame anyone with complete
10  impunity by first stating the defamatory matter in court. Silver's statements were
11  not made to a "public journal"; they were made at an industry conference.

12      In addition to the fantastic lies at issue in LeMahieu's claim for defamation
13  *per se,* Silver also told lies about LeMahieu's finances and marriage, alleging that
14  LeMahieu "holds 90% of the Nano." Of the painful end to LeMahieu's marriage,
15  Silver said "he got divorced from his wife last year. He decided that he was ready.
16  He deserved better because he was now rich. She took all the money. And then, the
17  financial affidavit, she, they, argued about how much the Nano was worth and what
18  the Nano was. But I will tell you this: he said it had value and he said that he
19  believed it was going up and he believed it was a security cause he put it on his
20  security side of the affidavit." Such statements of fact were all false.

21      Silver contends these statements fall within the penumbra of the litigation
22  privilege and, therefore, LeMahieu's claim fails because were "all comments
23  upon … the then-pending First Nano lawsuit." This lacks any semblance of candor

24

25  [5]   For example, Silver's assertion that *Ampex Corp. v. Cargle*, 128 Cal.App.4th
26  1569 (2005), held "that to prevail on claims for defamation involving an issue of
    'public interest,' plaintiff must prove 'actual malice under section 425.16" [Motion
    at 10:23-25, fn. 36], is categorically incorrect. What the court actually held therein
27  was merely that "*limited purpose public figures* such as respondents who sue for
    defamation must establish a probability that they can produce clear and convincing
28  evidence that the allegedly defamatory statements were made with knowledge of
    their falsity or with reckless disregard of their truth or falsity." *Id.* at 1578.

LAW OFFICES
**ROSENFELD,
MEYER &
SUSMAN LLP**
520507.03

1   or merit.  Said action did not in any way involve LeMahieu's marriage, his personal

2   finances, or the reasons why his marriage dissolved.  The parties were not litigating

3   whether LeMahieu "deserved better because he was now rich," a truly repulsive lie.

4   These statements are not privileged.  *Silberg*, 50 Cal.3d at 219.

5                    **(b)**      **Plaintiffs are not public figures.**

6        "Whether an individual [or entity] is a public figure is a question of law that

7   must be assessed through a totality of the circumstances."  *Manzari v. Associated*

8   *Newspapers*, 830 F.3d at 888.  One must be "famous or infamous because of who he

9   is or what he has done," to be considered a public figure for defamation purposes.

10  *Cepeda v. Cowles Magazine & Broad, Inc*., 392 F.2d 417, 419 (9th Cir. 1968).

11       As the Supreme Court explained in *Gertz v Robert Welch, Inc.*, requiring a

12  plaintiff who is a public figure to bear a higher burden of proof to recover damages

13  for defamation is based on two major rationales: (1) limited or general-purpose

14  public figures "voluntarily expose[] themselves to increased risk of injury"; and (2)

15  they have "significantly greater access to the channels of effective communication."

16  418 U.S. 323, 344-45 (1974).  A voluntary public figure is one who "assume[s a]

17  role[]s of especial prominence in the affairs of society" or "thrust[s] themsel[f] to

18  the forefront of particular public controversies." *Id*. at 345.

19       Nano Foundation is a non-profit corporation. LeMahieu is its executive

20  officer. Such an ordinary business person is not a public figure as a matter of law.

21  *See*, *Kamfar v. New World Restaurant Group, Inc.*, 347 F.Supp.2d 38, 46, (S.D.N.Y.

22  2004); *Rancho La Costa, Inc. v. Superior Court*, 106 Cal.App.3d 646, 660 (1980).

23  Even were Nano not a local non-profit, but instead a global corporation, the analysis

24  would not change. *See, Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287,

25  1299 (D.C. Cir. 1980) ("being an executive within a prominent and influential

26  company does not by itself make one a [limited purpose] public figure"); *see also*

27  *Lawlor v. Gallagher Presidents' Report, Inc.*, 394 F.Supp. 721, 731 (S.D.N.Y. 1975)

28  (court rejected that high-level executive in major corporation was a public figure

LAW OFFICES
**ROSENFELD,
MEYER &
SUSMAN LLP**

520507.03

21
PLAINTIFFS' OPPOSITION TO DEFENDANT'S SPECIAL MOTION TO
STRIKE COMPLAINT PURSUANT TO C.C.P § 425.16

1   regarding a publication "directed exclusively at that group" as "untenable … such a

2   rule would sweep all corporate officers under the restrictive *New York Times* rule

3   and distort the plain meaning of the public figure category beyond all recognition").

4        Similarly, that any of the statements were about Nano Foundation or its

5   products does not change the complexion of them.  The false statements at issue

6   address how LeMahieu reported assets in his divorce, why he got a divorce, and what

7   property he personally holds.  Further, they falsely accuse LeMahieu of committing a

8   crime and of being the subject of a criminal action.  These are essentially private

9   concerns.  A private conflict does not "transform" "into an issue of public concern

10  simply by arguing that his speech might have been of interest to the public". *Dorsett v.*

11  *Bd. of Trustees for State Colleges & Universities*, 940 F.2d 121, 124 (5th Cir. 1991).

12  The statements at issue are not public issues as a matter of law.  *Rancho La Costa,*

13  *Inc*, 106 Cal.App.3d at 660 ("[m]erely because a corporation sells services to the

14  public ... and merely because it employs and has access to the media to advertise its

15  services ... does not mean that such ability gives the corporation the status of one with

16  greater power of persuasion on public issues, controversial or not, or all-pervasive

17  influence. Thus it is apparent that neither the 'public interest' ... nor the voluntarily-

18  thrusting-into-public-controversy test ... applies").

19       "Spreading false information in and of itself carries no First Amendment

20  credentials".  *Herbert v. Lando*, 441 U.S. 153, 171 (1979).  "It is speech on matters

21  of public concern that is at the heart of the First Amendment's protection." *Dun &*

22  *Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–59 (1985).

23  Statements "involv[ing] a matter of purely private concern communicated between

24  private individuals" does not "rais[e] a First Amendment issue".  *Savage v. Pac. Gas*

25  *& Elec. Co.*, 21 Cal.App.4th 434, 445 (1993); *see*, *Milkovich v. Lorain Journal Co.,*

26  497 U.S. 1, 19-21 (1990). The statements at issue were made about a private figure

27  on a matter of private concern and thus are not shielded by the First Amendment.

28       Even if LeMahieu and/or Nano Foundation are deemed public figures, they

LAW OFFICES
**ROSENFELD,
MEYER &
SUSMAN LLP**

520507.03

22

PLAINTIFFS' OPPOSITION TO DEFENDANT'S SPECIAL MOTION TO
STRIKE COMPLAINT PURSUANT TO C.C.P § 425.16

1 would each still succeed in making the requisite showing actual malice.  "Actual
2 malice" means "knowledge that [a statement] was false" or "reckless disregard of
3 whether it was false or not."  *Flowers v. Carville*, 310 F.3d 1118, 1129 (9th Cir
4 2002), citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964).  "The
5 plaintiff can meet this burden by showing either that the defendant knew his
6 statements were probably false, or that he disregarded obvious warning signs of
7 falsity."  *Id.* at 1129.  "A defamation plaintiff may rely on inferences drawn from
8 circumstantial evidence to show actual malice." *Makaeff v. Trump University, LLC*,
9 26 F.Supp.3d 1002 at 1007-1008 (S.D. Cal. 2014), citing *Christian Research Inst. v.*
10 *Alnor*, 55 Cal.Rptr.3d 600, 612 (2007).  "Actual malice" presents a question of fact.
11 *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 513 (1991).

12       As Plaintiffs have established, *supra*, Silver's statements were wildly false.  As
13 an expert in the field of cryptocurrency litigation, Silver undoubtedly knew that Nano
14 was a "real coin," not an ICO, when he stated otherwise.  As a result, he must have
15 further known that neither Nano Foundation nor LeMahieu profited off transactions
16 made over BitGrail, since that is not how cryptocurrency works.  After investigating
17 the matter sufficiently to file a complaint, he also knew that Plaintiffs never stated
18 "it's against our ethos" to address and/or fix to the extent they could the third-party
19 BitGrail hack.  He also knew or recklessly disregarded that Plaintiffs were not under
20 criminal investigation or at risk of going to "jail."  Moreover, even a cursory review
21 of LeMahieu's divorce papers reveals that he never "said [his Nano] had value and he
22 said that he believed it was going up and he believed it was a security cause he put it
23 on his security side of the affidavit."  The divorce papers, which Silver either ignored
24 or recklessly failed to consult, say nothing of the sort.  At the time of LeMahieu's
25 divorce, in 2016, the Nano had next to no value, which is plainly evident from the
26 fact that it was not even sold on exchanges at the time.  A review of market rates in
27 2017 reveals that its value even at that time was less than a penny, even after Nano
28 had been introduced to exchanges and grown in value.

LAW OFFICES
ROSENFELD,
MEYER &
SUSMAN LLP
520507.03
23
PLAINTIFFS' OPPOSITION TO DEFENDANT'S SPECIAL MOTION TO
STRIKE COMPLAINT PURSUANT TO C.C.P § 425.16

1   It is inconceivable that Silver actually believed these statements.  If he

2   somehow did, his belief was rotted in a "reckless disregard" as to their truth or

3   falsity such that they are not protected speech.  See *Masson v. New Yorker Magazine,*

4   *Inc.*, 501 U.S. at 521 (concluding that misquotations of a public figure, implying he

5   had said things he did not say, raised a triable issue of fact for jury).

6   Even in the event the Court were to find that Silver's actual malice has not been

7   sufficiently demonstrated at this time, the Motion still cannot be granted.  Actual

8   malice requires evidence of *mens rea*.  *Id*. at 513 (actual malice is a question of fact).

9   In order to provide further evidence of Silver's state of mind, Plaintiffs require the

10  opportunity to conduct discovery in this matter, including written discovery and a

11  meaningful deposition concerning what he knew, what he did not know, and the steps

12  he took or did not take to investigate the falsity of his statements before he made them.

13  Accordingly, "discovery must be permitted" before Silver's motion can be granted.

14  *Planned Parenthood,* 890 F.3d at 833; *see* Code Civ. P., § 425.16(g); *1-800 Contacts,*

15  *Inc. v. Steinberg*, 107 Cal.App.4th 568, 593 (2003) (good cause shown if "a defendant

16  or witness possesses evidence needed by plaintiff to establish a prima facie case.")

17      **2.      Nano Is Likely to Succeed on its Trade Libel Claim**

18  Trade libel is "'an intentional disparagement of the quality of property, which

19  results in pecuniary damage.'" *Aetna Casualty & Sur. Co. v. Centennial Ins. Co.,*

20  838 F.2d 346, 351 (9th Cir. 1988).  It includes "all false statements concerning the

21  quality of services or product of a business." *ComputerXpress, Inc. v. Jackson*, 93

22  Cal.App.4th 993, 1010 (2001).

23  Here, Silver made false statements disparaging the quality of the product that

24  LeMahieu and Nano Foundation developed and service, the Nano.  Specifically,

25  Silver said that "Nano is not really a real coin … they were an alternative coin and

26  they weren't really a real coin". These statements were false. Silver made them with

27  knowledge they would harm Nano Foundation, as speaking as an official panelist and

28  resident expert at an industry panel, his false statement to those in the market for

520507.03

1  Nano necessarily carried an indicia of reliability.  Silver induced members of the

2  audience to not deal with Nano Foundation as its signature product has been

3  mischaracterized as a not a real coin, which would make it a risky investment tool.

4  Thereafter, resulting at least in part from Silver's statements, Nano fell by 75%.

5          **3.      The Intentional Interference Claim Should Succeed**

6          In order to prove a claim for intentional interference with prospective

7  economic advantage, a plaintiff has the burden of proving five elements: (1) an

8  economic relationship between plaintiff and a third party, with the probability of

9  future economic benefit to the plaintiff; (2) defendant's knowledge of the

10  relationship; (3) an intentional act by the defendant, designed to disrupt the

11  relationship; (4) actual disruption of the relationship; and (5) economic harm to the

12  plaintiff proximately caused by the defendant's wrongful act, including an

13  intentional act by the defendant that is designed to disrupt the relationship between

14  the plaintiff and a third party. (*Korea Supply Co. v. Lockheed Martin Corp.*,  29

15  Cal.4th 1134, 1153–1154 (2003)).  Here, Silver targeted LeMahieu's industry peers

16  with venomous lies, accusing him of being a criminal and presenting sordid, false

17  marital details.  As a result, LeMahieu has been shunned by industry peers and seen

18  his business network dry up, causing him economic harm.

19  **D.      PLAINTIFFS SHOULD BE AWARDED THEIR FEES**

20          Having failed to establish the first step of the anti-SLAPP inquiry, Silver's

21  motion lacks merit.  California law calls for an award of attorney's fees in such

22  circumstances. Cal. Code Civ. P. § 425.16(c)(l) (mandatory fee award for "frivolous"

23  filing).

24          His motion should be denied and Silver ordered to pay Plaintiffs' fees.

25  DATED:  July 15, 2019              ROSENFELD, MEYER & SUSMAN LLP

26                                              By: _____*/s/ Ryan M. Lapine*_____
                                                        Ryan M. Lapine
27                                              Attorneys for Plaintiffs NANO
                                                FOUNDATION, LTD. and COLIN
28                                              LeMAHIEU

LAW OFFICES
**ROSENFELD,
MEYER &
SUSMAN LLP**

520507.03

25

PLAINTIFFS' OPPOSITION TO DEFENDANT'S SPECIAL MOTION TO
STRIKE COMPLAINT PURSUANT TO C.C.P § 425.16