1  Rosanne L. Mah (State Bar No. 242628)
   Email: rmah@zlk.com
2  **LEVI & KORSINSKY, LLP**
   44 Montgomery Street, Suite 650
3  San Francisco, California 94104
   Telephone: (415) 373-1671
4  Facsimile: (415) 484-1294

5  *Counsel for Plaintiff JAMES FABIAN*

6  [*Additional Counsel listed on signature block*]

7
               **UNITED STATES DISTRICT COURT**
8
          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
9

10  JAMES FABIAN, individually and on behalf of      Case No. 19-cv-54-YGR
    all others similarly situated,
11                                                    **FIRST AMENDED CLASS ACTION
                       Plaintiff,                     COMPLAINT**
12
             v.                                       **JURY TRIAL DEMANDED**
13
    NANO F/K/A RAIBLOCKS F/K/A HIEUSYS,
14  LLC; COLIN LEMAHIEU; MICA BUSCH;
    ZACK SHAPIRO; TROY RETZER; BG
15  SERVICES, S.R.L. F/K/A BITGRAIL S.R.L.
    F/K/A WEBCOIN SOLUTIONS; AND
16  FRANCESCO "THE BOMBER" FIRANO,

17                     Defendants.

18

19

20

21

22

23

24

25

26

27

28

<span style="color:red">**EXHIBIT "A"**</span>

Case No. 19-cv-54-YGR
FIRST AMENDED CLASS ACTION COMPLAINT

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................ 1

NATURE AND SUMMARY OF THE ACTION ...................................................... 2

JURISDICTION AND VENUE ................................................................................. 8

CLASS ACTION ALLEGATIONS ......................................................................... 10

SUBSTANTIVE ALLEGATIONS .......................................................................... 14

    I.      Background on Blockchain Technology ........................................... 14

    II.     Creation of XRB ............................................................................... 15

    III.    XRB is Not Decentralized ................................................................ 16

    IV.    Cryptocurrency Faucets and the XRB Faucet ................................. 18

    V.      The Nano Defendants' Efforts to List XRB on Established Exchanges ..................... 22

    VI.    XRB is Listed on Exchanges and Bona Fide Offered to the Investing Public ............ 23

    VII.   The Nano Defendants and Firano Create and Launch BitGrail Together ................... 24

    VIII.  Defendants Heavily Solicit the Purchase of XRB on BitGrail ....................... 27

           A.    Instructing Members of the Investing Public to Purchase XRB ..................... 27

           B.    Encouraging the Public to Spread the Word ........................ 31

           C.    Increasing Social Media and Online Presence ................... 31

           D.    Downplaying Speculation: the "HODL Mentality" ........... 33

    IX.    The Nano Defendants Close the Nano Faucet and Extract Millions in Profits ........... 33

    X.      Defendants' Representations Regarding their Duties and Obligations to Investors ..... 35

    XI.    Nano's Recommendations Fail to Disclose the XRB Protocol's and the BitGrail Exchange's Lack of Safeguards Protecting the Class' Deposits ................................. 37

           A.    The Trading Platform Problem ........................................... 37

           B.    The Verification Problem .................................................. 38

           C.    The $170 Million Disappearing XRB Problem ................. 38

           D.    Lack of Idempotence in the Nano Protocol Resulted in the Theft of the Class' XRB Worth $170 Million ........... 39

           E.    Defendants Breached Their Duties Owed the Class and Concealed the Theft of the Class' XRB Investments for Eight Months ........... 41

i

XII.   XRB Are Unregistered Investment Contract Securities ................................................. 45

ADDITIONAL FACTS SPECIFIC TO LEAD PLAINTIFF FABIAN ............................................. 47

COUNT I ...................................................................................................................... 48

COUNT II ..................................................................................................................... 49

COUNT III .................................................................................................................... 50

COUNT IV .................................................................................................................... 50

COUNT V ..................................................................................................................... 51

COUNT VI .................................................................................................................... 54

COUNT VII ................................................................................................................... 54

COUNT VIII .................................................................................................................. 56

COUNT IX ..................................................................................................................... 57

COUNT X ...................................................................................................................... 58

COUNT XI ..................................................................................................................... 60

**INTRODUCTION**

Plaintiff James Fabian ("Plaintiff" or "Fabian"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this First Amended Class Action Complaint (the "Amended Complaint") claims for: (i) violations of Sections 12(a)(1) and 15(a) of the Securities Act of 1933 (the "Securities Act") (the "Securities Act Claims"); (ii) breach of contract;[1] (iii) breach of implied contract;[2] (iv) breach of fiduciary duty; (v) aiding and abetting breach of fiduciary duty; (vi) negligence; (vii) negligent misrepresentation; (viii) fraud; (ix) constructive fraud; and (x) quasi contract seeking restitution based upon his own knowledge and acts, and based on facts obtained upon investigation by his counsel, which include, *inter alia*: (a) documents and solicitation materials released by Defendants Nano f/k/a RaiBlocks f/k/a Hieusys, LLC ("Nano" or the "Company"), Colin LeMahieu ("LeMahieu"), Mica Busch ("Busch"), Zack Shapiro ("Shapiro"), Troy Retzer ("Retzer" and together with Nano, LeMahieu, Busch and Shapiro, the "Nano Defendants"), B.G. Services SRL f/k/a BitGrail SRL f/k/a Webcoin Solutions ("BitGrail"), and Francesco "The Bomber" Firano ("Firano" together with BitGrail, the "BitGrail Defendants") (collectively, "Defendants") in connection with their promotion of a cryptocurrency called NANO (f/k/a RaiBlocks) ("XRB"); (b) public statements made by Defendants concerning XRB and its listing on BitGrail -- an Italian-based cryptocurrency exchange; (c) media publications concerning XRB and BitGrail; and (d) the bankruptcy decisions issued by the Tribunale Di Firenze of Italy against against Defendant BitGrail in *In re BG Services (BitGrail S.R.L.)*, Trib. Florence, n.18/2019 (the "BitGrail Decision") and against Defendant Firano in *In re Firano*, Trib. Florence, n. 18/2019 (the "Firano Decision").

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

---

[1] Plaintiff's claim for breach of contract is asserted solely against the BitGrail Defendants (defined below).

[2] Plaintiff's claim for breach of implied contract is asserted solely against the Nano Defendants (defined below).

## NATURE AND SUMMARY OF THE ACTION

1.     This is a class action on behalf of a class of investors consisting of all individuals and entities who transferred fiat currency or cryptocurrency to BitGrail to invest in XRB or transferred XRB to BitGrail from April 1, 2017 through February 8, 2018, inclusive, and who suffered financial injury as a result thereof (the "Class" who purchased or held XRB on BitGrail during the "Class Period").   This action seeks to recover rescissory, compensatory, punitive and injunctive relief under Sections 12(a)(1) and 15(a) of the Securities Act [15 U.S.C. §§ 77l(a)(1) & 77o(a)] and various state and common law claims against Nano, certain of its top officials, certain influential promoters that received compensation in exchange for selling XRB or soliciting the general public to purchase XRB, and its partner the BitGrail Defendants.

2.     The Nano Defendants developed XRB, which they each promoted, offered, traded and sold to the general public for the Nano Defendants' personal financial benefit.   XRB has never been registered as a security with the Securities and Exchange Commission and is not exempt from registration.

3.     The Nano Defendants began working with the BitGrail Defendants to create BitGrail's "RaiBlocks dedicated exchange" (the "BitGrail Exchange") in approximately December 2016.   Indeed, Defendant LeMahieu personally worked with Defendant Firano and a member of Nano's core development team—an individual known as "mikerow"[3]— until October 2017 in developing the BitGrail Exchange.   In the words of mikerow on an online cryptocurrency discussion forum (www.bitcointalk.org ("Bitcoin Talk")) on May 4, 2017, the BitGrail Exchange was "written from 0 for XRB."

4.     The BitGrail Exchange launched in April 2017 (www.bitgrail.com).   Throughout the Class Period, each of the Nano Defendants remained substantially involved in the maintenance of the BitGrail Exchange's XRB-related operations and retained significant control over Defendant Firano's decision making concerning the BitGrail Exchange.

---

[3] "Mikerow" left the Nano development team in late-2017 following a disagreement regarding the Nano Defendants' decision to cease the Nano Faucet (defined *infra*).

5. Throughout the Class Period, the Nano Defendants directed the investing public to purchase XRB through, and stake XRB at, BitGrail by, *inter alia*, (i) commissioning, and contributing to, the creation of the BitGrail Exchange; (ii) providing specific investment instructions and assurances that the BitGrail Exchange was secure and could be trusted to safeguard investment assets; and (iii) collaborating with the BitGrail Defendants in maintaining and the BitGrail Exchange's on its XRB-related related operations.

6. In July 2017, during a private group chat including Defendant Firano and the Nano Defendants, Firano reported to the Nano team that there was an error in the code (the "XRB Protocol") for maintaining XRB's ledgers and transferring XRB from the BitGrail Exchange into private wallets, which caused certain transactions to be entered two or more times.[4] The Double Withdrawal Transactions occurred because the XRB Protocol lacked "idempotence."[5]

7. Due to the XRB Protocol lacking idempotence, the Double Withdrawal Transactions were accomplished even if the account transferring the XRB off of the BitGrail Exchange lacked sufficient funds to complete the multiple transactions—by transferring XRB belonging to other accountholders off of the BitGrail Exchange to the private wallet destination.

8. Approximately 2.5 million XRB were stolen in July 2017 by exploiting XRB's lack of idempotence in the XRB Protocol, which permitted Double Withdrawal Transactions. The error permitting the Double Withdrawal Transactions was exploited by anonymous users of the BitGrail Exchange from July 2017 through and including January 2018 to ultimately obtain over 15 million XRB rightfully belonging to the Class.

---

[4] While these withdrawals involved two or more identical transactions being processed, these erroneous transactions are, for simplicity, referred to herein as "Double Withdrawals Transactions."

[5] As explained by the Tribunal in the BitGrail Decision: "'Idempotence' is the property of executing a command only once, even if issued multiple times, even if identical and in rapid succession. To give a 'trivial' but clarifying example: during cash withdrawals at an ATM, also trying to press the withdrawal button several times, the 'idempotent' function means that the device can emit one and only one withdrawal command, providing the requested cash only once, and tracking the withdrawal only once in the account statement of the customer."

9.   Throughout the BitGrail Exchange's existence, Defendant Firano "highly recommended to [the Nano Defendants] that we close the markets because of major issues with the NANO protocol, but they were hesitant and forced me to keep it open and sometimes begged as well."[6]

10.  On or about February 8, 2018, the BitGrail Defendants announced that over 15 million XRB, bearing a market value of approximately $170 million, which were supposedly safely stored on BitGrail, were "lost."

11.  Less than 24 hours after investors learned that the entirety of their XRB holdings were "lost," the Nano Defendants released to their XRB investors an "Official Statement Regarding BitGrail Insolvency," denying any responsibility and pointing their finger at BitGrail:

> BitGrail is an independent business and Nano is not responsible for the way Firano or BitGrail conduct their business. We have no visibility into the BitGrail organization, nor do we have control over how they operate.

*See* Nano Core Team, *Official Statement Regarding BitGrail Insolvency* (Feb. 9, 2018).

12.  Since that announcement, the Nano Defendants have made every effort to distance themselves from BitGrail and their substantial involvement with BitGrail's operations related to purchasing, selling, and storing custody of XRB.  Indeed, the Nano Defendants have even gone so far as to fund a lawsuit against its former partners, the BitGrail Defendants, to avoid unwanted attention for their actions.  For example, on April 6, 2018, a putative class action (which has since been settled on an individual non-public basis) was filed in the United States District Court for the Southern District of New York.  A mere three (3) days later, on April 9, 2018, the Nano Defendants announced that the Company was "sponsoring" a "legal fund" purportedly designed to "provide all victims of the hack of the cryptocurrency exchange BitGrail with equal access to representation" and enable such investors to seek recourse against the exchange.

---

[6] The foregoing is from a public statement Defendant Firano published on May 2, 2018 on Medium.com regarding his relationship with the Nano Defendants and BitGrail's operations.  This post was entitled "On NANO and BitGrail and The Repercussions of Supporting Technology That Is Not Ready For Mass Consumption" and is referred to herein as the "Firano Statement."

13.     On February 16, 2018 -- after the 15 million XRB had been "lost" -- the Nano Defendants updated the XRB Protocol to include idempotence, thereby preventing future Double Withdrawal Transactions from occurring.

14.     Defendants: (a) unlawfully issued, distributed, and promoted the ongoing sale of XRB -- an unregistered security; (b) were responsible for managing BitGrail's safekeeping of the unregistered security on BitGrail – itself an unregistered exchange; (c) successfully solicited the general public to entrust BitGrail with their substantial assets by promoting, encouraging, and otherwise directing investors to establish XRB trading accounts at BitGrail; (d) expressly endorsed and assured the public that BitGrail was a safe, secure, and valid exchange; (e) continued to endorse and promote the use of BitGrail as a safe, secure, and valid exchange, notwithstanding having direct insider information of specific issues likely to jeopardize accountholders XRB investments months prior to the February 8, 2018 announcement; and (f) profited from the purchase and sale of XRB on BitGrail and other exchanges.

15.     Plaintiff's Securities Act Claims arise from Defendants' offer and sale of XRB—which constituted the offer and sale of an investment contract security because, *inter alia*, Defendants touted, and Plaintiff and XRB purchasers were conditioned to expect, and did reasonably expect, that XRB received would increase in value and become worth more than the fiat or digital currencies invested. Defendants are strictly liable for offering and selling these unregistered securities.

16.     Plaintiff's claim for breach of contract against the BitGrail Defendants arises from "the agreement executed between the exchanger and its users [being] a service agreement through which the exchanger guarantees the possibility to perform the exchange, sale and purchase and deposit, through an account, of various types of virtual currencies, including the 'Nano' cryptocurrency." *See* BitGrail Decision. The BitGrail Defendants breached this contract by failing to maintain the Class' XRB deposits on the BitGrail Exchange, as evidenced by the loss of $170 million worth of the Class' XRB investments announced in February 2018.

17.     Plaintiff's claim for breach of implied contract against the Nano Defendants arises from the implied contracts that the Nano Defendants had with Plaintiff and the Class through their

participation in creating and running the BitGrail Exchange as well as through their creation of XRB and maintenance of its protocols. These implied contracts were breached by the Nano Defendants: (i) forcing of Defendant Firano to keep the BitGrail Exchange operating despite having been aware of the error in the XRB Protocol, permitting the Double Withdrawal Transactions to occur since July 2017; and (ii) permitting the Double Withdrawal Transactions to occur in the first place by failing to implement necessary idempotence safeguards in the XRB Protocol—a safeguard the Nano Defendants included *after* the Class had already lost $170 million worth of XRB—on February 16, 2018.

18.    Plaintiff's claim for breach of fiduciary duty against the Nano Defendants arises from their breach of their duties to the Class—both in their capacity as the developers of XRB and as their involvement in, or control over, the BitGrail Exchange's XRB-related operations—by: (i) forcing Defendant Firano to keep the BitGrail Exchange online despite having actual knowledge in July 2017 of, or recklessly disregarding, the fact that the Double Withdrawal Transactions were causing significant losses to the Class' funds on the BitGrail Exchange; (ii) failing to maintain adequate controls preventing the theft of XRB from the BitGrail Exchange; and (iii) concealing the fact that the Class' funds were, in fact, not "safe" on the BitGrail Exchange. The Nano Defendants benefited from their breaches of duties owed the Class by selling millions of XRB—which rose in value from $0.01 for each XRB in April 2017 to over $32 for each XRB in December 2017, largely as a result of the significant XRB trading volume the BitGrail Exchange provided.

19.    Plaintiff's claim for breach of fiduciary duty against the BitGrail Defendants arises from their breach of their duties to the Class in their capacity as the owners of the BitGrail Exchange by: (i) failing to rebuff the Nano Defendants' insistence on keeping the BitGrail Exchange online despite having actual knowledge of, or recklessly disregarding, the fact that the Double Withdrawal Transactions were occurring; and (ii) concealing the fact that the Class' funds were being depleted from July 2017 through January 2018 through the exploitation permitting the Double Withdrawal Transactions to occur.

20.    Plaintiff's claim for aiding and abetting breach of fiduciary duty against the Nano Defendants arises from their aiding the BitGrail Defendant's breaches of their duties to the Class by

forcing Defendant Firano to keep the BitGrail Exchange online -- permitting the ongoing theft of the Class' funds -- and concealing their knowledge that the Class' XRB deposits on BitGrail were being stolen from July 2017 through January 2018.

21.     Plaintiff's claims for negligence against Defendants arise from the Nano Defendant's failure to adopt adequate idempotency measure in the XRB Protocol and the BitGrail Defendant's failure to safeguard the Class' XRB deposits, resulting in the theft of the Class' XRB—representing a $170 million loss.

22.     Plaintiff's claims for negligent misrepresentation arise from Defendants' assurances through January 2018 that the Class' XRB deposits on the BitGrail Exchange were "safe" despite having actual knowledge of, or recklessly disregarding, the fact that the Double Withdrawal Transactions were occurring as early as July 2017—when according to the Tribunal in the BitGrail Decision, Defendant Firano notified the Nano Defendants of the issue in a private group chat.

23.     Plaintiff's claims for fraud and constructive fraud arise from Defendants' intentional concealment of the losses occurring on the BitGrail Exchange throughout the Class Period by falsely assuring that the Class' funds were safe.  Plaintiff and the Class detrimentally relied on these false assurances by maintaining their XRB funds on the BitGrail Exchange rather than withdrawing the XRB to their personal wallets.  Because the Nano Defendants created XRB and maintained the XRB Protocol and repeatedly vouched that the BitGrail Defendants could be trusted, Plaintiff's reliance on Defendants false assurances was justifiable.  To the Class' detriment, Defendants each benefited from their concealment of the XRB losses by the Nano Defendants' sale of millions of XRB at inflated prices and the BitGrail Defendants' ability to extract transaction fees operating the BitGrail Exchange.

24.     Plaintiff's quasi contract claim seeking restitution arises because Defendants induced Plaintiff and the Class to create accounts on the BitGrail Exchange, purchase XRB through the exchange, and maintain their XRB on the platform despite Defendants' knowledge of ongoing theft of the Class' funds.  Defendants were unjustly enriched by Plaintiff's and the Class' use of the BitGrail Exchange by the Nano Defendants' sale of XRB at inflated prices and the BitGrail Defendants' extraction of transaction fees from the exchange's operation.

25. Plaintiff and the Class are among the members of the public who invested in tens of millions of dollars' worth of XRB to be held in, and exchanged from, their BitGrail accounts, and who, from July 2017 through January 2018, through no fault of their own, suffered a loss of more than $170 million worth of XRB when their investment holdings were simply "lost."

26. For these reasons, Plaintiff on behalf of himself, and all similarly situated XRB investors, seeks compensatory, injunctive, and rescissory relief, providing rescission and repayment of all investments made to purchase, or store, XRB Tokens on BitGrail prior to February 8, 2018.

## JURISDICTION AND VENUE

27. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) and 1332(d)(2)(A) because this is a class action in which the matter or controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs, and in which some members of the Class are citizens of a state different from Defendants.

28. This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and Section 22 of the Securities Act [15 U.S.C. § 77v] because Plaintiffs allege violations of Sections 12(a)(1) and 15(a) of the Securities Act [15 U.S.C. §§ 77l(a)(1) and 77o(a)]. Plaintiff's federal claims further provide this Court with supplemental jurisdiction over their state and common law claims under 28 U.S.C. § 1367.

29. The Court has personal jurisdiction over each of the Defendants because each either conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

30. Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C. § 77v, as well as under 28 U.S.C. § 1391, because: (a) the conduct at issue took place and had an effect in this District; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect in this District.

8

**PARTIES**

31.     Plaintiff is an individual domiciled in Discovery Bay, California and is *sui juris*.  On February 8, 2018, Plaintiff had 23,033 XRB frozen by Defendants -- valued on or about February 8, 2018 at over Two Hundred Sixty Thousand Dollars ($260,000.00).

32.     Defendant Nano f/k/a RaiBlocks f/k/a Hieusys, LLC ("NANO") is a Texas company which lists its principal place of business in Austin, Texas.  According to NANO's own published promotional materials, NANO is a "low-latency payment platform" that "utilizes a novel block-lattice architecture" on which "each account has [its] own blockchain as part of a larger directed acyclic graph."  In layman's terms, NANO purports to have created a faster, cheaper, and more scalable blockchain and cryptocurrency that improves upon earlier blockchains and cryptocurrencies such as the widely-popular bitcoin.

33.     Defendant Colin LeMahieu ("LeMahieu") is an individual domiciled in Austin, Texas and is *sui juris*.  According to Nano's own published promotional materials, LeMahieu founded NANO in 2014 and serves as the Company's Lead Developer, "spearheading development of the core protocol."

34.     Defendant Mica Busch ("Busch") is an individual domiciled in Chicago, Illinois and is *sui juris*.  According to NANO's own published promotional materials, at all relevant times, Busch was a key member of Nano's core team, serving as a "Control System Developer" for Nano's "Residential" and "Enterprise" markets.

35.     Defendant Zack Shapiro ("Shapiro") is an individual domiciled in Brooklyn, New York and is *sui juris*.  According to Nano's own published promotional materials, at all relevant times, Shapiro was a key member of Nano's core team, as he "runs Mobile, Wallets, and Product" for the company and serves as the company's head iOS Developer.

36.     Defendant Troy Retzer ("Retzer") is an individual domiciled in Hilton Head Island, South Carolina and is *sui juris*.  According to Nano's own published promotional materials, Retzer is a key member of Nano's core team, as he manages and directs the company's marketing and Community and Public Relations efforts.

37.     Defendant B.G. Services SRL f/k/a BitGrail SRL f/k/a Webcoin Solutions ("BitGrail") was a cryptocurrency exchange operating in Italy which was primarily focused on creating and sustaining a market for XRB/Nano.  In July 2018, an Italian Court of Appeals ordered BitGrail's assets to be frozen with the anticipation that the minimal funds remaining will eventually be used to refund investors such as Plaintiff.

38.     Defendant Francesco "The Bomber" Firano ("Firano") is an individual believed to be domiciled in Italy and the sole proprietor of BitGrail.  Firano has consistently blamed the Nano Defendants for the "loss"/theft of the putative class's funds from BitGrail.

39.     In addition to those persons and entities set forth as Defendants herein, there are likely other parties who may well be liable to Plaintiff and the Class but respecting whom Plaintiff currently lacks specific facts to permit him to name such person or persons as a party defendant.  By not naming such persons or entities at this time, Plaintiff is not waiving his right to amend this pleading to add such parties, should the facts warrant the addition of such parties.

## CLASS ACTION ALLEGATIONS

40.     A class action is the proper form to bring Plaintiff's and the Class' claims under Rule 23 of the Federal Rules of Civil Procedure.  The proposed class is so large that joinder of all members would be impractical.  Additionally, there are questions of law or fact common to the class, the claims or defenses of the representative parties are typical of the claims or defenses of the class, and the representative parties will fairly and adequately protect the interests of the class.

41.     Plaintiff brings this nationwide class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all members of the following class:

> **All BitGrail investors and accountholders who are citizens of the United States and who, between April 1, 2017 and March 31, 2018, and who transferred bitcoins, alternative cryptocurrencies, or any other form of monies or currency to BitGrail to purchase, invest in, or stake XRB.   Excluded from the class are: Defendants themselves, Defendants' retail employees, Defendants' corporate officers, members of Defendants' boards of directors, Defendants' senior executives, Defendants' affiliates, and any and all judicial officers (and their staff) assigned to hear or adjudicate any aspect of this litigation.**

42. This action satisfies all of the requirements of Federal Rules of Civil Procedure, including numerosity, commonality, predominance, typicality, adequacy, and superiority.

43. Members of the Class are so numerous and geographically dispersed that joinder of all members is impractical.

44. While the exact number of class members remains unknown at this time, upon information and belief, there are at least hundreds if not thousands of putative Class members.

45. Again, while the exact number is not known at this time, it is easily and generally ascertainable by appropriate discovery.

46. It is impractical for each class member to bring suit individually.

47. Plaintiff does not anticipate any difficulties in managing this action as a class action.

48. There are many common questions of law and fact involving and affecting the parties to be represented.

49. When determining whether common questions predominate, courts focus on the issue of liability; and if the issue of liability is common to the class and can be determined on a class-wide basis, as in the instant matter, common questions will be held to predominate over individual questions

50. Common questions include, but are not limited to, the following:

(i) whether the XRB offered for sale by Defendants constitute securities under federal securities laws;

(ii) whether Defendants violated federal securities laws in offering, selling, or soliciting the offer and sale of, unregistered securities—in the form of XRB;

(iii) whether by virtue of Defendants' custodianship over the proposed class' investments or by their control over the Nano Protocol, Defendants owed a fiduciary duty to Plaintiff and the proposed class and if so, whether that duty was breached;

(iv) whether Defendants promoted XRB and BitGrail despite being aware of the exchange's shortcomings;

(v) whether Defendants are liable for steering Plaintiff and the Class to BitGrail;

(vi)    whether Defendants are liable for negligently auditing, vetting and/or supervising BitGrail;

(vii)    whether statements made by Defendants about BitGrail were false or were made without due regard for the safety of those who read or heard the statements;

(viii)    whether Defendants benefitted from the Class's purchasing and holding of XRB;

(ix)    whether Defendants capitalized on their XRB holdings at the expense of the Class;

(x)    whether Defendants have converted the funds belonging to Plaintiff and the Class;

(xi)    whether Defendants owed duties to Plaintiff and the Class, and whether Defendants breached those duties;

(xii)    whether Defendants' conduct was unfair or unlawful;

(xiii)    whether Defendants owe restitution to Plaintiff and the Class;

(xiv)    whether Plaintiff and the Class have sustained damages as a result of Defendants' conduct; and

(xv)    whether Defendants have within their power the ability to, and should, institute an equitable remedy that would resolve the harm that has befallen Plaintiff and the Class.

51.    These common questions of law or fact predominate over any questions affecting only individual members of the Class.

52.    Plaintiff's claims are typical of those of the other Class members because, *inter alia*, all members of the Class were injured through the common misconduct described above and were subject to Defendants' unfair and unlawful conduct.

53.    Plaintiff is advancing the same claims and legal theories on behalf of himself and all members of the Class.

54. Plaintiff will fairly and adequately represent and protect the interests of the Class in that he has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class.

55. Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel, experienced in complex consumer class action litigation of this nature, to represent him. Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class.

56. The infringement of the rights and the damages Plaintiff has suffered are typical of other Class members.

57. To prosecute this case, Plaintiff has retained counsel experienced in class action litigation and has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

58. Class action litigation is an appropriate method for fair and efficient adjudication of the claims involved herein. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; as it will permit a large number of Class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require.

59. Class action treatment will permit the adjudication of relatively modest claims by certain Class members, who could not individually afford to litigate a complex claim against well-funded corporate defendants like Nano.

60. Further, even for those Class members who could afford to litigate such a claim, it would still be economically impractical. The nature of this action and the nature of laws available to Plaintiff make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and the Class for the wrongs alleged because: Defendants would necessarily gain an unconscionable advantage if they were allowed to exploit and overwhelm the limited resources of each individual Class member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to

which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each member of the Class to recover on the cause of action alleged; individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation; the Class is geographically dispersed all over the world, thus rendering it inconvenient and an extreme hardship to effectuate joinder of their individual claims into one lawsuit; there are no known Class members who are interested in individually controlling the prosecution of separate actions; and the interests of justice will be well served by resolving the common disputes of potential Class members in one forum.

61. Plaintiff reserves the right to modify or amend the definition of the proposed class and to modify, amend, or create proposed subclasses before the Court determines whether certification is appropriate and as the parties engage in discovery.

62. The class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

63. Because of the number and nature of common questions of fact and law, multiple separate lawsuits would not serve the interest of judicial economy.

64. As a result of the foregoing, Plaintiff and the Class have been damaged in an amount that will be proven at trial.

65. Plaintiff has duly performed all of his duties and obligations, and any conditions precedent to Plaintiff bringing this action have occurred, have been performed, or else have been excused or waived.

## **SUBSTANTIVE ALLEGATIONS**

### I. **Background on Blockchain Technology**

66. A "blockchain" is essentially a digitized, decentralized, public ledger that cryptographically records, preserves, and presents information. The general idea is that each "block" contains information, such as details on transactions that are made. After a "block" is created (with cryptography so as to verify its contents), the information inside of it cannot be changed. The "block" then becomes part of the "blockchain" and an encrypted version of the information contained therein

becomes publicly available along with all the previous "blocks" in the chain. After this process is complete, another block is created with additional information and so on and so forth.

67.   To date, most "blockchains" are used to record transactions involving virtual currencies, *e.g.*, bitcoin.  However, a "blockchain" could be used to record all types of information.  For example, a blockchain could be used for deed recordation/transfers or even transfers of stock certificates.

## II.   Creation of XRB

68.   XRB was originally launched in or about December 2014 under the brand name RaiBlocks.  XRB was initially represented by the stock ticker "MRAI." In mid-2016, the RaiBlock's stock ticker symbol was changed to XRB.  In January 2018, shortly before the "hack" was announced, the Nano Defendants rebranded RaiBlocks once again as "Nano."

69.   As early as February 2016, if not earlier, Defendant LeMahieu promoted XRB on online fora, as a free way to transact and settle micropayments:



70.   The promotion of XRB ramped up in and after March 2016, including promoting XRB on various online social networks, such as Reddit and Twitter.

71.   Around this time, Defendants planned, formulated, and began executing a marketing campaign designed to develop popular interest in and mass adoption of XRB.

15

72.     For example, in a March 3, 2016 Reddit post, Defendant LeMahieu advertised XRB's competitive edge as its unique capacity to eliminate confirmation delays and fees: "RaiBlocks [XRB/Nano] places transactions in to ledger on an individual basis.  This removes the concept of block intervals, block sizes, and all the other complicated paramtes that destroy scalability."



## III.     XRB is Not Decentralized

73.     XRB is not a decentralized cryptocurrency.

74.     The Nano Defendants have made multiple representations to imply that they are merely part of a larger network that has collectively developed and maintained a decentralized protocol.  Such representations from the Nano Defendants are demonstrably false.  Investors in XRB rely almost exclusively on the efforts of the Nano Defendants and their core team.[7]

75.     To illustrate, on or about September 10, 2018, Reddit user DeepBlueMachine presented the following questions and concerns to the Nano Team concerning its apparent centralized nature:

> 1.     NANO centralization concerns, where 70-80% NANO are centralized even currently.
>
> 2.     90% of github commits by one person working on the team Colin.
>                      . . .
> 3.     Whales initially might have hired third-world country folks to solve captcha and gain control of Nano. Currently 100 addresses hold 65% of all 133 million NANO which is kind of crazy.

---

[7]     *See* https://www.nano.org/en/team/ (last visited Oct. 8, 2018).

76. In response, Defendant Retzer acknowledged that Nano is centralized, that Defendant LeMahieu is responsible for developing at least 90 percent of all of Nano's underlying coding and programing, and that just 100 unique accounts own and hold at least 65 percent of the existing XRB:

> 1. **Nano has been steadily moving towards decentralization this year without really any active programs pushing it.** As it becomes more of a focus I expect this trend to continue.
>
> 2. **Colin was the lone dev for a few years, so if you look at total commits then yea, he is going to have the majority of them**. He also has not led the last 2 releases.
>
> . . .
>
> 3. **The did hire people to solve the captcha. Anyone was able to do this.** People buy more bitcoin miners in order to have more bitcoin.

(Emphasis added).

77. Moreover, the Nano Core Team possesses more than 50 percent of the total voting power. In addition to the Nano Core Team, a total of nine other representatives comprise the ownership of over 96 percent of the total voting power.

78. The Nano Core Team handles all aspects of business development and marketing. As Defendant LeMahieu wrote in January 2018 on Reddit, it is merely wishful thinking that non-Nano Core Team members will contribute to Nano's development, and the Nano Core Team will not wait for those contributions to materialize:

> Right now we have about 12 people, half core and half business developers. I think this count is good for working on what we're doing right now which is getting wallets and exchanges worked on. **Ideally people outside our team will start developing technology around xrb taking advantage of the network effect to build more technology faster than we could internally. That being said we're going to look in a few months to see if there's anything out there people aren't developing that should be and we'll see what people we need to make it happen.**

(Emphasis added).

79. While the Nano Defendants might claim it is working towards the goal being a decentralized, that goal has yet to be achieved. As Defendant LeMahieu acknowledged in a post contrasting Nano from Ripple on Reddit on September 27, 2018, Nano is not yet decentralized (rather,

that is the goal the Nano Core Team is working toward), the Nano Defendants make the important decisions, and the Nano Defendants implement those important decisions: "Nano [XRB] is 100% **aiming** for decentralized interbank settlement though our approach is compared to [Ripple]. **We're** plugging in to the existing FX trading economy with a currency that has instant settlement. . . **We're** taking incremental steps which will be far, far easier for FX to adopt instead of trying to boil the oceans from the start." (Emphasis added).

80.     Stated otherwise, the Nano Defendants wield absolute control over essentially every aspect of XRB; and its value—and continued existence—is based entirely on their actions or inactions. This significant control creates a special relationship giving rise to a fiduciary duty that the Nano Defendants owed investors such as Plaintiff and the proposed Class.

**IV.     Cryptocurrency Faucets and the XRB Faucet**

81.     To incentivize the adoption and use of XRB, Defendants focused on distributing XRB to as many people as possible.  Rather than sell XRB for a price per coin, Defendants used a method of distribution known as a "faucet."

82.     It is critical to keep in mind that developers utilize faucets to generate public use, adoption and interest.  By giving away cryptocurrency for free, individuals can amass cryptocurrency without spending any money on purchasing the cryptocurrency.   Individuals who collect cryptocurrencies have a vested interest in their development, use, and mass adoption.  Consequently, faucets provide a way to build and grow a community of people who are interested in increasing the value of that particular cryptocurrency.

83.     To collect cryptocurrency from a faucet, an individual takes the following steps: (1) visit a website featuring the subject faucet; (2) type in the wallet address where the individual wants the cryptocurrency delivered; (3) click on a captcha (e.g., clicking an "I am not a robot" box); and (4) wait for a period of time before repeating the process (e.g., 10 minutes, 1 hour, etc.).

84.     Below is an example of a faucet distributing XRB:



85.     Once an individual completes this simple process, the faucet then distributes a (small) percentage of the total amount of cryptocurrency dedicated to the faucet.  For example, a developer team might assign 10 million of its coins to a faucet, and then permit 100 individuals per hour to collect .01 percent of that allocated sum from the faucet.  In practice, this means that the first 100 people to go to the faucet's website, type in their wallet address, and click on the captcha, will collect 1,000 coins per hour.

86.     Beginning in early 2016, the Nano Defendants opened a faucet for distributing XRB (hereafter, the "Nano Faucet").  The Nano Faucet operated for approximately one and a half years before closing on or about October 15, 2017. The Nano Defendants regularly advertised and promoted the Nano Faucet on social networks, such as Defendant LeMahieu's March 4, 2016 post on Reddit's Cryptocurrency subreddit, with 900,000 members:



87.    The Nano Defendants had exclusive control and authority over every aspect of the Nano Faucet, including how much XRB it distributed (*e.g.*, 100 XRB per click), to how many people (e.g., the first 100 people), and the frequency of these distributions.

88.    For example, on March 7, 2016, Defendant LeMahieu wrote, "We're currently at 1.5% publicly distributed," meaning, the Nano Defendants had distributed 1.5 percent of the total supply of XRB via the faucet.  Defendant LeMahieu continued, providing a link to the "distribution schedule" design by the Nano Defendants.



89.    On April 3, 2016, Defendant LeMahieu further demonstrated his control over the Nano Faucet: "The short of the story is I think we have a way to make the faucet work and scale.  We'll total up faucet clicks and pay them out in bulk daily or hourly rather than instantly."



90.     The Nano Faucet was an undeniable success. Defendants assigned the then-total-existing supply of XRB to the faucet.  They permitted between 100 and 150 individuals to claim approximately 1,000 XRB per hour throughout that time period.  By October 2017, individuals across the world had claimed more than 120 million XRB, or approximately 40 percent of the then-existing total supply of XRB.

91.     In fact, the Nano Defendants acknowledged that many individuals devoted themselves to collecting XRB full-time, like a job:



92.     Similarly, Defendant LeMahieu recognized on September 18, 2017 that many "people who use xrb's faucet specifically for hours a day [do so] as their entire job . . .



**V.   The Nano Defendants' Efforts to List XRB on Established Exchanges**

93.   The Nano Defendants repeatedly represented to the public that they sought to list XRB on as many exchanges as possible to promote the purchase and adoption of XRB.

94.   On March 4, 2016, Defendant LeMahieu wrote on the Cryptocurrency subreddit – which had over 900,000 members – that XRB would be "getting listed" on two popular cryptocurrency exchanges in America and Russia – Bittrex (www.bittrex.com) and YoBit (www.yobit.net):



95.   In other words, Defendant LeMahieu implied that XRB had an international following and demand, and that XRB would soon appreciate in value and grow in adoption by listing it on online exchanges.

96.   On March 19, 2016, Defendant LeMahieu advised that XRB/Nano began marketing to the public in March 2016, which would address the lack of stability in XRB's price: "Part of the reason we've been out so long and haven't received much attention is we haven't been marketing until just about the beginning of March.  We've been working on stability and the ad clearing demo, at this point we think those two goals are achieved so we're hitting the pavement."

22

97.     Defendant LeMahieu continued, encouraging mass promotion of XRB: "As always having XRB(RaiBlacks) [NANO] will only be useful if more people want to use it so getting the word out, telling anyone you find about the faucet and to try it out is what will ultimately make it useful."



98.     Similarly, on April 21, 2016, Defendant LeMahieu submitted a post on the Bitcointalk forum complaining about the Nano Defendants' inability to get XRB listed on an exchange: "I've talked with Bittrex, Poloniex, C-Cex, many, many others over a period of almost 9 months trying to get accepted.  I doubt many more are irritated at the situation than I am, if "any" of them would contact me back I'd be helping them get it listed."

## VI.     XRB is Listed on Exchanges and Bona Fide Offered to the Investing Public

99.     Due to the fact that larger exchanges were unwilling to list XRB, in late-2017, the Nano Defendants determined to simply create a new exchange that would be built from the ground up and dedicated to XRB.  Accordingly, in approxiamtely December 2016, the Nano Defendants approached Defendant Firano to create a "RaiBlocks dedicated exchange."

100.     Shortly thereafter, one of the numerous exchanges that the Nano Defendants pleaded with to list XRB agreed to list the asset.  Specifically on March 4, 2017, XRB's first listing was obtained on an obscure exchange named Cryptopia—a New Zealand-based cryptocurrency exchange that has since gone into liquidation.

101. Within weeks, on March 24, 2017, Cryptopia announced that it would be delisting XRB from its platform because of "excessive load from recaptcha click farmers, death threats to support, account abuse, deposit spamming and network syncing issues."

102. The Cryptopia delisting pressured the Nano Defendants to secure XRB's listing on another exchange—regardless of its reputation—leading to XRB becoming listed on or about March 25, 2017, on a recently created and highly unreliable exchange—Mercatox.

103. XRB's Mercatox listing immediately resulted in frustrations for the potential XRB investors attempting to purchase XRB through Mercatox. For example, on May 4, 2017, a user on the Bitcointalk forum posted:



104. In early-April 2017, the Nano Defendants were anxious to create and sustain a market for XRB so they could profit by (a) turning off the Nano Faucet thereby significantly reducing XRB's supply and consequenlty increasing XRB's trading price and then (b) selling their own XRB holdings at a significant premium. Given that Mercatox was highly unreliable and frequently did not process transactions, the Nano Defendants devoted a substantial amount of their effort to working with Defendant Firano on creating and launching BitGrail as quickly as possible.

## VII. The Nano Defendants and Firano Create and Launch BitGrail Together

105. The Nano Defendants began working with Defendant Firano to create BitGrail's "RaiBlocks dedicated exchange" *i.e.*, the BitGrail Exchange in approximately December 2016.

106. Indeed, Defendant LeMahieu personally worked with Defendant Firano as well as multiple former members of XRB's then-"core" development team to create and launch the BitGrail

Exchange.  In the words of a former XRB developer, the BitGrail Exchange was "written from 0 for XRB."  Similarly, in Defendant Firano's own words:

> I was reached by [sic] the NANO team members to create a new exchange from the ground up that supported NANO natively, with the help of the coin designer Colin LeMahieu and the team that he had at the time.

> When BitGrail was being developed, we used the protocol that they recommended and designed and **we worked hand in hand in developing the NANO portion of the exchange.  The node implementation and API were all directed to us to be used by their team**.

> We spoke with their team almost on a daily basis and they recommended us how to run the NANO portion of the exchange.

Firano Statement (Emphasis added).

107.    The BitGrail Exchange launched in April 2017 (www.bitgrail.com).  BitGrail was far-and-away XRB's largest marketplace -- a result of strategic positioning and widespread marketing efforts by Defendants.



108.    Throughout the Class Period, each of the Nano Defendants remained substantially involved in the maintenance of the BitGrail Exchange's XRB-related operations and retained

significant control over Defendant Firano's decision making concerning the BitGrail Exchange.  As explained by Defendant Firano:

> I started implementing the NANO team's recommended API as well as their implementation of the nodes.
>
> We consistently kept in touch and I was always transparent with them about the many issues, but **the NANO team had been hesitant in allowing me to shut down the NANO portion of the website** because it was causing major strain on our staff and hundreds to thousands of tickets and missed transactions that were consistently stuck in transfer with this coin.
>
> ***
>
> As we continued to work with the NANO team consistently, the majority of the time **I highly recommended to them that we close the markets because of major issues with the NANO protocol**, but they were hesitant and **forced me to keep it open and sometimes begged as well**.
>
> To mention again, the NANO team, especially Colin LeMahieu, had complete access to our servers for a while as we gave him direct access to the database and servers. That is how close **we worked as a team and as a preferred exchange which they forced me to keep open, despite my constant warnings about the technology and problems we were having for months**.
>
> I had presented many issues to the team regarding the NANO technology and they continued to recommend to us on what to fix and to make it keep going, since the other exchanges also had constant issues with the same technology. We kept the markets open, despite constant node crashes, constant support tickets and angry customers that our team had to deal with due to the NANO node sync issues that are inherent in the technology itself, which had nothing to do with BitGrail services.
>
> Despite the negativity towards BitGrail and myself on social media from disillusioned customers, I consistently recommended to the NANO developer team that this technology has major issues and we were having issues all the time with angry customers . . . I continually informed them of major issues with their technology and their implementation

Firano Statement (Emphasis added).

109.    Defendant Firano's description of events is also well-documented by the Nano Defendants' public statements throughout the Class Period.  For example, on January 2, 2018, the Nano Defendants posted that Defendant Busch and Firano were "[t]wo passionate & hard-working gents"

that were "solving the operational challenges at @BitGrail in a high-pressure environment as a game-changing tech matures."



VIII. **Defendants Heavily Solicit the Purchase of XRB on BitGrail**

    A.    **Instructing Members of the Investing Public to Purchase XRB**

110. The Nano Defendants promoted XRB as having the following relative advantages over other cryptocurrencies: transactions in XRB are purportedly instant, carry no fees, and have no limit to their scalability. By comparison to payments via credit or debit card, XRB purports to offer nearly instantaneous settlement of transactions with no transaction fees.

111. The Nano Defendants focused on promoting and encouraging individuals to purchase, sell, and trade XRB on online exchanges, and in particular, on BitGrail. Although the termination of the Nano Faucet briefly doubled the price of XRB to nearly seventeen cents ($0.17), it was trading on the BitGrail Exchange that drove the price of XRB up to nearly twelve dollars ($12.00) as of the February 8, 2018 loss.

112. On April 20, 2017, the official XRB/Nano account announced that XRB was available for purchase on their recently created BitGrail Exchange:



113.    Similarly, Defendants released the following infographic on how to purchase XRB describing in detail how to purchase XRB from BitGrail:



114.    Indeed, the Nano Defendants recommended BitGrail on XRB/Nano's Twitter feed, on Reddit, on Slack, on Telegram, on Medium, and on its official website multiple times:



115. As discussed in greater detail below, before the loss of 15 million XRB, the Nano Defendants expressly encouraged members of the public, including Plaintiff and the Class, to purchase, trade, and hold XRB on BitGrail.

116. Additionally, the Nano Defendants offered investment advice to XRB holders. For example, Defendant Shapiro advised one XRB holder on Twitter: "I recommend selling your xrb there and withdrawing btc even if it's at a loss. Thanks":



117. Similarly, Defendant Shapiro touted: "the faster $xrb can get in blockfolio,[8] the faster people can see their gains and losses and come to Bit Bitgrail to invest more in a coin getting more and more attention."



---

[8] Blockfolio is a service that tracks cryptocurrency prices.

118. Indeed, Defendants even promoted XRB's coverage on investment shows such as CNBC's Fast Money:



119. Defendant Shapiro went so far as to create an application specifically designed to monitor XRB's price:



30

**B.  Encouraging the Public to Spread the Word**

120.  The Nano Defendants promoted XRB by instructing members of the public, including Plaintiff and the Class, to tell their friends, family, and acquaintances to purchase and acquire XRB.

121.  For example, on December 20, 2017, Defendant LeMahieu wrote, "I think the best thing an average fan could do is word of mouth and telling people about RaiBlocks [XRB].  More people being aware of it means there's the possibility someone who's never heard of it before would be interested in contributing as a vendor, developer, exchange, etc.  Good advertising or marketing will never be able to reach everyone as well as someone reaching out within their own network."



122.  In other words, the Nano Defendants encouraged and caused members of the public, including Plaintiff and the Class, to lend their reputations, trust, and goodwill on their fellow friends, family, and followers to influence and cause more members of the public to purchase and acquire CRB.

**C.  Increasing Social Media and Online Presence**

123.  The Nano Defendants promoted XRB on various social-network platforms, including Reddit and Twitter, among others.

124.  For example, in September 2017, Defendant LeMahieu stated on Reddit's Cryptocurrency subreddit that XRB had "been organically growing and expanding since our launch two years ago and we want to open up discussion of the technology to a broader audience.":



125.    The Nano Defendants also produced, participated in, and published videos online for members of the public, including Plaintiff and the Class, to watch, which were used to promote the purchase, acquisition, and appreciation of XRB's value.

126.    The Nano Defendants also maintained numerous online group chats for members of the public, including the Class, to join, follow, and even contribute to on multiple fora.   For example, the Nano Defendants maintained an online group chats on Slack (https://slack.raiblocks.net), Telegram (www.telegram.com) and Discord (www.discord.com).   Therein, members of the public, including the Class, followed and engaged in ongoing conversations relating to XRB, such as price volatility, trading on BitGrail and other exchanges, price appreciation, and other related topics.

127.    In late 2017, the Nano Defendants revamped their website and grew their team to portray themselves in a more favorable light.   On December 20, 2017, Defendant LeMahieu wrote, "We have about 12 people in the core team; about half are code and half are business developers.   On the redesigned website we're going to include bios for sure . . . ."



### D.    Downplaying Speculation: the "HODL Mentality"

128.    The Nano Defendants were aware that members of the public, including Plaintiff and the Class, were purchasing and acquiring XRB to "hodl," the jargon for patiently holding a cryptocurrency to wait for it appreciate in value before selling it. Notwithstanding their awareness of this behavior by members of the public, including Plaintiff and the Class, the Nano Defendants downplayed the significance of this speculative behavior as a bug and not a feature, when in fact, the opposite was true: speculation over XRB's price was the feature and the promise of future, mass adoption was the bug.

129.    Defendants repeatedly acknowledged the speculative nature of XRB. For example, when a Reddit user suggested that Nano peg XRB to another nomination of value (*e.g.*, the U.S. Dollar) to stabilize the valuation, Defendant Retzer replied, "It is only stable to another currency. If the pegged currency fails, so does the stable coin. **We are still in the highly speculative stage of cryptocurrencies.** As time goes on and projects gain adoption and success, the volitality [sic] will decrease." (Emphasis added).

### IX.    The Nano Defendants Close the Nano Faucet and Extract Millions in Profits

130.    By October 2017, XRB's trading volume on BitGrail was significant and the Nano Defendants determined it was time to close the Nano Faucet and obtain millions of profits in the the process.

131.    The Nano Faucet was shut down on October 15, 2017. Contemporaneous with the termination of the Nano Faucet, the Nano Defendants: (a) withheld seven million XRB for themselves for their work in conceiving, developing, promoting, and selling XRB to the public; and (b) "burned" (meaning, purportedly sent to three digitals wallets that are inaccessible) the undistributed 60 percent of XRB that was not claimed during the Nano Faucet. In other words, the Nano Defendants condensed the entire value of XRB supply into the remaining 40 percent:



132.    Consistent therewith, the price of XRB nearly doubled at that time, from $0.09 per XRB to nearly $0.17 per XRB:



133.    As Defendant Busch acknowledged, during the Nano Faucet, the constant distribution of XRB to the public diluted the value of his shares, but the Nano Defendants' strategy of patiently waiting to grow a robust and interested network of holders resulted in substantial price appreciation:



134.    In addition, Defendant Busch wrote that the termination of the Nano Faucet eased "sell pressure."  In other words, the end of the Nano Faucet meant that individuals who acquired XRB by purchasing it with fiat or cryptocurrency translated into in holders of XRB who were less interested in quickly selling their holdings:



135.    In sum, Defendants stood to reap enormous returns by virtue of a robust and widespread network of individuals buying, selling, and trading XRB.

136.    The Nano Faucet served as the tool by which the Nano Defendants created and grew a public network of individuals invested in the development, adoption, and sustained growth of XRB.

## X.  Defendants' Representations Regarding their Duties and Obligations to Investors

137.    At all times material, the Nano Defendants made various statements and representations that the Nano Defendants owed various duties of care and loyalty to Plaintiff and the Class at large.

138.    For example, on March 7, 2016, Defendant LeMahieu wrote, "We're investigating creating an irrevocable legal trust to document our commitment to the distribution."



35

139.     On September 18, 2017, Defendant LeMahieu expressly recognized that the Nano Defendants' behavior, actions, and conduct was informed by their recognition of a correlation between listing XRB on larger exchanges and ensuing damages: "For a long time we weren't actively seeking because we wanted to hammer out node performance and usability issues.  **Larger exchanges mean more visibility and damage if there had been problems**."



140.     On December 18, 2017, a person posted on RaiBlocks' subreddit, "Colin, is any security audit to the source code planned?"   In other words, the person asked whether there would be any security testing of the XRB Protocol.

141.     Defendant LeMahieu responded, acknowledging that the Nano Defendants recognized the importance of conducting a security audit to detect any deficiencies or exposure, but admitted that the Nano Defendants had failed to do so.  He replied, "We don't have one contracted **though both internally and externally this is an important thing people want completed**."



142. In August 2018, when users on the Internet forum, Reddit.com, raised concern over the fact that the Nano Developer's Wallet had sold over $600,000 of XRB, Defendant Retzer assured the public that the funds were sold to pay for regular expenses, including salaries. However, Defendant Retzer also added, "[w]ith the current state of the market, it makes sense for the Nano foundation to hold cash to protect the dev fund in case of the price dropping in order to ensure that development continues into the future."

143. The following month, in September 2018, when Reddit users again asked the Nano Core Team about the large positions sold by the Nano Core Team, Defendant Retzer again acknowledged the highly-speculative nature of XRB's future: "I said a few weeks ago, when the FUD [fear, uncertainty, doubt] was that we were cashing some of the dev funds, that we were simply hedging against a further market crash (It seems a bit backwards that there was FUD that we were selling and now FUD that we are quitting because no money, but alas..)."

144. In addition, on April 9, 2018, the Nano Defendants announced that they were "sponsoring" a "legal fund" purportedly designed to "provide all victims of the hack of the cryptocurrency exchange BitGrail with equal access to representation" and enable such investors to seek recourse against the exchange.

## XI. Nano's Recommendations Fail to Disclose the XRB Protocol's and the BitGrail Exchange's Lack of Safeguards Protecting the Class' Deposits

145. Notwithstanding the Nano Defendants' widespread promotion of BitGrail as a safe haven for XRB investors, BitGrail's troubled past, uncertain present, and questionable future make the Nano Defendants' recommendations highly suspect, if not outright reckless.

### A. The Trading Platform Problem

146. In late-2017, many BitGrail users reportedly experienced problems with the Nano Protocol and reliability and security of BitGrail's trading platform.

147. For some users, account balances would inexplicably (and inaccurately) slip into negative figures.

148. For some users, single account withdrawals were processed twice.

149. BitGrail accountholders took to social media to decry the lack of reliability and trustworthiness of BitGrail's operations or the reliability of the XRB Protocol itself.

150. Despite the account glitches and functionality concerns that affected so many BitGrail users, the Nano Defendants did not distance themselves from the BitGrail Defendants as a direct result of the problems. Rather, according to Defendant Firano, the Nano Defendants "forced" him to keep XRB on BitGrail despite his warnings.

**B.     The Verification Problem**

151. In or about mid-January 2017, BitGrail proved itself unable to timely verify its new users, which left those users incapable of engaging in anything more than a very meager volume of transactions -- a frustrating circumstance that rendered the users' accounts effectively useless with regard to the purpose for which the accounts were opened.

152. The Nano Defendants and BitGrail had a public spat over BitGrail's verification problem, and some asserted that the problem stemmed from the Nano Defendants' failure to cooperate with BitGrail's business model.

153. Despite the verification issue that plagued so many BitGrail users, the Nano Defendants did not distance themselves from BitGrail as a direct result of the problem.

**C.     The $170 Million Disappearing XRB Problem**

154. In early-February 2018, BitGrail announced that it had "lost" $170 Million worth of XRB from its exchange due to "unauthorized transactions." The "missing" XRB amounted to approximately eighty percent (80%) of the XRB that BitGrail customers held in their accounts and amounts to nearly fifteen percent (15%) of all XRB in existence.

155. In the aftermath of the purported XRB theft that devastated BitGrail's inventory of the cryptocurrency, the Nano Defendants and the Bitgrail Defendants engaged in yet another very public dispute over the cause of the problem and how it should be resolved.

156. The Nano Defendants accused Defendant Firano of trying to cover-up the event and of asking NANO to engage in purportedly unethical behavior to solve the problem. According to the

Nano Defendants, the problem stemmed from flaws related to BitGrail's software, not any issue in the XRB protocol.

157. BitGrail denied all allegations of wrongdoing and alleged that the Nano Defendants were unwilling to cooperate in formulating a solution.

158. In the wake of the latest of the calamities in the relationship between BitGrail and the Nano Defendants, BitGrail users have sought to move their XRB off of the BitGrail exchange into private cryptocurrency wallets; however, BitGrail has made such withdrawals impossible by suspending all account activity.

159. The XRB holders at BitGrail -- including Plaintiff and the Class -- were ushered there by the Nano Defendants, those users relied on Defendants' representations in investing their assets at BitGrail, and those users have now been burned by the Nano Defendants and the BitGrail Defendants.

D. **Lack of Idempotence in the Nano Protocol Resulted in the Theft of the Class' XRB Worth $170 Million**

160. Since this action's initiation, numerous additional facts have been revealed by Tribunal of Florence in Italy through its issuance of the BitGrail Decision and the Firano Decision.  In reaching its decisions, the Tribunal relied upon a court-appointed expert witness to conduct an analysis of the events surrounding the "hack" of the Class' funds on BitGrail.  These Decisions included the following findings:

- *During the expert operations it was undisputedly ascertained and shared between the parties that the shortfall took place during the exchange's normal operation and life cycle and by regular users through their own e-mail, data, and wallet, and no stolen key, no crack of the systems, no piercing of the perimeter security program, no trojan/backdoor and no vulnerability of the mathematical protocol of the cryptocurrencies.*

- *[T]the court-appointed expert ascertained that the shortfall 'was caused by multiple withdrawals (also called "double withdrawals") that occurred in circumstances which are not clearly proven.  According to the statement of Mr Firano, indeed, these withdrawals occurred on occasions of the malfunctioning of the node (he makes reference to possible 'crashes' of the node), however, today we have no certainty regarding the dynamics of such malfunctions.*

- *The users would, essentially, request withdrawal of a certain amount and receive the same amount twice or more times. This is because, due to the configuration of the exchange system and the features of the cryptocurrency, the Nano node carried out 'double' transactions, i.e., multiple withdrawals, without the exchange having tracked the execution.*

- *Firano became aware of the significant shortfalls – such as the one that occurred in July 2017. . . [t]his emerges clearly from the messages on the Telegram chat with the Nano's development team (that Mr. Firano had joined in December 2016 and left in December 2017) . . ..*

- *Firano had discovered the shortfall in mid-July 2017, when considerable amounts were withdrawn twice (double withdrawals") , so much so that he described the problem in a Telegram group chat attached to the Nano investigative report produced by the public prosecutor and on record as an annex to the court-appointed expert witness report.*

- *From several documents, it emerges how the use of the node as 'accounting centre' was envisages – as, in general, it is also the case for other cryptocurrencies – only for single users, with their private wallet, and without intense or concurrent activity. The exchanges have always been invited to autonomously manage the transactions, precisely because blindly trusting the node implies a high risk, not only for possible double withdrawals.' This is a risk that, in this Court's view should have been managed by the platform operator, which could and should have limited such risk while providing its services.*

- *[T]he analysis of the transactions with the same TXID that were present in a massive way in July 2017 in the 'withdrawals' table indicates how the double withdrawals were almost always related to multiple withdrawal attempts very close together and for the same amount, as also noted by Firano already in July 2017, as well as reported in the Telegram chat with the Nano development team within which Firano had entered in December 2016 and exited in December 2017.*

- *The shortfalls took place because the users who stole the Nano had realized that, by requesting a withdrawal at specific times, it was likely that two identical withdrawals would be granted: one was recorded and considered 'official', while the other was not recorded by the exchange despite being regularly recorded in the blockchain of the Nano node: as a result, several amounts of Nano cryptocurrency left the account without these transactions ever being recorded in the exchange's database.*

161. As demonstrated in the BitGrail Decision and the Firano Decision, the Class' funds were stolen through an exploitation of the Nano Protocol's lack of idempotence by way of Double

Withdrawal Transactions. Furthermore, each of the Defendants became aware of this issue in July 2017 when Defendant Firano raised the issue to the Nano Defendants in a private group chat.

162. The foregoing events plainly demonstrate that the Nano Defendants: (i) failed to adopt adequate safeguards in the Nano Protocol resulting in the theft of the Class' XRB funds on the BitGrail Exchange; (ii) concealed their actual knowledge that the Double Withdrawal Transactions were resulting in the loss of the Class' funds beginning in July 2017; and (iii) knowingly, or negligently, misrepresented that the Class' funds were "safe" on the BitGrail Exchange with their unqualified recommendations of, and public representations of trust of, BitGrail as the place where XRB should be kept and traded.

**E.    Defendants Breached Their Duties Owed the Class and Concealed the Theft of the Class' XRB Investments for Eight Months**

163. Nano Defendants breached their legal duties of care relating to their management of XRB when they failed to, *inter alia*,  (i) implement idempotence into the XRB Protocol thereby permitting the theft of the Class' XRB by the use of Double Withdrawal Transactions; (ii) disclose material information related to the XRB Protocol and the BitGrail Exchange's operation while discussing information, knowledge, and exercising authority on all things XRB-related at panels, conferences, and online social networks; (iii) permit Defendant Firano to shut down the BitGrail Exchange online despite having actual knowledge, or recklessly disregarding, the ongoing theft of XRB from accountholders on the BitGrail Exchange from July 2017 through January 2018; (iv) disclose to Plaintiff and the Class the fact that the Class' XRB was being stolen through use of Double Withdrawal Transactions from July 2017 through January 2018; (v) take reasonable measures to ensure that the exchanges upon which XRB was bought, sold, and traded employed, utilized, and followed adequate security measures and protocols;  (vi) know or confirm that the material representations and statements regarding BitGrail's safety and security were accurate; and (vii) Conduct a security audit of the XRB Protocol.

164. Additionally, despite being fully aware of the Double Withdrawal Transactions as of July 2017, the Nano Defendants issued countless statements falsely or negligently assuring Plaintiff and the Class that their funds were safe on the BitGrail Exchange.

41

165. For example:



166. Similarly:

167. The Nano Defendants publicly promoted BitGrail as a safe and reliable place for XRB holders to stake and exchange their XRB, and XRB holders relied on that endorsement by the Nano Defendants in choosing the exchange that would house their valuable assets.

168.   For example, when one concerned XRB holder questioned the Nano Defendants about the sagacity of relying upon the otherwise unknown BitGrail exchange and its founder and principal operator, Francesco "The Bomber" Firano, Defendant Shapiro publicly represented on Twitter that he speaks with Mr. Firano every day and that both Mr. Firano and BitGrail can be trusted:



169.   As another example, a mere four days before the loss of $170 million worth of the Class's XRB was announced, the Nano Defendants represented that all of BitGrail's issues were "100% on our radar":



170.   Based on Defendants' assurances, assistance, promotion, and instruction, BitGrail became the predominate and nearly exclusive home for XRB.  XRB/BTC[9] was the most popular trading

---

[9] "XRB/BTC" represents the exchange of XRB for bitcoin (BTC), the most widely-used and recognizable alternative currency in the world.  In other words, participants on the exchange traded bitcoin for XRB (and vice versa).

pair at BitGrail and constituted more than eighty percent (80%) of BitGrail's overall trading volume. Moreover, Plaintiff's and the Class's detrimental reliance on Defendants' misstatements, misrepresentations, and omissions of material fact, includes but is not limited to, causing Plaintiff to purchase, acquire, own, hold, and refrain from selling their respective XRB before suffering their respective losses on February 8, 2018.

171. However, in early-February 2018, when BitGrail announced that it had "lost" $170 Million worth of XRB from its exchange -- approximately eighty percent (80%) of the XRB that BitGrail customers held in their accounts – the Nano Defendants suddenly sought to put more distance between themselves and the BitGrail Defendants than even the Atlantic Ocean could provide. So much so that Defendant Firano described Nano, his relationship with the Company and their subsequent falling out as follows:

> *As we continued to work with the NANO team consistently, the majority of the time I highly recommended to them that we close the markets because of major issues with the NANO protocol, but they were hesitant and forced me to keep it open and sometimes begged as well.*

> *To mention again, the NANO team, especially Colin LeMahieu had complete access to our servers for a while as we gave him direct access to the database and servers. That is how close we worked as a team and as a preferred exchange which they forced me to keep open, despite my constant warnings about the technology and problems we were having for months.*

> \*\*\*

> *The Nano team was relentless in directing users to the BitGrail exchange despite the major issues I had consistently warned them about. . . .*

> \*\*\*
> *They used me and BitGrail to gain entry into the virtual cryptocurrency market.*

172. Simply stated, the Nano Defendants created the XRB currency, created the BitGrail Exchange with Defendant Firano, directed XRB investors to place their assets at BitGrail (an exchange that they essentially controlled); caused the loss of the Class' XRB by failing to include idempotence in the Nano Protocol; concealed the fact that the Class' funds were, in fact, not "safe" on the BitGrail

Exchange, and when nearly all of the XRB "disappeared", the Nano Defendants disavowed any responsibility for the harm the XRB investors suffered.

173. At all times relevant hereto, Lemahieu, Busch, Shapiro, and Retzer each took to social media outlets -- including Twitter, Facebook, Medium, and Reddit -- to promote XRB and BitGrail as a purported safe haven at which investors could stake and trade their XRB for profit.

174. Unfortunately, in their fervent push to drive XRB investors to BitGrail, the Nano Defendants failed in their due diligence or knowingly disregarded many material concerns about the Nano Protocol and BitGrail's operations, safety, and reliability.

## XII. XRB Are Unregistered Investment Contract Securities

175. In addition to failing to implement necessary safeguards in the Nano Protocol and recklessly directing XRB investors to utilize BitGrail, XRB themselves are securities; which the Nano Defendants offered and sold without either registering with the necessary governmental authorities or obtaining an exemption from such registration.

176. Under the Securities Act, a "security" is defined as including any "note," "investment contract," or "instrument commonly known as a 'security.'" *See* 15 U.S.C. §§ 77b(a)(1). Here, XRB are investment contracts. In *SEC v. W.J. Howey Co.*, the United States Supreme Court established a three-part test to determine whether an offering, contract, transaction, or scheme constitutes an investment contract.[10] Under the test articulated in *Howey*, a contract, transaction, or scheme is an "investment contract" if it involves: (*i*) the investment of money; (*ii*) in a common enterprise; (*iii*) with the expectation of profits to come solely from the efforts of others.

177. When determining whether a security has been offered and sold, the focus must be on the economic realities underlying the transaction. Here, the economic realities are that Plaintiff and the Class invested funds and assets to stake and trade XRB -- each of which they expected would lead to lucrative returns. Investors in XRB used cryptocurrency or fiat currency to purchase the XRB required

---

[10] *See SEC v. W.J. Howey, Co.*, 328 U.S. 293 (1946); *see also Intern. Bhd. of Teamsters v. Daniel*, 421 U.S. 837, 852 (1979) (noting that the *Howey* test is not the only test for determining a security but has been held to embody "all the attributes that run through all of the Court's decisions defining a security").

45

to make their investments. Accordingly, Plaintiff's and the Class' investment of cryptocurrency or fiat currency constitutes an investment of money for the purposes of determining whether an investment involved a security.

178. Plaintiff and the Class were investing in a common enterprise with the Nano Defendants, as the Nano Defendants fund their operations through their ongoing sale of XRB and thus, the fortunes of both the Class and the Nano Defendants rise and fall with the success of XRB – which has at all relevant times been entirely reliant on the Nano Defendants' actions, primarily the Nano Defendants' ability to maintain and expand the functionality of XRB, thus providing financial returns to investors.

179. In short, it is indisputable that the Nano Defendants were selling investment contracts and that any success from the Nano Defendants' development, maintenance, and expansion of the functionality of XRB -- as well as any future potential increases to the value of XRB -- were entirely dependent on the Nano Defendants' actions.

180. Despite XRB's clear characterization as a "security," the Nano Defendants did not register XRB with any regulatory authority in the United States as required by federal securities laws.

181. Furthermore, the Nano Defendants neither applied for, nor received, an exemption from registration of XRB with regulatory authorities in the United States as required by federal securities laws.

182. U.S. securities regulation focuses on, *inter alia*, mandatory disclosures that require issuers of securities to make publicly available certain information that regulators deem material to investors. When those necessary disclosures are not made -- and regulators have not granted an exemption to the normal requirement of such disclosures -- investors are at risk of undue harm. Indeed, in the instant matter, XRB investors were lured into investing their funds and assets in the self-issued cryptocurrency being offered by Defendants and were further lured by the Nano Defendants into staking and exchanging those investments at BitGrail. Without adequate protections in place, Plaintiff and the Class have suffered millions of dollars of harm; and the Nano Defendants -- without regard to the regulatory environment in which they live and operate their business -- have tried to distance

themselves from that harm and have refused to institute the remedy well within their grasp, simply because it does not suit their own financial interests.

### ADDITIONAL FACTS SPECIFIC TO LEAD PLAINTIFF FABIAN

183.    Commencing in or around April-May 2017, Plaintiff Fabian learned about XRB by reading social media posts touting XRB -- including but not limited to those published on Twitter -- exemplars of which are incorporated throughout this Amended Complaint.

184.    As part of his due diligence in learning more about XRB, Plaintiff Fabian followed (*i.e.*, subscribed to) the Twitter feeds of Defendant LeMahieu, Defendant Shapiro, and other people related to XRB.

185.    After months of following the representations published by those people and relying on the truthfulness of their representations, Plaintiff Fabian began investing in XRB.

186.    On or about August 16, 2017, Plaintiff Fabian purchased 1.62457112 bitcoin (BTC) on Coinbase's website (www.coinbase.com) using a credit card.  The total purchase price was $7,104.30 with each bitcoin worth $4,308.83.

187.    On August 22, 2017, Plaintiff Fabian transferred his entire 1.62457112 BTC to Bittrex, a cryptocurrency exchange (www.bittrex.com).

188.    In further reliance on the social media representations he had read from Defendant LeMahieu, Defendant Shapiro, and other people related to XRB -- and in reliance on the representations he had read about the safety and security of both the Nano Protocol and the BitGrail exchange -- Plaintiff Fabian turned to BitGrail as the exchange where he would purchase and stake his XRB.

189.    On August 31, 2017, Plaintiff Fabian opened an account on BitGrail and then transferred .66971933 BTC from his Bittrex bitcoin wallet to BitGrail.  At the time, the .66971933 BTC had a value of approximately $3,220.

190.    To open and manage his BitGrail account, Plaintiff logged onto BitGrail's website from his home and followed the instructions provided.

191.    On September 1, 2017, the .66971933 BTC became available on BitGrail, and Plaintiff Fabian used that entire sum to purchase approximately 21,143 XRB.

192. On December 12, 2017, Plaintiff Fabian transferred $2,850.00 to BitGrail to purchase another 2,000 XRB.

193. As of December 12, 2017, Plaintiff Fabian purchased and held on BitGrail 23,143 XRB with a total purchase price of $6,070.00.

194. In deciding to invest in XRB, open an account at BitGrail, and stake his investment holdings there, Plaintiff Fabian reviewed and relied upon the Nano Defendants' promotions on social media channels and/or statements made on the Nano Defendant's own website representing that BitGrail is a safe and reliable exchange on which to purchase and stake XRB.

195. Shortly before Plaintiff Fabian lost control and possession of his 23,143 XRB on BitGrail, he transferred 110 XRB to a separate XRB wallet off of BitGrail. Therefore, he owned and held a total of 23,033 XRB in his BitGrail wallet.

196. The 23,033 XRB had a market value of approximately $275,000 as of February 8, 2018.

## COUNT I
### Claim for Violation of Section 12(a)(1) of the Securities Act of 1933
### Against All Defendants

197. Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 196 above, and further alleges:

198. Section 12(a)(1) grants Plaintiff a private right of action against any person who offers or sells a security in violation of Section 5, and states that such person,

> Shall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

199. Between April 2017 and March 2018, in connection with the offer and sale of XRB, Defendants unlawfully made use of means or instruments of transportation or communication in interstate commerce or of the mails for the purposes of offering, selling, or delivering unregistered securities in direct violation of the Securities Act.

200.     The offer and sale of XRB constituted the offer and sale of unregistered securities under controlling federal law.  XRB exhibit the following particular hallmarks of a security under the *Howey* test: (a) to receive any XRB, an investment of money, in the form of cryptocurrency and/or fiat currencies was required; (b) the investment of money was made into the common enterprise that is Defendant NANO and its ability to provide value to the XRB through the functionality and popularity of its self-created XRB; and (c) the success of the investment opportunities and any potential returns thereon were entirely reliant on Defendants' ability to maintain and expand the functionality and popularity of XRB, thus providing financial returns to investors.

201.     Each of the individual Defendants constitute "seller[s]" under the Securities Act and are thus equally liable for selling unregistered securities in connection with XRB.

202.     As such, Defendants have participated in the offer and sale of unregistered securities in violation of the Securities Act and are liable to Plaintiff and the Class for rescission and/or compensatory damages in excess of $5 million.

## COUNT II
### Claim for Violation of Section 15(a) of the Securities Act of 1933
### Against the Individual Defendants

203.     Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 196 above, and further alleges:

204.     Due to their ownership in and/or control over the business operations of Defendant Nano and/or BitGrail, Defendants LeMahieu, Busch, Shapiro, Retzer and Firano acted as controlling persons of Nano and/or BitGrail within the meaning of Section 15(a) of the Securities Act as alleged herein.

205.     By virtue of their positions as managers, directors, and key members of Nano's core team and by their participation in and/or awareness of Defendant Nano's operations, Defendants Colin LeMahieu, Mica Busch, Zack Shapiro, Troy Retzer and Firano had the power to influence and control and did influence and control, directly or indirectly, the decision making relating to the development and success of XRB, including the decision to engage in the sale of unregistered securities in furtherance thereof.

206. By virtue of the foregoing, Defendants Colin LeMahieu, Mica Busch, Zack Shapiro, Troy Retzer and Francesco "The Bomber" Firano are liable to Plaintiff and the Class as control persons of Defendant NANO and/or BitGrail under Section 15(a) of the Securities Act for damages in excess of $5 million.

<u>**COUNT III**</u>
**Breach of Contract**
**Against BitGrail Defendants**

207. Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 196 above, and further alleges:

208. The BitGrail Defendants had a legally binding contract with Plaintiff and the Class.

209. The BitGrail Defendants breached their contracts with Plaintiff and the Class by failing to safeguard their funds and disabling the ability for accountholders to withdraw their XRB assets from the exchange.

210. The BitGrail Defendants breaches are the proximate cause of the damages suffered by Plaintff and the Class.

211. Defendants are liable to Plaintiff and the Class for damages resulting from Defendant BitGrail's breaches of contract in excess of $5 million.

<u>**COUNT IV**</u>
**Breach of Implied Contract**
**Against Nano Defendants**

212. Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 196 above, and further alleges:

213. The Nano Defendants had a valid, binding and enforceable contract with Plaintiff and the Class that was not reduced to writing, but was implied based on the Nano Defendants' conduct.

214. The Nano Defendants' implied promises to Plaintiff and the Class included, but were not limited to: (i) the XRB Protocol maintained adequate safeguards to prevent the theft of the Class' XRB; (ii) the exchanges upon which XRB was bought, sold, and traded employed—particularly the BitGrail Exchange which the Nano Defendants created and with Defendant Firano—utilized and followed adequate security measures and protocols; (iii) the Nano Defendants vetted the exchanges on

which XRB was purchased, sold, staked, and traded; and (iv) that the Class' XRB funds were "safe" on the BitGrail Exchange.

215.    The Nano Defendants breached their implied contracts with the class by:

    a.    Encouraging Plaintiff and the Class to buy, sell, stake, and trade XRB on the BitGrail Exchange despite knowing that the XRB Protocol nor the exchange had adequate security measures and protocols;

    b.    Making material representations and statements to Plaintiff and the Class regarding BitGrail's – and other exchanges – safety and security;

    c.    Failing to implement idempotence into the XRB Protocol thereby permitting the theft of the Class' XRB by the use of Double Withdrawal Transactions;

    d.    Forcing Defendant Firano to keep the BitGrail Exchange online despite having actual knowledge, or recklessly disregarding, the ongoing theft of XRB from accountholders on the BitGrail Exchange from July 2017 through January 2018;

    e.    Concealing from Plaintiff and the Class the fact that the Double Withdrawal Transactions resulted in the theft of the Class' funds from July 2017 through January 2018; and

    f.    Continuing to promote the buying, selling, and trading of XRB on BitGrail after multiple red flags and other issues arose.

216.    The Nano Defendants' foregoing breaches proximately caused damages suffered by the Plaintiff and the Class.

217.    Plaintiff and the Class suffered damages in excess of $5 million.

## COUNT V
### Breach of Fiduciary Duty
### Against Defendants

218.    Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 196 above, and further alleges:

219.    The BitGrail Defendants had a fiduciary relationship with, and owed fiduciary duties or loyalty of care to, Plaintiff and the Class as the owners of the BitGrail Exchange.   The BitGrail Defendants breached their duties to Plaintiff and the Class by: (i) failing to safeguard the Class' funds on the BitGrail Exchange; (ii) permitting the Nano Defendants to force them to keep the BitGrail Exchange online despite having actual knowledge of, or recklessly disregarding, the fact that the Class'

funds were being stolen by exploitation of the XRB Protocol through the Double Withdrawal Transactions; and (iii) concealing the fact that the Class' funds were being stolen from July 2017 through January 2018.

220. The Nano Defendants had a fiduciary relationship with, and owed fiduciary duties or loyalty and care to, Plaintiff and the Class due to their relationship with Plaintiff and the Class both in their capacity as the developers of XRB and as well as from their creation of BitGrail and involvement in, or control over, the BitGrail Exchange's XRB-related operations.

221. The Nano Defendants' status as fiduciaries to the class is evidenced by their:

    a. Serving as the primary source of information, knowledge, and authority on all things XRB-related, such as at panels, conferences, online social networks (e.g., Twitter, Reddit, etc.);

    b. Maintaining exclusive control over the XRB Protocol;

    c. Commissioning Firano to create the BitGrail Exchange as an XRB dedicated exchange;

    d. Partnering with the BitGrail Defendants to create the BitGrail Exchange and involvement in maintaining the exchange's XRB-related operations.

    e. Exercising exclusive control over the decision to list XRB on BitGrail;

    f. Maintaining superior and unique knowledge of the inadequacy of the XRB Protocol's safeguards—specifically its lack of idempotence—and the BitGrail Exchange's lack of secondary measures to prevent the Double Withdrawal Transactions;

    g. Updating Nano Protocol to include idempotence on February 16, 2018 after the Class' XRB had already been stolen from exploitation of the Double Withdrawal Transactions;

    h. Promoting and encouraging Plaintiff and the Class to buy, sell, and trade XRB on BitGrail;

    i. Making repeated assurances to Plaintiff and the Class that BitGrail was a safe and secure exchange, downplaying and explaining away red flags, and maintaining constant contact and involvement in issues involving trading XRB on BitGrail;

    j. Having the exclusive ability and acknowledging the need to conduct a security audit of the XRB Protocol;

    k. Advising the public that Nano Defendants were contemplating creating and administering trust fund for distribution of XRB;

l. Creating legal fund to help Plaintiff and Class recover their respective losses; and

m. Acknowledging that Nano Defendants were aware that listing on larger exchanges would lead to responsibility for larger damages.

222. The Nano Defendants breached its fiduciary duties owed to Plaintiff and the Class by failing to, inter alia:

a. Failing to implement idempotence into the XRB Protocol thereby permitting the theft of the Class' XRB by the use of Double Withdrawal Transactions;

b. Failing to disclose material information related to the XRB Protocol and the BitGrail Exchange's operation while discussing information, knowledge, and exercising authority on all things XRB-related at panels, conferences, and online social networks;

c. Forcing Defendant Firano to keep the BitGrail Exchange online despite having actual knowledge, or recklessly disregarding, the ongoing theft of XRB from accountholders on the BitGrail Exchange from July 2017 through January 2018;

d. Concealing from Plaintiff and the Class the fact that the Class' XRB was being stolen through use of Double Withdrawal Transactions from July 2017 through January 2018;

e. Making repeated assurances to Plaintiff and the Class that BitGrail was a safe and secure exchange, downplaying and explaining away red flags, and claiming to maintain constant contact and involvement in issues involving trading XRB on BitGrail;

f. Failing to conduct a security audit of the XRB Protocol;

g. Creating legal fund to divert attention and blame away from the Nano Defendants; and

h. Failing to take responsibility for damages that arose in connection with listing XRB on BitGrail.

223. The Nano Defendants are liable to Plaintiff and the Class for damages resulting from the Nano Defendant's breaches of their fiduciary duties to Plaintiff and the Class in excess of $5 million.

**COUNT VI**
**Aiding and Abetting Breach of Fiduciary Duty**
**Against Nano Defendants**

224. Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 196 above, and further alleges:

225. The Nano Defendants aided and abetted the BitGrail Defendant's breaches of their fiduciary duties to Plaintiffs and the Class by forcing Defendant Firano to keep the BitGrail Exchange online permitting the ongoing theft of the Class' funds and concealing their knowledge that the Class' XRB deposits on BitGrail were being stolen through exploitation of the XRB Protocol's lack of idempotence from July 2017 through January 2018.

226. Nano Defendants are liable to Plaintiff and the Class for damages resulting from Nano Defendant's breaches of their fiduciary duties to Plaintiff and the Class in excess of $5 million.

**COUNT VII**
**Negligence**
**Against Nano Defendants**

227. Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 196 above, and further alleges:

228. The Nano Defendants had a legal duty to exercise reasonable care with respect to the management of XRB, including but not limited to maintaining the XRB Protocol; listing XRB on a secure exchange; promoting the use of secure exchanges; properly vetting the exchanges on which XRB was bought, sold and traded; making accurate representations and statements to Plaintiff and the Class about the safety of the Class' XRB on the BitGrail Exchange; dissuading the buying, selling, and trading of XRB on BitGrail after multiple red flags and other issues arose; creating a functional, performing, and non-defective XRB token; and conducting a security audit of the XRB Protocol, among other legal duties or care.

229. Nano Defendants breached their legal duties of care relating to their management of XRB when they failed to, *inter alia*,

    a. Implement idempotence into the XRB Protocol thereby permitting the theft of the Class' XRB by the use of Double Withdrawal Transactions;

b. Disclose material information related to the XRB Protocol and the BitGrail Exchange's operation while discussing information, knowledge, and exercising authority on all things XRB-related at panels, conferences, and online social networks;

c. Permit Defendant Firano to shut down the BitGrail Exchange online despite having actual knowledge, or recklessly disregarding, the ongoing theft of XRB from accountholders on the BitGrail Exchange from July 2017 through January 2018;

d. Disclose to Plaintiff and the Class the fact that the Class' XRB was being stolen through use of Double Withdrawal Transactions from July 2017 through January 2018;

e. Take reasonable measures to ensure that the exchanges upon which XRB was bought, sold, and traded employed, utilized, and followed adequate security measures and protocols;

f. Promote secure exchanges that had adequate security measures and protocols for buying, selling, and trading XRB;

g. Refrain from encouraging buying, selling, and trading XRB on exchanges that lacked adequate security;

h. Know or confirm that the material representations and statements regarding BitGrail's safety and security were accurate;

i. Make material representations and statements to Plaintiff and the Class about the lack of safety and security measures and protocols utilized by the exchanges on which XRB was bought, sold and traded;

j. Dissuade the further buying, selling, and trading of XRB on BitGrail after multiple red flags and other issues arose; and

k. Conduct a security audit of the XRB Protocol.

230.    The Nano Defendants' failure to properly exercise the foregoing legal duties of care to Plaintiff and the Class was the proximate cause of the damages suffered by Plaintiff and the Class.

231.    Plaintiff's and the Class's damages total more than $5 million.

## COUNT VIII
### Fraud
### Against Nano Defendants

232. Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 196 above, and further alleges:

233. The Nano Defendants made multiple misstatements and misrepresentations to Plaintiff and the Class, and further, concealed or failed to disclose material information to Plaintiff and the Class that Nano Defendants knew not to be true or did not believe to be true, including, but not limited to:

    a. That BitGrail was a safe, legitimate, and responsible exchange that observed and followed sufficient safety and security measures, protocols and safeguards;

    b. That the Nano Protocol was secure and included adequate safeguards;

    c. That the Class' XRB was being stolen through use of Double Withdrawal Transactions from July 2017 through January 2018;

    d. That Defendant Firano informed the Nano Defendants of the Double Withdrawal Transactions as early as July 2017 and recommended that the BitGrail Exchange be taken offline;

    e. That the Class' funds were safe because the Nano Defendants were working closely with BitGrail to resolve these issues, and that there was no reason for any concern;

    f. That there was no need or reason to relocate or otherwise transfer XRB or any other store of value (e.g., fiat or other cryptocurrency) from BitGrail to other exchanges or wallets;

    g. That Nano Defendants' sale of XRB was for standard operating costs and not for profit; and

    h. That Nano Defendants had only paid themselves reasonable, small salaries and were not taking advantage of their positions to unilaterally pay themselves large and excessive salaries.

234. The Nano Defendants made these misstatements and misrepresentations to Plaintiff and the Class, and concealed or failed to disclose material information to Plaintiff and the Class with the intent to defraud and/or induce Plaintiff and the Class to rely on these misstatements, misrepresentations, and concealment and nondisclosure of material information.

235. Plaintiff and the Class justifiably and detrimentally relied on the Nano Defendants' foregoing false statements and representations, including purchasing, acquiring, and holding their XRB on BitGrail.

236. Plaintiff and the Class suffered damages as a result of their reliance on the Nano Defendants' foregoing statements and representations, including losing all of their respective XRB on or about February 8, 2018.

237. Based on the foregoing, the Nano Defendants are liable to Plaintiff and the Class for damages in excess of $5 million.

### COUNT IX
### Negligent Misrepresentation
### Against Nano Defendants

238. Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 196 above, and further alleges:

239. Nano Defendants made multiple misstatements and misrepresentations to Plaintiff and the Class, and further, concealed or failed to disclose material information to Plaintiff and the Class including, but not limited to:

 a. That BitGrail was a safe, legitimate, and responsible exchange that observed and followed sufficient safety and security measures, protocols and safeguards;

 b. That the Nano Protocol was secure and included adequate safeguards;

 c. That the Class' XRB was being stolen through use of Double Withdrawal Transactions from July 2017 through January 2018;

 d. That Defendant Firano informed the Nano Defendants of the Double Withdrawal Transactions as early as July 2017 and recommended that the BitGrail Exchange be taken offline;

 e. That the Class' funds were safe because the Nano Defendants were working closely with BitGrail to resolve these issues, and that there was no reason for any concern;

 f. That there was no need or reason to relocate or otherwise transfer XRB or any other store of value (e.g., fiat or other cryptocurrency) from BitGrail to other exchanges or wallets;

 g. That Nano Defendants' sale of XRB was for standard operating costs and not for profit; and

h.   That Nano Defendants had only paid themselves reasonable, small salaries and were not taking advantage of their positions to unilaterally pay themselves large and excessive salaries.

240.   The Nano Defendants made these misstatements and misrepresentations to Plaintiff and the Class without any reasonable ground for believing the statements to be true.

241.   Furthermore, the Nano Defendants failed to disclose material information without reasonably believing that the material information should have been withheld or not disclosed to Plaintiff and the Class.

242.   Plaintiff and the Class justifiably and detrimentally relied on the Nano Defendants' foregoing misstatements and misrepresentations, including purchasing, acquiring, and holding their XRB on BitGrail.

243.   Plaintiff and the Class suffered damages as a result of their reliance on the Nano Defendants' foregoing misstatements and misrepresentations, including losing all of their respective XRB on or about February 8, 2018.

244.   Based on the foregoing, the Nano Defendants are liable to Plaintiff and the Class for damages in excess of $5 million.

## COUNT X
### Constructive Fraud
### Against All Defendants

245.   Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 196 above, and further alleges:

246.   The Nano Defendants had a fiduciary relationship with, and owed fiduciary duties or loyalty and care to, Plaintiff and the Class due to their relationship with Plaintiff and the Class, which included but was not limited to:  The Nano Defendants' status as fiduciaries to the class is evidenced by their:

a.   Serving as the primary source of information, knowledge, and authority on all things XRB-related, such as at panels, conferences, online social networks (e.g., Twitter, Reddit, etc.);

b.   Maintaining exclusive control over the XRB Protocol;

c.   Commission of Firano to create the BitGrail Exchange as an XRB dedicated exchange;

    d.   Partnering with the BitGrail Defendants to create the BitGrail Exchange and involvement in maintaining the exchange's XRB-related operations.

    e.   Exercising exclusive control over the decision to list XRB on BitGrail;

    f.   Maintaining superior and unique knowledge of the inadequacy of the XRB Protocol's safeguards—specifically its lack of idempotence—and the BitGrail Exchange's lack of secondary measures to prevent the Double Withdrawal Transactions;

    g.   Updating Nano Protocol to include idempotence on February 16, 2018 after the Class' XRB had already been stolen from exploitation of the Double Withdrawal Transactions;

    h.   Promoting and encouraging Plaintiff and the Class to buy, sell, and trade XRB on BitGrail;

    i.   Making repeated assurances to Plaintiff and the Class that BitGrail was a safe and secure exchange, downplaying and explaining away red flags, and maintaining constant contact and involvement in issues involving trading XRB on BitGrail;

    j.   Having the exclusive ability and acknowledging the need to conduct a security audit of the XRB Protocol;

    k.   Advising the public that the Nano Defendants were contemplating creating and administering trust fund for distribution of XRB;

    l.   Creating a legal fund to help Plaintiff and Class recover their respective losses; and

    m.  Acknowledging that the Nano Defendants were aware that listing on larger exchanges would lead to responsibility for larger damages.

247.    The Nano Defendants engaged in various acts, omissions, and concealments involving the breach of those fiduciary duties owed to Plaintiff and the Class, including but not limited to, failing to:

    a.   Failing to implement idempotence into the XRB Protocol thereby permitting the theft of the Class' XRB by the use of Double Withdrawal Transactions;

    b.   Failing to disclose material information related to the XRB Protocol and the BitGrail Exchange's operation while discussing information, knowledge, and exercising authority on all things XRB-related at panels, conferences, and online social networks;

    c.   Forcing Defendant Firano to keep the BitGrail Exchange online despite having actual knowledge, or recklessly disregarding, the ongoing theft of XRB from accountholders on the BitGrail Exchange from July 2017 through January 2018;

d. Concealing from Plaintiff and the Class the fact that the Class' XRB was being stolen through use of Double Withdrawal Transactions from July 2017 through January 2018;

e. Making repeated assurances to Plaintiff and the Class that BitGrail was a safe and secure exchange, downplaying and explaining away red flags, and claiming to maintain constant contact and involvement in issues involving trading XRB on BitGrail;

f. Failing to conduct a security audit of the XRB Protocol;

g. Creating legal fund to divert attention and blame away from the Nano Defendants; and

h. Failing to take responsibility for damages that arose in connection with listing XRB on BitGrail.

248. Plaintiff and the Class justifiably and detrimentally relied on the Nano Defendants' foregoing acts, omissions, and concealments involving their breaches of the fiduciary duties of care and loyalty owed to Plaintiff and the Class.

249. Plaintiff and the Class suffered damages as a result of their reliance on the Nano Defendants' foregoing acts, omissions, and concealments, including losing all of their respective XRB as disclosed on February 8, 2018.

250. Based on the foregoing, the Nano Defendants are liable to Plaintiff and the Class for damages in excess of $5 million.

## COUNT XI
### Quasi Contract Claim
### Against Nano Defendants

251. Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 196 above, and further alleges:

252. Plaintiff and the Class conferred a benefit on the Nano Defendants through fraud, mistake, coercion, or request, including, but not limited to the Nano Defendants' actions, omissions, and failures to disclose material information, such as:

a. That XRB would revolutionize global payment systems, such usurping the Visa, MasterCard, and Amex credit and debit payment networks by offering instant and immediate payment and settlement of transactions;

b. That BitGrail was a safe, legitimate, and responsible exchange that observed and followed sufficient safety and security measures, protocols and safeguards;

c. That the Nano Defendants were aware of red flags and other safety issues that arose prior to February 8, 2018, and that the Nano Defendants were working closely with BitGrail to resolve these issues, and that there was no reason for any concern;

d. That there was no need or reason to relocate or otherwise transfer XRB or any other store of value (e.g., fiat or other cryptocurrency) from BitGrail to other exchanges or wallets;

e. Failing to disclose that BitGrail lacked sufficient safety and security measures, protocols, and safeguards;

f. Representing to Plaintiff and the Class that BitGrail would safely store custody of Plaintiff's and the Class's respective XRB;

g. Encouraging investing, trading, and holding of XRB on BitGrail as a sensible and reasonable investment strategy;

h. Assuring that all XRB on BitGrail was safely stored;

i. That the Nano Defendants' sale of XRB was for standard operating costs and not for profit; and

j. That the Nano Defendants had only paid themselves reasonable, small salaries and were not taking advantage of their positions to unilaterally pay themselves large and excessive salaries.

253. The Nano Defendants were unjustly enriched by the Plaintiff's and Class' purchase and trading of XRB, because XRB's price appreciated as a result of Plaintiff's and the Class's purchase and trading of XRB, thereby enriching the Nano Defendants with large appreciation of value of their own XRB holdings, the ability of a large market to sell and dump their XRB at a large profit, and potentially obtain fees or payments for directing trading volume at exchanges like BitGrail.

254. It would be inequitable and against the fundamental principles of justice, equity, and good conscience for Defendants to retain the substantial monetary benefits they have received as a result of their misconduct.

255. Based on the foregoing, Plaintiff and the Class suffered damages in excess of $5 million.

256. Defendants should disgorge all benefits conferred upon them as a result of their misconduct to make full restitution to Plaintiff and the Class.

# **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the proposed Class pray for relief and judgment against Defendants, as follows:

A.    Declaring that this action is properly maintainable as a class action and certifying Plaintiff as the Class representative and his counsel as Class counsel;

B.    Declaring that Defendants offered and sold unregistered securities in violation of the federal securities laws;

C.    Declaring Defendants are liable to Plaintiff and the Class under Sections 12(a)(1) and/or 15(a) of the Securities Act;

D.    A judgment awarding Plaintiff and the Class equitable restitution, including, without limitation, rescission of their investments in all XRB held in accounts at BitGrail, restoration of the *status quo ante*, return to Plaintiff and the Class all cryptocurrency or fiat currency they paid as a result of Defendants' unlawful and unfair business practices and conduct;

E.    An award of any and all additional damages recoverable under law -- jointly and severally entered against Defendants -- including but not limited to compensatory damages, punitive damages, incidental damages, and consequential damages;

F.    An Order requiring an accounting of the remaining funds and assets raised from Plaintiff and the Class in connection with XRB;

G.    An Order imposing a constructive trust over the funds and assets rightfully belonging to Plaintiff and the Class;

H.    Awarding pre-judgment and post-judgment interest;

I.    Awarding Plaintiff and the Class reasonable attorneys' fees, expenses, and the costs of this action; and

J.    Granting other relief as this Court may deem just and proper.

# DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury of all claims so triable.

**LEVI & KORSINSKY, LLP**

By:  */s/ Rosanne L. Mah*
Rosanne L. Mah
**LEVI & KORSINSKY, LLP**
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 373-1671
Facsimile: (415) 484-1294

Donald J. Enright (to be admitted *pro hac vice* )
Email: denright@zlk.com
John A. Carriel (admitted *pro hac vice* )
Email: jcarriel@zlk.com
**LEVI & KORSINSKY, LLP**
1101 30th St., NW, Ste. 115
Washington, DC 20007
Telephone: (202) 524-4290
Facsimile: (202) 333-2121

David C. Silver (to be admitted *pro hac vice*)
E-mail: DSilver@SilverMillerLaw.com
Jason S. Miller (to be admitted *pro hac vice*)
E-mail: JMiller@SilverMillerLaw.com
Todd R. Friedman (admitted *pro hac vice*)
E-mail: TFriedman@SilverMillerLaw.com
**SILVER MILLER**
11780 W. Sample Road
Coral Springs, Florida 33065
Telephone:(954) 516-6000

*Counsel for Plaintiff JAMES FABIAN*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing was electronically filed with the Clerk of Court on this   25th   day of July 2019 by using the CM/ECF system and that a true and correct copy will be served via electronic mail to: **PETER SCOOLIDGE, ESQ.**, SCOOLIDGE LLP, *Counsel for Defendants Hieusys LLC d/b/a Nano, Colin LeMahieu, Mica Busch, and Troy Retzer*, 315 W. 36th Street, New York, NY 10018, E-mail: Peter@ScoolidgeLLP.com; **SHAWN NAUNTON, ESQ. and VANESSA GARCIA, ESQ.**, ZUCKERMAN SPAEDER LLP, *Counsel for Defendant Zack Shapiro*, 485 Madison Avenue, New York, NY 10022, E-mail: SNaunton@zuckerman.com; VGarcia@zuckerman.com; and **PAUL J. BYRNE, ESQ.**, CORNERSTONE LAW GROUP, *Counsel for Defendants Hieusys LLC d/b/a Nano, Colin LeMahieu, Mica Busch, Troy Retzer, and Zack Shapiro*, 351 California St, Ste 600, San Francisco, CA 94104, E-mail: PByrne@cornerlaw.com.

    /s/ Rosanne L. Mah
    ROSANNE L. MAH