RYAN M. LAPINE, ESQ. (Cal. Bar No. 239316)
*ryan.lapine@diamondmccarthy.com*
JOSHUA H. HERR, ESQ. (Cal. Bar No. 301775)
*joshua.herr@diamondmccarthy.com*
DIAMOND MCCARTHY LLP
333 South Hope Street, 18th Floor
Los Angeles, CA 90071
Telephone: (424) 278-2335/Facsimile: (424) 278-2339
Attorneys for Plaintiffs NANO FOUNDATION, LTD. and
COLIN LeMAHIEU

Bridget B. Hirsch, Esq. (State Bar No. 257015)
*bhirsch@andersonkill.com*
**ANDERSON KILL CALIFORNIA L.L.P.**
355 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 943-1444/Facsimile: (212) 278-1733

Stephen D. Palley, Esq. (*pro hac vice* application pending)
*spalley@andersonkill.com*
**ANDERSON KILL L.L.P.**
1717 Pennsylvania Ave., NW, Suite 200
Washington, DC 20006
Telephone: (202) 416-6500/Facsimile: (202) 416-6555
Attorneys for Defendant DAVID SILVER

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| NANO FOUNDATION, LTD., a New York non-profit corporation; and COLIN LeMAHIEU, an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>DAVID C. SILVER, an individual,<br><br>Defendant. | Case No. 2:19-cv-04237 MRW<br><br>**JOINT REPORT OF THE PARTIESPURSUANT TO FED.R.CIV.P. 26(f)**<br><br>**HON. MICHAEL R. WILNER** |

**JOINT CASE MANAGEMENT STATEMENT AND RULE 26(f) REPORT**

Pursuant to Federal Rule of. Civil Procedure ("Rule") 26(f), the parties met and conferred telephonically on September 3, 2019.  Ryan M. Lapine participated on behalf of Plaintiffs Nano Foundation, Ltd. and Colin LeMahieu ("Plaintiffs"), and F. Jason Seibert participated on behalf of Defendant David C. Silver ("Defendant").  Bridget B. Hirsh has recently entered an appearance for Mr. Silver.  Stephen D. Palley's pro hac vice Motion will be filed when all certificates of good standing have been received by counsel.  Ms. Hirsch and Mr. Palley, both of whom are with the Anderson Kill law firm, will represent Mr. Silver going forward, including at trial.  Counsel have subsequently met and conferred on several occasions prior to the drafting of this Joint Report.  The parties submit this Joint Case Management Statement and Rule 26(f) Report pursuant to California Central District Local Rule 26-1.

## 1.    JURISDICTION & SERVICE

Plaintiffs assert subject matter jurisdiction over their Compliant pursuant to 28 U.S.C. §1332.  At this time, no parties remain to be served.

## 2.    FACTS

### a.    Plaintiffs' Allegations

This lawsuit results from statements Defendant David C. Silver made during a panel speech at any industry convention, the Blockchain Law Summit, in Los Angeles, California on May 24, 2018, statements now published for public access on YouTube.  During his presentation, Mr. Silver stated "Nano is not really a real coin, they claim to be a real coin but what they couldn't get, uh, any recognition in the United States Coinbase, Kraken, Poloniex, Bitfinex, Gemini, no one was willing to put them on their exchange.  Why?  Cause [sic] they were an alternative coin and they weren't really a real coin."

Mr. Silver's statement was false.  Nano is a pure cryptocurrency, not an ICO or some other form of alternative coin.  Several entities put Nano on their exchanges,

including but not limited to Cryptopia, BitGrail, and KuCoin.  Other exchanges were created solely for the purpose of listing and trading Nano.  Binance, the largest cryptocurrency exchange, lists Nano.  The European company CoinGate integrated Nano into their online cryptocurrency payment system allowing Nano to be used to purchase goods on websites that use CoinGate as a payment provider.  WireX, a European cryptocurrency debit card issuer accepts Nano to fund their debit cards.

Mr. Silver said of the Plaintiffs: "They tell their customers 'if you really believe in Nano….. go to this small exchange in Italy that we don't know anybody and we have nothing to do but we completely vouch for him and he's running a legitimate exchange', we're gonna [sic] give him the Nano, he's gonna [sic] give us money every time he sells a Nano, he's gonna [sic] take half and we're gonna take half, we're gonna [sic] get rich and then one day there's gonna [sic] be an exit scam and then you're gonna [sic] be out $150 million."  None of these statements were true.

Neither Nano, nor any of its executives or team members ever stated to owners of Nano coins or to consumers or to anyone "if you really believe in Nano….. go to this small exchange in Italy that we don't know anybody and we have nothing to do but we completely vouch for him and he's running a legitimate exchange".  They never made these exact statements, nor did they ever make statements to this general effect.  Neither Nano nor any of its executives received any money as a result of consumers trading Nano they owned on the BitGrail exchange or elsewhere.   Nano is a cryptocurrency, not an ICO.

Further, neither Nano Foundation nor Mr. LeMahieu gave Mr. Firano or BitGrail any Nano coins.  Third-party owners of the coins traded them on this exchange.  Neither Nano Foundation nor its executives "got rich" – or obtained any money at all – by virtue of private third-party consumers buying and selling their own Nano on BitGrail.

Nano did not participate in any criminal activity, much less an "exit scam" as

DIAMOND McCARTHY LLP

1  Mr. Silver alleges.  As the audience at the Blockchain Summit would be well aware,

2  in cryptocurrency development, an "exit scam" occurs when the owners of a

3  purported cryptocurrency company intentionally create a coin using faulty

4  technology.  They artificially cause a price increase by making false promises or

5  representations.  They then sell all or substantially all of their holdings for top dollar.

6  They then leave the cryptocurrency unsupported and disappear when it fails due to

7  inadequate technology.  None of that occurred with Nano Foundation and its

8  developers.  The development fund contains over 50% of its initial amount and

9  continues to fund development operations.  The remaining funds have been used to

10  pay employees for service and development of the cryptocurrency.  The Nano is not

11  defective.  Its founders and developers have not left the market or otherwise

12  disappeared from contact.  Instead, the development team has doubled in size in the

13  past year.

14      Mr. Silver went on to say "When [the Nano developers] were asked to fix the

15  problem and fork it [sic], their response was 'it's against our ethos.' … I don't care

16  where [sic] your ethos is, you live in the United states of America, there are laws

17  here, those laws will be followed.  We are now in Federal Court.  When they tell the

18  judge 'well, we don't wanna [sic] give back the money' a Federal Court judge is

19  gonna say 'well if you wanna [sic] stay here and you don't wanna [sic] go to jail,

20  you're gonna [sic] give back the money'."

21      Mr. Silver's statements were not truthful.  The Nano developers and

22  executives, Mr. LeMahieu among them, never stated or implied that it was against

23  their ethos to address and/or fix to the extent they can the third-party BitGrail hack.

24  Instead, when they learned of it, they immediately reported it to the Federal Bureau

25  of Investigation.  They have assisted law enforcement in its efforts to investigate this

26  third-party criminal act.

27      The Nano developers and executives, Mr. LeMahieu among them, cannot and

28  did not say "we do not wanna [sic] give the money back" to a Federal Judge or to

3

1   anyone else, as contrary to Mr. Silver's false statements, they did not receive any
2   funds from the sale of Nano on BitGrail, they certainly did not obtain any of the
3   Nano stolen from BitGrail, and they certainly did not profit from a third-party
4   stealing Nano from BitGrail.

5        Mr. Silver's statement that Mr. LeMahieu and the other Nano developers face
6   the prospect of a jail sentence in a current Federal action is both categorically false
7   and highly inflammatory.  Mr. LeMahieu and the other Nano developers are not even
8   the target of a criminal inquiry, much less in Federal court on criminal charges.  They
9   are parties to a civil action that seeks monetary damages against them for the third-
10  party hack of BitGrail.  Mr. Silver's false statement to a convention full of their
11  industry peers and colleagues that they face the prospect of incarceration in Federal
12  Court related to the BitGrail hack – that they committed a crime – has greatly
13  damaged their reputations, has affected their professional prospects, has caused them
14  emotional distress, and has caused them considerable shame.

15       Mr. Silver continued "Uhhhhh Nano, the CEO and the head guy at Nano who
16  holds 90% of the Nano at like $15 it was worth $1.4 billion, I think it's down to like
17  $4, so I think it's only worth like $400,000,000 now.  Uhhh, he got divorced from his
18  wife last year.  He decided that he was ready.  He deserved better because he was
19  now rich.  She took all the money.  And then, the financial affidavit, she, they,
20  argued about how much the Nano was worth and what the Nano was.  But I will tell
21  you this: he said it had value and he said that he believed it was going up and he
22  believed it was a security cause [sic] he put it on his security side of the affidavit."

23       Mr. Silver's statements were not truthful.  Mr. LeMahieu does not own 90% of
24  the Nano coins in circulation.  He owns less than 2% of the Nano in circulation.  Mr.
25  LeMahieu did not divorce his wife because he was rich.  In fact, at the time of their
26  divorce, Nano lacked any value at all and was not traded on any exchange.  The
27  Nano was not discussed in any financial affidavit in their divorce.  Mr. Silver's
28  claims to the contrary are false.

RULE 26(f) JOINT REPORT OF THE PARTIES

1   It was not listed anywhere in any affidavits, much less on the "security side" of
2   the affidavit.  Mr. LeMahieu did not say that the Nano had value in his divorce
3   filings.  At the time, it did not.  Mr. LeMahieu did not say that he believed the Nano
4   was going up in his divorce filings.  At the time of his divorce, he did not believe
5   that, nor did he have any reason to believe that.  It was not even on an exchange, yet.
6   Mr. LeMahieu did not say that it was a security.  It is a cryptocurrency, not an ICO.

7   Mr. Silver's false statements regarding Mr. LeMahieu's divorce to a
8   convention full of his industry peers and colleagues have caused him considerable
9   emotional distress, have greatly damaged his reputation, and have caused him
10  considerable shame.

11  **b.    Defendant's Response**

12  Defendant expressly denies Plaintiffs' allegations and contests Plaintiffs'
13  claims for damages.  The comments Defendant made at the May 24, 2018
14  Blockchain Law Summit were either true, were mere hypotheticals or hyperbolic
15  statements of opinion, and/or were forms of constitutionally-protected speech.
16  Defendant denies that he defamed Plaintiffs, denies that Plaintiffs suffered trade
17  libel, and denies that Defendant interfered with any purported economic advantage
18  claimed by Plaintiffs.

19  Mr. Silver's comments at the May 24, 2018 Blockchain Law Summit were an
20  outgrowth of his work on the First Nano Lawsuit (*Brola v. Nano, et al.*, U.S. District
21  Court - E.D.N.Y. - Case No: 1:18-cv-02049-NG-RML).   In a class action lawsuit
22  commenced in April 2018 and concluded in October 2018 -- the law firm Silver
23  Miller -- of which Attorney Silver is a Founding Partner -- represented the plaintiff
24  and putative plaintiff class against cryptocurrency start-up company NANO f/k/a
25  RAIBLOCKS f/k/a HIEUSYS, LLC, a Texas company ("NANO") and certain key
26  members of NANO's core team of developers and executives (collectively, "the
27  NANO Core Team") including, among others, Colin LeMahieu.  The action (the
28  "First NANO Lawsuit") was brought under the Private Securities Litigation Reform

DIAMOND McCARTHY LLP

5

1  Act of 1995, as amended (the "PSLRA"), and alleged violations of Sections 12(a)(1)
2  and 15(a) [15 U.S.C. §§ 77l(a)(1), 77o(a)] of the Securities Act of 1933 (the
3  "Securities Act") stemming from the alleged sale of unregistered securities in the
4  form of a cryptocurrency called Nano (f/k/a RaiBlocks) [XRB], which was
5  developed and promoted by the NANO Core Team but never registered with, or
6  exempted from registration by, any regulatory authority.

7      None of the statements Mr. Silver made are defamatory or "trade libel."  For
8  example, plaintiff complains about the statement "Nano is not really a real coin, they
9  claim to be a real coin but what they couldn't get, uh, any recognition in the United
10 States Coinbase, Kraken, Poloniex, Bitfinex, Gemini, no one was willing to put them
11 on their exchange.  Why?  Cause [sic] they were an alternative coin and they weren't
12 really a real coin."  Whether or not something is or is not a "real coin" is a matter of
13 opinion.  In fact, defendant believes that the evidence will show that not Nano is an
14 investment contract under the Securities Act of 1933 and that the so-called "faucet"
15 used by Nano was an "air drop" that meets the three step test set forth in *SEC v.*
16 *Howey*, 328 U.S. 293 (1946) and its progeny.  This is consistent with recent SEC's
17 guidance.  See "Framework for 'Investment Contract' Analysis of Digital Assets,
18 available at https://www.sec.gov/corpfin/framework-investment-contract-analysis-
19 digital-assets ("the lack of monetary consideration for digital assets, such as those
20 distributed via a so-called "air drop," does not mean that the investment of money
21 prong is not satisfied; therefore, an airdrop may constitute a sale or distribution of
22 securities.  In a so-called "airdrop," a digital asset is distributed to holders of another
23 digital asset, typically to promote its circulation.")

24      As a security it would be more than fair to state that this token is not a cash
25 substitute that can be used in lieu of fiat currency.  Mr. Silver was also correct that
26 Nano was not listed on any of the referenced United States exchanges.  In short, this
27 statement is either a protected statement of opinion or (as Mr. Silver believes the
28 evidence will show) a non-actionable statement of fact.

RULE 26(f) JOINT REPORT OF THE PARTIES

The remainder of Plaintiff's claims crumble with similar analysis – Mr. Silver never said that the Plaintiffs were going to be arrested.   The notion that Nano was damaged by Mr. Silver's statements is not only absurdly speculative but belied by the very complaint in this lawsuit, which states that Nano has a "sterling reputation." (See, Complaint, ¶ 39:  "Nano is now traded and continues to be traded on dozens of exchanges. Additional new exchanges, included ones dedicated solely to Nano, have begun to appear given the coin's sterling reputation.")  The notion that the Plaintiffs suffered damage, harm or shame from a ten second speculative imaginary statement by a lawyer responsible suing them that was heard by 30 people and viewed less than 100 times on Youtube is absurd. This is probably why the damages allegations in the Complaint are threadbare.

Here's what actually happened: plaintiffs ran an unregistered securities offering for cryptocurrency that was stolen from an exchange to which they sent their users.  Upset by statements made by the plaintiff's lawyer who filed suit for people who lost money because of their malfeasance, plaintiffs decided to take revenge by filing this lawsuit.  They have suffered no harm, compensable or otherwise, and have woven outrage out of thin air in the very same way that they created millions of dollars in wealth from an unregistered securities offering for a cryptocurrency token.

**3.** **LEGAL ISSUES**

(1)     Whether the comments made by Defendant Silver about Plaintiff LeMahieu at the May 24, 2018 Blockchain Law Summit constitute defamation.

(2)     Whether the comments made by Defendant Silver at the May 24, 2018 Blockchain Law Summit constitute trade libel against Plaintiff Nano Foundation Ltd.

(3)     Whether Defendant Silver intentionally interfered with Plaintiff LeMahieu's prospective economic advantage.

(4)     Whether the Settlement Agreement and Release executed in the First Nano Lawsuit (*Brola v. Nano, et al.*, U.S. District Court - E.D.N.Y. - Case No: 1:18-cv-02049-NG-RML) releases claims against Defendant Silver.

1    (5)    Whether Plaintiffs suffered damages.

2    **4.    MOTIONS**

3    Plaintiffs anticipate filing a motion pursuant to Federal Rules of Civil

4    Procedure 56.

5    Defendant anticipates filing a motion for summary judgment, or in the

6    alternative, a motion for summary adjudication. Defendant anticipates filing a Rule

7    42 Motion to consolidate this matter with *Fabian v. Nano, et al.*, U.S. District Court -

8    N.D. Cal. - Case No.: 4-19-cv-00054-YRG.  In the alternative, Defendant will seek a

9    stay until the Fabian case is resolved.

10    **5.    AMENDMENT OF PLEADINGS**

11    The Parties do not anticipate adding new parties or causes of action.

12    **6.    EVIDENCE PRESERVATION**

13    The parties have discussed the scope of anticipated discovery, including

14    discovery of electronically stored information ("ESI").  The parties have conferred

15    pursuant to Rule 26(f) regarding reasonable and proportionate steps to preserve

16    evidence relevant to the issues reasonably evident in this action.  The Parties have

17    discussed and anticipate agreeing on protocols for the production of ESI.

18    **7.    DISCLOSURES**

19    The parties have agreed to exchange Initial Disclosures pursuant to Rule

20    26(a)(1) on or before November 5, 2019.

21    **8.    DISCOVERY**

22    The Parties intend to take depositions and propound written discovery, the

23    parties have already served written discovery on one another. The Parties do not

24    believe formal phases of discovery or limiting or focusing of discovery are

25    necessary.

26    **9.    RELATED CASES**

27    Plaintiffs dispute that any separate matters are related to the instant litigation;

28    they assert that this is a simple libel and intentional interference case regarding

DIAMOND McCARTHY LLP

1    statements made exclusively at an industry conference.

2         Defendant contends the First Nano Lawsuit (*Brola v. Nano, et al.*, U.S. District

3    Court - E.D.N.Y. - Case No: 1:18-cv-02049-NG-RML) -- and the allegations set

4    forth in the pleadings therein -- is related to the instant matter.  Additionally,

5    Defendant contends the Second Nano Lawsuit (*Fabian v. Nano, et al.*, U.S. District

6    Court - N.D. Cal. - Case No.: 4-19-cv-00054-YRG) -- and the allegations set forth in

7    the pleadings therein -- is likewise related to the instant matter.

8         **10.    CLASS ACTION**

9    This is not a class action.

10        **11.    COMPLEX CASE**

11   This is not a complex case.

12        **12.    RELIEF**

13        A.     Plaintiffs seek the following relief for the claims alleged in the

14   Complaint:

15        1.     Actual, compensatory, and consequential damages.

16        2.     Punitive and exemplary damages.

17        3.     Costs incurred in prosecuting this lawsuit; and

18        4.     Such other relief as this Honorable Court deems just and proper.

19   Defendant believes Plaintiffs are not entitled to any damages in this action.

20        **13.    SETTLEMENT AND ADR**

21        Counsel have conferred regarding the prospects of settlement.  Defendant has

22   offered to engage in in person early mediation in Los Angeles prior to continuing

23   discovery.  Plaintiff has declined to mediate at this time and believes that some

24   discovery must be completed before meaningful settlement discussions can occur.

25        **14.    CONSENT TO MAGISTRATE JUDGE FOR ALL PURPOSES**

26        The parties have voluntarily consented to using The Honorable Michael R.

27   Wilner for all purposes.

28

*DIAMOND McCARTHY LLP*

9
RULE 26(f) JOINT REPORT OF THE PARTIES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**15.** **SCHEDULING**

Based on the scheduling conflicts of the parties' counsel and of Defendant Silver, who himself is an active trial lawyer, the parties recommend the following schedule based on Judge Wilner's availability and approval:

| | |
|---|---|
| Rule 26(a)(1) disclosures | November 5, 2019 |
| Fact Discovery Cut-off Date | February 28, 2020 |
| Mediation Completion Deadline | March 6, 2020 |
| Dispositive Motions Filing Deadline | March 13, 2020 |
| Rule 26(a)(2) Expert Witness Opening Report(s) | March 27, 2020 |
| Rule 26(a)(2) Expert Witness Rebuttal Report(s) | April 10, 2020 |
| Expert Witness Discovery Cut-off | April 24, 2020 |
| Rule 16 Pretrial Conference | May 18, 2020 |
| Jury Trial Commences | June 15, 2020 |

**16.** **TRIAL**

Both parties have demanded trial by jury.  The Parties anticipate needing five trial days.  Ryan M. Lapine and Joshua H. Herr will try this matter on behalf of Plaintiffs; and Bridget Hirsch and Stephen D. Palley of Anderson Kill will try this matter on behalf of Defendant (Mr. Palley's pro hac vice Motion will be filed shortly, pending receipt of all good standing certificates)

///

///

///

DIAMOND McCARTHY LLP

10

## 17.   **OTHER MATTERS**

None at this time.

Dated: October 24, 2019

Respectfully submitted,

<table>
<tr>
<td>

_/s/  Ryan M. Lapine_

Ryan M. Lapine, Esq.
(Cal. Bar No. 239316)
ryan.Lapine@diamondmccarthy.com
Joshua H. Herr, Esq.
(Cal. Bar No. 301775)
joshua.Herr@diamondmccarthy.com
DIAMOND McCARTHY LLP
333 S. Hope Street
Los Angeles, California 90071
Telephone:  (424) 278-2355
Facsimile:  (424)278-2339

Attorneys for Plaintiffs Nano
Foundation, Ltd. and Colin LeMahieu

</td>
<td>

_/s/    Bridget B. Hirsch_

Bridget B. Hirsch, Esq.
(State Bar No. 257015)
bhirsch@andersonkill.com
ANDERSON KILL CALIFORNIA
L.L.P.
355 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 943-1444
Fax: (212) 278-1733

Attorneys for Defendants David S.
Silver

</td>
</tr>
</table>

936919v1

11